UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 09-335 (RJL) |
| | : | |
| v. | : | |
| | : | |
| AMARO GONCALVES, *et al.*, | : | |
| | : | |
| Defendants. | : | |

GOVERNMENT'S RESPONSE TO MOTIONS TO
COMPEL AND MOTION FOR BILL OF PARTICULARS

DENIS J. McINERNEY
Chief, Fraud Section

HANK BOND WALTHER
Acting Deputy Chief
LAURA N. PERKINS
JOEY LIPTON
Trial Attorneys
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Avenue N.W.
Washington, D.C. 20530

RONALD C. MACHEN JR.
United States Attorney

MATTHEW C. SOLOMON
Assistant United States Attorney
Fraud & Public Corruption Section
United States Attorney's Office
555 4th Street, N.W., Room 5233
Washington, D.C. 20530

## TABLE OF CONTENTS

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.      Recorded Telephone Calls and Text Messages . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B.      Recorded Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        C.      Emails and Documents for the Country A Deal and Historical Deals . . . . . . . . . 6

        D.      Arrest-Related Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        E.      Documents Related to Individual 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        F.      Individual 1 Documents While Employed at Armor . . . . . . . . . . . . . . . . . . . . . 8

        G.      Documents Related to the Undercover Investigation . . . . . . . . . . . . . . . . . . . . 9

        H.      Search Warrant Materials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        I.      UK Search Warrants Materials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        J.      Prison Calls and Bank Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        K.      Additional Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

MOTIONS TO COMPEL DISCOVERY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.    Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        A.      Rule 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        B.      Brady and Giglio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        C.      Jencks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

II.    Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        A.      Internal Documents Relating to Individual 1 and the Undercover Operation . . . 16

i

1.     Individual 1 Management Documents Have Been Produced  . . . . . . . . 17

2.     Internal FBI and DOJ Reports Are Not Subject to Discovery . . . . . . . . . 20

       a.     Rule 16(a)(2) Exempts Disclosure . . . . . . . . . . . . . . . . . . . . . . . . 20

       b.     No Showing of Materiality under Brady . . . . . . . . . . . . . . . . . . . 23

           1.     Management of Individual 1  . . . . . . . . . . . . . . . . . . . . . . 25

           2.     Management of the Undercover Operation  . . . . . . . . . . . 26

           3.     On-Site Review of the Undercover Operation . . . . . . . . 27

           4.     Accounting of the Undercover Operation  . . . . . . . . . . . 29

           5.     FBI and DOJ Guidelines, Manuals and Policies  . . . . . . 31

           6.     Summaries and Transcripts of Calls and Meetings  . . . . . 34

       c.     No Brady Found in Internal FBI and DOJ Files  . . . . . . . . . . . . 35

B.     Armor Is Entitled to Assert a Claim of Privilege . . . . . . . . . . . . . . . . . . . . . . . . 35

     1.     Background  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

     2.     Mushriquis' Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

     3.     Giordanella's Argument  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

C.     Defendants Are Not Entitled to Documents Produced
by Individual 1 and His Attorneys and Communications
Between Individual 1's Attorneys and DOJ and SEC . . . . . . . . . . . . . . . . . . . . 42

D.     Defendants Are Not Entitled to Documents
or Information of Prospective Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

E.     Defendants Are Not Entitled to Individual 1's Tax Returns . . . . . . . . . . . . . . . 46

F.     Defendants Are Not Entitled to Further Documents Reflecting
Assistance in Obtaining or Renewing Licenses and Registrations  . . . . . . . . . 52

G.     Defendants Are Not Entitled to Records from CIA and Other Agencies  . . . . . . 54

H.  Defendants Are Not Entitled to Individual 1's Bank Records . . . . . . . . . . . . . . . 57

I.  Defendants Are Not Entitled to Individual 1's Drug and Alcohol Records  . . . . 57

J.  Defendants Are Not Entitled to Search Warrant Affidavits  . . . . . . . . . . . . . . . 59

K.  Defendants Are Not Entitled to
    Correspondence Between Mishkin and Attorneys . . . . . . . . . . . . . . . . . . . . . . . . 61

L.  Defendants Are Not Entitled to Duplicate Images of Their Computers  . . . . . . . 62

M.  Government Has Produced the Emails from FBI Avondale Account . . . . . . . . . 62

N.  Requests for Documents that Have Been Produced or Do Not Exist  . . . . . . . . . 63

BILL OF PARTICULARS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

I.  Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

II.  Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

A.  Defendants Are Not Entitled to Specific Details of Overarching Conspiracy  . . 66

B.  Request for Names of Unindicted Co-Conspirators is Premature and
    Pretrial Disclosure of Co-Conspirators' Overt Acts is Unwarranted  . . . . . . . . 72

    1.  Names  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

    2.  Co-Conspirator Overt Acts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 09-335 (RJL) |
| | : | |
| v. | : | |
| | : | |
| AMARO GONCALVES, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

GOVERNMENT'S RESPONSE TO MOTIONS TO
COMPEL AND MOTION FOR BILL OF PARTICULARS

The United States of America, by and through its undersigned attorneys, submits this response to the defendants' motions to compel and motion for bill of particulars in the above-captioned case. To date, the government has complied with, and in many instances far exceeded, its obligations under Rule 16 of the Federal Rules of Criminal Procedure and will continue to do so in disclosing supplemental discovery. Notwithstanding the liberal and significant production of discovery, in their motions the defendants impermissibly attempt to expand the scope of Rule 16 and request documents that are not properly subject to discovery.

Under the guise of a bill of particulars, the defendants seek a detailed accounting of the government's expected proof at trial although they are not entitled to such details. Through the particularized superseding indictment and the production of substantial discovery, the government has more than satisfied its obligation to put the defendants on notice as to the charges against them.

For these reasons, as set forth below, the defendants' motions to compel discovery and motion for bill of particulars should be denied except to the extent otherwise indicated in this response.

BACKGROUND

I.      Charges

On December 11, 2009, following a two-and-a-half year undercover investigation into corruption in the military and law enforcement products industry, a grand jury returned 16 indictments charging 22 defendants involved in a multi-million dollar scheme. Each indictment charged one count of conspiracy to violate the Foreign Corrupt Practices Act ("FCPA"), one or more substantive counts to violate the FCPA, and one count of conspiracy to commit money laundering. On January 18, 2010, the defendants were arrested in Las Vegas, Nevada, except for one defendant, who was arrested in Miami, Florida.

On April 17, 2010, a grand jury returned a superseding indictment charging all of the defendants together. The superseding indictment charged the same crimes as in the original indictments but provided additional facts related to the charged conduct. The 32-page "speaking" indictment contains detailed information about the nature of the charged conspiracy, the manner in which the defendants carried it out, and the acts undertaken in furtherance of the illegal scheme. It names each of the charged conspirators and provides the pseudonyms used by the undercover agents during the investigation.

The superseding indictment provides detailed information about the defendants and their affiliated companies. (See Superseding Indictment ¶¶ 2-24.) It sets forth the approximate duration of the conspiracy (May 2009 to January 2010), indicates the object of the conspiracy, details the manner and means by which the defendants sought to fulfill that object, and catalogues over 100 overt acts undertaken in furtherance of the conspiracy in a manner that indicates which defendants participated in which overt acts. (See id. ¶¶ 29, 30(a)-(o), 31(a)-(m).)

2

The "manner and means" section of the superseding indictment lays out in detail how the conspiracy progressed, with a series of meetings between the defendants and a cooperating witness and undercover agents; agreements to ship specific supplies to a country in Africa and to pay a "commission" to a purported foreign official in connection with those shipments; the creation of two sets of invoices with one containing the true price of the goods sold and the other adding a 20 percent mark-up to include the bribe; a reception in Washington, D.C., attended by most of the defendants, where those present were personally thanked by a person they believed to be a representative of the foreign government; and a meeting in Las Vegas, Nevada, attended by 21 of the 22 defendants, at which the defendants expected to meet with the Minister of Defense of the foreign country and receive partial payment for second phase of the corrupt deal. (See id. ¶¶ 30 (a)-(o).)  The "manner and means" section also reveals how one of the conspirators would share in a portion of the corrupt "commission" that each of the defendants agreed to pay and explains how some of the conspirators directly worked together to attain the conspiracy's goal.  (See id. ¶¶ 30(a), 30(j)-(k).)

The "overt acts" section of the superseding indictment amplifies the concerted conduct undertaken by all conspirators by laying out in detail dates and locations of meetings between each defendant and the cooperating witness and undercover agents where the terms of the corrupt deal were discussed; communications initiated by the defendants to launch the first phase of the corrupt deal; notifications the defendants provided indicating that the goods they agreed to supply had been sent; wire transfer information regarding the corrupt payments used to facilitate the deal; information related to meetings that the defendants had where they were informed that the "commission" to the foreign official had been received; mailings by the defendants to initiate

the corrupt second phase of the $15 million deal; and the defendants' travel to Las Vegas, Nevada, in connection with the deal.  (See id. ¶¶ 31(a)-(m).)  This section also reveals how some of the defendants worked together to facilitate the corrupt scheme.  (See id. ¶¶ 31(a)(2), 31(a)(4), 31(a)(12), 31(a)(15), 31(a)(16), 31(f), 31(i).)

II.     Discovery

        The government has produced exceptionally thorough discovery in this case, well beyond the requirements of Rule 16.  The government has produced discovery at its own expense and most of it on an expedited basis.  The government has produced the bulk of the materials in electronic form for the convenience of the parties and provided discovery aids, such as indexes, to facilitate review.  The government has made itself available to meet with the defendants to identify and explain the relevant discovery, and has done so with every defendant who has made such a request.

        A.      Recorded Telephone Calls and Text Messages

        The government has produced to the defendants all of the audio recordings of the telephone conversations and all of the existing text messages in the course of the undercover investigation in this case.  The government has produced all of the recorded telephone conversations between the cooperating witness, identified as "Individual 1" in the indictment, and the defendants, and between the undercover agents and the defendants.  The government also has produced all of the recorded telephone conversations between Individual 1 and any other individual who was not charged in this case, and between the undercover agents and any other individual who was not charged in this case.  Finally, the government has produced all of the recorded telephone conversations between Individual 1 and the undercover agents, and

4

between Individual 1 and the Federal Bureau of Investigation ("FBI") agents who were handling Individual 1 during the investigation.

The government has produced to the defendants the text messages between Individual 1 and the defendants. The government also has produced the text messages between Individual 1 and any other individual who was not charged in this case. Finally, the government has produced the text messages between Individual 1 and the undercover agents, and between Individual 1 and the FBI agents.

To assist the defendants in identifying and locating recordings among the approximately 24,000 telephone conversations and identifying and locating messages among the approximately 5,000 text messages, the government has provided indexes of all of the telephone calls and text messages. Those indexes are organized by call or text session in chronological order according to date and searchable by participant and date. The indexes also identify, where possible, telephone calls that did not connect or were of no duration, as well as telephone calls and text messages that were not recorded due to a malfunction with the recording equipment.

B.    Recorded Meetings

The government has produced to the defendants all of the audio and video recordings of meetings in the course of the undercover investigation in this case. The government has produced all of the audio and video recordings of meetings with Individual 1and the defendants, and meetings with the undercover agents and the defendants. The government also has produced all of the audio and video recordings of meetings with Individual 1 and any other individual who was not charged in this case, and meetings with the undercover agents and any other individual who was not charged in this case.

5

To assist the defendants in identifying and locating recordings among the approximately 615 audio and video recordings of the approximately 230 meetings, the government has provided an index organized by defendant and searchable by participant and date.  Further, the government has met and conferred with any defendant who has requested assistance in locating or identifying relevant recordings.

C.    Emails and Documents for the Country A Deal and Historical Deals

The government has produced to the defendants emails and documents relating to the defendants' participation in the Country A deal charged in the indictment, as well as in uncharged historical deals.[1]  The government has produced the emails between Individual 1 and the defendants, and between the undercover agents and the defendants.  The government also has produced the emails between Individual 1 and any other individual who was not charged in this case, and between the undercover agents and any other individual who was not charged in this case.  Finally, the government has produced the emails between Individual 1 and the undercover agents, and between Individual 1 and the FBI agents.  While those emails were originally produced from the government's files, the government took the additional step of obtaining from the providers the email accounts of Individual 1 and the undercover agents to ensure that all of the emails were provided to the defendants in one complete set.

The government has produced to the defendants the quotes, invoices and purchase

---

[1]    During the course of the undercover investigation but before the conduct charged in the indictment, the FBI changed Individual 1's email account to increase its storage capacity and sought to transfer emails from the prior account.  During the transfer, some of Individual 1's emails were lost and could not be recovered.  The government has produced to the defendants the FBI reports documenting the transfer, loss and attempted recovery of those emails.  This section refers to the emails currently in existence, all of which the government has produced in discovery.

6

agreements for the products supplied by the defendants in the Country A deal.  The government

also has produced photographs of the items the defendants sold in Phase I of the Country A deal.

The government has made those physical items, as well as additional samples that were provided

by certain defendants in advance of Phase I, available to the defendants for inspection and

photographing.

      D.     <u>Arrest-Related Documents</u>

The government has produced to each defendant the FBI 302 report memorializing his or

her post-arrest statement along with the interviewing agent's notes, and has made the reports and

notes memorializing the post-arrest statements of the co-defendants available upon request.  The

government has produced to each defendant the documents seized from the defendant at the time

of his or her arrest.  The government has produced photographs of the whiteboard at the jail in

Las Vegas, Nevada, used to track the defendants' movements while they were detained and

processed following their arrests, as well as an FBI report explaining the abbreviations used on

the whiteboard.  The government also has produced to each defendant a copy of his or her

criminal record where the government is aware such record exists.

      E.     <u>Documents Related to Individual 1</u>

The government has produced to the defendants in excess of 6,600 pages of documents

relating to Individual 1.  Those documents include: (1) materials relating to the Country A deal,

such as product materials, quotes, invoices, purchase orders and agreements, export paperwork,

letters, emails and notes; (2) Individual 1's files relating to historical deals with the defendants

and others, which include product materials, quotes, invoices, licensing paperwork, purchase

agreements, letters, emails, notes, and bank records corresponding to those deals; (3) FBI reports

and notes from Individual 1's proffers and debriefings; (4) personal services agreements between the FBI and Individual 1; (5) FBI reports and other paperwork documenting money paid by the FBI to Individual 1 for service and expenses with accompanying expense receipts; (6) Individual 1's drug test results while working with the FBI; (7) FBI reports authorizing Individual 1's participation in illegal activity and admonishments provided to Individual 1; (8) Individual 1's immunity agreement with the authorities in the United Kingdom; (9) FBI reports relating to Individual 1's international travel; (10) FBI reports documenting contact between the FBI agents and Individual 1; (11) Individual 1's information, plea agreement and statement of offense; (12) Individual 1's bank records and telephone bills; (13) Individual 1's emails and Skype text messages; and (14) Individual 1's notes.  The emails and text messages are in addition to those produced in connection with the undercover operation discussed above.

While telephone bills for Individual 1 were originally produced from the FBI's files, the government took the additional step of obtaining from the telephone carriers the records for the telephone Individual 1 used in connection with the undercover operation, as well as the records for his personal telephone.

F.       Individual 1 Documents While Employed at Armor

The government has produced documents provided by Individual 1 to the government from the time period when Individual 1 was employed at Armor Holdings, Inc. ("Armor"), before he began cooperating with the government.  Those documents include financial statements, bank account statements and associated documents, W2s, amended tax returns, and notes.

The government is in possession of documents provided by Armor to the government in

8

connection with the company's voluntary disclosure of possible illegal conduct by Individual 1.

The government also is in possession of Armor documents provided by Individual 1.  Armor has

agreed to the production of some of those documents subject to a protective order with the

defendants.  Armor also has sought to withhold production of other documents based on a claim

of privilege, confidentiality or other concern relating to the disclosure of the documents.  While

many of the documents provided to the government by Armor and Individual 1 are not subject to

disclosure, the government has agreed to produce all of the documents pending the resolution of

Armor's privilege claims.

       G.     Documents Related to the Undercover Investigation

The government has produced to the defendants numerous documents related to the

undercover investigation, including FBI administrative documents relating to Individual 1 and

the undercover operation; FBI 302 and FBI 1023 reports of Individual 1's proffers and

debriefings relating to information pertaining to, and contacts with, the defendants and others;

records from the bank accounts used in the undercover investigation; electronic communications;

and FBI on-site reports reviewing the undercover operation.  In addition, the government has

produced FBI 209 cooperating witness contact reports and FBI 1040 request for otherwise illegal

activity reports, described above with respect to the documents relating to Individual 1.

       H.     Search Warrant Materials

The government has produced the materials seized from search warrants executed at 13

locations in connection with the undercover investigation in this case.  In doing so, the

government has provided over 242,000 pages or in excess of 90 boxes of seized documents in

electronic format and returned over 75 computers, servers and other electronic media, including

USB drives, zip discs, memory cards and DVDs, to the relevant defendants.  The government

also has produced to the defendants the photographs taken in connection with the execution of

the search warrants, the accompanying photograph logs, as well as the search diagrams and

seizure inventories.  In addition, the government has returned to the defendants the computers

that were searched pursuant to the defendants' consent at the time of their arrest.  Finally, the

government has unsealed and produced to the relevant defendants the search warrant affidavits

relating to the searches of the businesses and residences of those defendants who have requested

the affidavits.

Because several defendants have raised the issue that the search materials may contain

privileged information, the government, upon notice to the defendants and the Court, has

implemented filter team procedures designed to protect potentially privileged information and

ensure that the prosecution team is not exposed to it.

I.      UK Search Warrants Materials

The City of London Police executed seven search warrants in the United Kingdom on the

date of the defendants' arrest in connection with its own investigation.  Those searches were

conducted by the United Kingdom authorities and were not done at the direction of the United

States authorities.  The government has requested the materials seized in those searches and

recently filed a motion with the Court seeking an extension of time in which to receive them.[2]  If

and when the government receives those materials, it will produce all discoverable materials to

the defendants.

---

[2]      All of the defendants who reside in the United Kingdom have returned home and
received copies of the seized materials from the United Kingdom authorities.

J.      Prison Calls and Bank Records

The government has produced to each defendant the recorded telephone calls obtained by the government of each defendant while in custody following his or her arrest, and has made the telephone calls of the co-defendants available upon request.  Before doing so, the telephone calls were reviewed for privileged information by filter team agents.  The government also has produced to each defendant the bank records obtained by the government for each defendant.

K.      Additional Discovery

To the extent the government comes into possession of additional discovery materials, it will produce them to the defendants.  The government has already advised the defendants and the Court that it has subpoenaed documents, including records from companies in the law enforcement and military products industry, in connection with the undercover investigation and is receiving materials in response to those requests on a rolling basis.  The government will continue to produce discoverable materials to the defendants as they are received and reviewed by the government.

MOTIONS TO COMPEL DISCOVERY

The defendants filed six motions to compel.  Defendant Stephen Giordanella filed a motion that was joined in by 15 other defendants.  Defendants John and Jeana Mushriqui filed a separate joint motion.  Defendants John Godsey and Mark Morales filed a joint motion and indicated that they joined in and adopted the motions by Giordanella and the Mushriquis. Defendant John Wier, who was not identified as joining in the motion by Giordanella, filed a motion and indicated that he adopted the motions by Giordanella and the Mushriquis.  Defendant Andrew Bigelow filed a motion and indicated that he joined in the motions by Giordanella and

11

the Mushriquis.  Defendant Pankesh Patel filed a motion merely indicating that he adopted the motion by Giordanella.[3]

In their motions, the defendants seek well over 50 separate categories of documents, information and other materials requested by the Mushriquis (10 categories), Giordanella (25), Godsey and Morales (10), Wier (29), and Bigelow (4).  Only the Mushriquis and, to a lesser extent, Bigelow, tie their argument to specific categories of materials and attempt to support it with any authority.  Giorandella and Godsey and Morales provide a general discussion of discovery and <u>Brady</u> and then conclude, without any meaningful argument or supporting caselaw, that they are entitled to the requested categories.  Wier does not even attempt to offer any argument and flatly admits that some of his requests are outside the scope of Rule 16.

As an initial matter, all of the defendants seek categories of materials that, as the government has previously indicated to the defendants, do not exist, are not in the possession, custody or control of the government, or have already been produced to the defendants.  The defendants make requests for other categories of materials that are premature, overly broad or lacking in factual or legal support.  The remaining categories of materials, with limited exceptions, fall well outside the bounds of Rule 16 or are not otherwise properly subject to discovery under the circumstances.[4]

---

[3]        The remaining defendants, Daniel Alvirez, Jonathan Spiller and Haim Geri, did not file or join in a motion to compel.

[4]        Despite its requests, the defendants have failed to produce any discovery to the government.  Having requested discovery under Rule 16(a), the defendants are obligated to produce reciprocal discovery to the government in accordance with Rule 16(b).

I.      Legal Standard

Discovery in federal criminal cases is governed by the Federal Rules of Criminal Procedure, federal statutes, and caselaw.  See, e.g., Fed. R. Crim. P. 16; 18 U.S.C. § 3500; Giglio v. United States, 405 U.S. 150 (1972); Brady v. Maryland, 373 U.S. 83 (1963).  Therefore, "in most criminal prosecutions, the Brady rule, Rule 16 and the Jencks Act exhaust the universe of discovery to which the defendant is entitled."  United States v. Presser, 844 F.2d 1275, 1286 n.12 (6th Cir. 1988); see United States v. Tarantino, 846 F.2d 1384, 1418 (D.C. Cir. 1988) ("We decline to extend the defendant's right to discovery beyond that required by statute or the Constitution.").

A.      Rule 16

"Rule 16 delineates the specific categories of documents and materials the Government must make available to a defendant on request prior to trial, including a defendant's oral, written or recorded statements, prior criminal records, documents and objects that are material to prepare the defense or will be used in the Government's case-in-chief at trial, and summaries of the Government's anticipated expert testimony, among other disclosure requirements."  United States v. Pineda, No. 04 CR 232 (TFH), 2006 WL 825778, at *2 (D.D.C. Mar. 29, 2006) (citing Fed. R. Crim. P. 16).

It is understood that "[t]he language and the spirit of the Rule are designed to provide to a criminal defendant, in the interest of fairness, the widest possible opportunity to inspect and receive such materials in the possession of the government as may aid him in presenting his side of the case."  United States v. Poindexter, 727 F. Supp. 1470, 1473 (D.D.C. 1989), rev'd on other grounds, 951 F.2d 369 (D.C. Cir. 1991).  However, "[n]otwithstanding the Court's liberality with

13

regard to defendant's discovery requests, some requests are of such tangential relevance that, given the potential burdensomeness to the government of producing the documents, the motion to compel as to them must be denied."  Id.

"The law is clear that the United States is not required simply to turn all its files over to a defendant."  Id. at 1485 (citing United States v. Bagley, 473 U.S. 667, 675 (1985)); see also United States v. Agurs, 427 U.S. 97, 106 (1976) (the government is under "no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor"); Bagley, 473 U.S. at 676 ("the prosecutor is not required to deliver his entire file to defense counsel"); Weatherford v. Bursey, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case."); United States v. Percevault, 490 F.2d 126, 130 (2d Cir. 1974) (Rule 16 was intended to provide defendants with "liberal discovery," although not discovery of "the entirety of the government's case against him.").

B.     Brady and Giglio

The government has a duty to produce evidence favorable to the defendants that is material to either guilt or punishment.  See Brady, 373 U.S. at 87; Bagley, 473 U.S. at 676-77. Evidence is favorable when it tends to exculpate the defendant or impeaches the credibility of the prosecution's witnesses.  See Giglio, 405 U.S. at 154-55.  Evidence is exculpatory if it is "clearly supportive" of a claim of innocence.  United States v. Agurs, 427 U.S. 97, 107 (1976); see United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998) (exculpatory evidence goes to "the heart of the defendant's guilt or innocence").  The government's disclosure obligation under Brady extends only to information that is "material."  Agurs, 427 U.S. at 108.

Brady does not create a right to discovery of any information that would be useful to a

defendant preparing for trial.  See Bagley, 473 U.S. at 675; Weatherford, 429 U.S. at 559-60.

The government is not required to "provide to the defendant evidence that . . . is merely not

inculpatory and might therefore form the groundwork for some argument in favor of the

defense." Poindexter, 727 F. Supp. at 1485; see United States v. Scarpa, 913 F.2d 993, 1010-11

(2d Cir. 1990) (evidence is not necessarily exculpatory because it is not affirmatively

incriminating).

> C.    Jencks

Rule 16 does not apply to statements made by prospective government witnesses.  The

production of witness statements is governed solely by the Jencks Act.  See Palmero v. United

States, 360 U.S. 343, 351 (1959).  Rule 16(a)(2) explicitly recognizes this fact in its directive

that Rule 16 does not "authorize the discovery or inspection of statements made by prospective

government witnesses except as provided in 18 U.S.C. § 3500." See Tarantino, 846 F.2d at

1414; United States v. Haldeman, 559 F.2d 31, 77 n.111 (D.C. Cir. 1976).  The Jencks Act

compels disclosure only after a witness has testified on direct examination.  See 18 U.S.C. §

3500; see also Fed. R. Crim. P. 26.2 (incorporating provision of § 3500 into the Federal Rules of

Criminal Procedure); Bagley, 473 U.S. at 670 n.2.

II.    Argument

From the inception of this case, the government has provided liberal and early discovery

that, consistent with Department of Justice ("DOJ") policy, has been more expansive than Rule

16 and far broader than constitutionally required.  In providing expansive and broad discovery,

the government has repeatedly sought to err on the side of over-inclusiveness and disclosure.

Despite the substantial and meaningful discovery produced by the government to date, the

defendants make a raft of requests seeking reams of additional materials that do not fall within the letter of Rule 16 or comport with the spirit of the government's discovery obligations.

A.   Internal Documents Relating to Individual 1 and the Undercover Operation

The Mushriquis seek a range of internal FBI and DOJ documents relating to Individual 1 and the undercover operation, including (1) all materials regarding the management of Individual 1 during the undercover operation; (2) all materials regarding the management of the undercover operation; (3) documents regarding the on-site review of the undercover operation; (4) an accounting of the costs of the undercover investigation; (5) FBI and DOJ guidelines, manuals and policies relating to the undercover operation; and (6) summaries and transcripts of the defendants' calls and meetings with Individual 1.  (See Mushriquis' Motion ("Mushriquis Mot.") at 13-26, 32-34; see also Giordanella's Motion ("Giordanella Mot.") at 5-8 (Points 1, 3, 18 and 25); Wier's Motion ("Wier Mot.") at 2-4 (Points 2, 3, 14, 15 and 22).)

While the Mushriquis admit the government has produced some of the requested documents, they argue that the government has refused to produce certain internal FBI and DOJ documents relating to Individual 1 and the undercover operation.  The Mushriquis appear to support their argument with respect to Individual 1 on the supposition that there must be more documents memorializing the management of Individual 1 and point to internal reports of the FBI as the source for that material.  (See Mushriquis Mot. at 16-18.)  The Mushriquis go on to speculate that they are entitled to other internal FBI and DOJ documents relating to the undercover investigation on the premise that those documents must contain discoverable information.  (See id. at 18-23, 25-26, 32-34.)  The Mushriquis' arguments are misplaced.

16

1.   <u>Individual 1 Management Documents Have Been Produced</u>

On February 17, 2010, the Court ordered the government to "produce all Brady, Giglio,

Rule 16 materials" relating to Individual 1.  (Transcript of Status Conference on February 17,

2010 ("Tr.") 77.)  The Court indicated that this was "over and above and in addition to

producing, on a rolling basis, all Rule 16 discovery already owe[d] [to] [defense] counsel . . . ."

(<u>Id.</u>; <u>see also</u> Tr. 78.)  The Court went on to say, "I don't want there to be any question in

anyone's mind about the [Individual 1]-related material that we have heard a lot of talk about

today.  [The government] ha[s] got [un]til March 10th to produce those to each and every

defense counsel."  (<u>Id.</u> at 77.)

At a status conference on April 6, 2010, after several of the defendants raised concerns

about discovery relating to the management of Individual 1, the Court stated:

> Now, with regard to [Individual 1], obviously he still falls under the umbrella of
> discovery.  I think the points that were made by counsel that were specific to him
> certainly had a lot of surface appeal to them, at least from where I am sitting.  If
> he was under specific directions, if he was being, you know, managed so to speak
> on a day-to-day basis, if he was receiving direction if not orders from his handlers
> as to how he was conduct himself as an undercover operative in this situation, I
> think to the extent that's reduced to writing anywhere, to the extent that's on
> paper in the form of memos or any kind of notes that were taken or whatever, I
> think you are going to have to produce those.  I really do.
>
> .   .   .   .
>
> I don't even know exactly what forms they are in exactly other than notes or
> memos that may be part of the FBI's files with regard to this particular person,
> but the description that we have given in the past was [Individual 1] related
> documents that are of a management nature or a specific directive nature, so you
> have got ten days to produce them and, if you are not going to produce them, then
> you need to submit some kind of Motion which the Defendants will have a chance
> to respond to as to why you don't believe legally you have any obligation to do so
> under the circumstances.

(Transcript of Status Conference on April 6, 2010, at 53-54.)

17

In accordance with the Court's order, the government has produced all <u>Brady</u>, <u>Giglio</u> and Rule 16 materials relating to Individual 1, including all documents involving the direction, guidance, instruction and management of Individual 1 during the undercover operation.  In that regard – as the government stated in its letter on March 10, 2010,[5] at the status conference on March 22, 2010,[6] and in its notice on April 1, 2010[7] – the government has produced FBI 302 and

---

[5]     In its letter to the Court dated March 10, 2010, the government advised:

On March 9, 2010, the government produced to each defendant the "Brady, Giglio, Rule 16 materials" relating to the cooperating witness identified as Individual 1 in the indictments.  (Tr. 77.)  That discovery, which has been scanned and copied in a searchable format onto digital video discs ("DVDs"), consists of over 4,700 pages of documents, and satisfies a concern raised by the defendants, and echoed by the Court, at the last status hearing.

[6]     At the status conference on March 22, 2010, the government explained:

Then, on March 9th, we produced, in accordance with your Honor's order, the Bistrong documents, as we are calling them.  The documents were a little bit over 4700 pages of documents, some of which were discovery, some of which were in the category of Giglio and – you know, I don't really think there is Brady in there, but to the extent there is, that was produced.  There's documents that are more akin to 3500 Jencks Act material, and a lot of information that – I don't know if it has been produced in other types of cases, but we've produced basically everything that we had, your Honor.

That included reports, expense reports, drug test results, bank statements, receipts, hard copies of quotes, e-mails, notes, agent's notes, payment receipts and case summaries, just to give your Honor a flavor of how much stuff we have been giving over just so your Honor is aware of the volume and the nature of what's been turned over.

(Transcript of Status Conference on March 22, 2010, at 18-19.)

[7]     In its notice dated April 1, 2010, the government explained:

The government has produced in excess of 5,000 pages of documents relating to Individual 1, including reports, expense paperwork, bank statements, quotes, emails, notes, drug tests results, payment receipts, and Skype text messages,

FBI 1023 reports of Individual 1's proffers and debriefings relating to information pertaining to, and contacts with, the defendants and others, FBI proffer and debriefing notes, FBI administrative documents relating to Individual 1 and the undercover operation, FBI on-site reports reviewing the undercover operation, FBI reports documenting contact between the FBI agents and Individual 1, FBI reports and paperwork documenting payments to Individual 1, FBI reports authorizing Individual 1's participation in illegal activity and admonishments, FBI reports relating to Individual 1's international travel, Individual 1's notes, consensual recordings, bank records, telephone bills, emails, text messages, Skype text messages, personal services agreements, expense receipts, drug test results, United Kingdom immunity agreement, information, plea agreement and statement of offense, and materials related to the County A deal and historical deals, including product materials, quotes, invoices, licensing paperwork, purchase agreements and correspondence.

As the wide range of documents reflects, the government not only produced all of the Rule 16, Brady and Giglio materials relating to the management of Individual 1 – as ordered by the Court – but it produced a wealth of documents far surpassing the required disclosure obligations, including early production of Jencks material, as well as prospective witness statements not even discoverable under the Jencks Act.  See United States v. Donato, 99 F.3d 426, 433 (D.C. Cir. 1996) ("[T]he agent's notes and 302 report . . . are not covered by the Jencks Act."); United States v. Williams, 998 F.2d 258, 269 (5th Cir. 1993) ("We hold that the FBI

---

among others.  The government has also produced emails from the accounts of Individual 1 and the undercover FBI agents.  Additionally, the government has produced nearly 3,000 pages of text messages from the telephone Individual 1 used in connection with the undercover operation ("Operation Phone").

Forms 302 were not discoverable statements under the Jencks Act.").

> 2. <u>Internal FBI and DOJ Reports Are Not Subject to Discovery</u>

Despite the fact that the government has provided virtually all of the evidence gathered in the investigation, the Mushriquis claim they are entitled to internal FBI and DOJ reports and other documents that they believe relate to the management of Individual 1 and the undercover operation.  In support, the Mushriquis argue that the government relies on a self-styled and manufactured work product privilege that neither exists nor provides any protection from disclosure.  (<u>See</u> Mushriquis Mot. at 14-15, 21.)  The Mushriquis' argument is without merit.

> a. <u>Rule 16(a)(2) Exempts Disclosure</u>

While Rule 16(a)(1) specifies the information that may be discovered, Rule 16(a)(2) excludes from disclosure the discovery of "reports, memoranda, or other internal government documents made by the attorney for the government or other government agent in connection with investigating or prosecuting the case."  <u>See also</u> <u>United States v. Armstrong</u>, 517 U.S. 456, 463 (1996) ("Under Rule 16(a)(1)(C) [now Rule 16(a)(1)(E)], a defendant may examine documents material to his defense, but, under Rule 16(a)(2), he may not examine Government work product in connection with his case.").

Contrary to the Mushriquis' argument, courts, in recognizing a work product-related privilege, have explained that the discovery afforded by Rule 16(a)(1) is exempted by Rule 16(a)(2).  <u>See</u> <u>United States v. Fort</u>, 472 F.3d 1106, 1110 (9th Cir. 2007) (Rule 16(a)(2) exempts Rule 16(a)(1)(E)); <u>United States v. Jordan</u>, 316 F.3d 1215, 1251 (11th Cir. 2003) ("The discovery afforded by Rule 16(a)(1)(C) [now Rule 16(a)(1)(E)] is limited by Rules 16(a)(2) and (3)."); <u>United States v. Ghailani</u>, No. 98 CR 1023 (LAK), 2010 WL 653269, at *2 (S.D.N.Y. Jan.

21, 2010) ("Rule 16(a)(2) exempts from the government's rule-based discovery obligations certain work product or work product-like information . . . ."); United States v. Banda, No. CR 109-133, 2009 WL 3734689, at *3 (S.D. Ga. Nov. 5, 2009) (Rule 16(a)(1)(E) "is qualified and limited by Rule 16(a)(2) . . . . Even if the statements satisfy one of the requirements of Rule 16(a)(1)(E), discovery by a defendant is still barred by Rule 16(a)(2) . . . ."); United States v. Ail, No. CR 05-325-RE, 2007 WL 1229415, at *2 (D. Or. 2007) ("Rule 16(a)(2) recognizes a work product privilege, which specifically exempts from discovery" the requirements of Rule 16(a)(1)(E)); United States v. Rudolph, 224 F.R.D. 503, 504-11 (N.D. Ala. 2004) (surveying the history of Rule 16(a)'s purpose and structural amendments and concluding that Rule 16(a)(2) is an exception to the discovery requirements of Rule 16(a)(1)(E)); cf. United States v. Edelin, 128 F. Supp. 2d 23, 39-40 (D.D.C. 2001) (recognizing the work product doctrine in the context of Rule 16(a)(2)).

In Fort, the court began its analysis of a discovery dispute over the disclosure of investigative reports by explaining: "It is undisputed that the written police reports at issue here are 'documents' within the 'possession, custody, or control' of the federal prosecutor and that they are 'material to preparing the defense.'  Thus, the reports are discoverable under Rule 16(a)(1)(E) unless exempted by Rule 16(a)(2)."  Fort, 472 F.3d at 1110.  The court went on to find that the police reports qualified as "reports . . . made by . . . [a] government agent in connection with investigating or prosecuting the case," and thus were exempt under Rule 16(a)(2) from the disclosure requirements of Rule 16(a)(1)(E).  Id. at 1111-20.

Applying that rationale, courts have routinely found that law enforcement reports and other internal documents, such as those requested here, are precluded from discovery.  See id. at

1119 ("Rule 16(a)(2) exempts reports created by FBI agents (Form 302s) from disclosure.");

United States v. Wipf, 397 F.3d 632, 637 (8th Cir. 2005) ("'[R]eports, memoranda, or other

internal government documents' created by a government agent in connection with the

investigation or prosecution of the case are immune from discovery.") (quoting Rule 16(a)(2));

Jordan, 316 F.3d at 1126 n.13 & 1127 (under Rule 16(a)(2), interview summaries, including FBI

302s and memoranda prepared by FBI agents, were exempt from discovery); United States v.

Maranzino, 860 F.2d 981, 986 (10th Cir. 1988) ("internal government documents made in

connection with a prosecution are exempt from discovery."); Ail, 2007 WL 1229415, at *3 ("the

FBI's internal reports of payments to informants, reports of authorized criminal activity,

informant instructions, and concurrence letters prepared in connection with this investigation are

exempt from discovery as 'work product' under Rule 16(a)(2)."); United States v. Rufolo, No.

89 CR 938 (RMW), 1990 WL 29425, at *6 (S.D.N.Y. Mar. 13, 1990) (holding that Rule 16(a)(2)

bars disclosure of investigative, agent and surveillance reports prepared by federal agents).

        As the caselaw makes clear, the defendants are not entitled to the requested internal FBI

reports and documents relating to the management of Individual 1 and the undercover operation.

Under Rule 16(a)(2), that material constitutes "reports, memoranda, or other internal government

documents made by . . . government agent[s] in connection with investigating or prosecuting the

case." As a result, those reports and documents are exempt from disclosure under Rule

16(a)(1)(E) and not subject to discovery.

        In the same vein, summaries of the defendants' recorded conversations prepared by law

enforcement agents are precluded from discovery under Rule 16(a)(2). See United States v.

Wright, 121 F. Supp. 2d 1344, 1351 (D. Kan. 2000). As the court in Wright explained, in the

context of monitoring intercepted Title III calls, an agent's summary of the defendant's recorded

conversation is protected from discovery "because it is the officer's mental impression

amounting to work product and is an internal document solely prepared for the criminal

investigation under Rule 16(a)(2)."  Id.; see also United States v. Marquez, No. 91 CR 951

(SWK), 1992 WL 88139, at *10 (S.D.N.Y. Apr. 22, 1992) (denying defendant's request for "all

notes and memoranda made by law enforcement officers" during electronic surveillance of the

defendant on the ground that "[s]uch internal government documents developed by the

prosecution are specifically exempted from discovery") (quoting United States v. Nakashian,

635 F. Supp. 761, 775 (S.D.N.Y. 1986), rev'd on other grounds, 820 F.2d 549 (2d Cir. 1987)).

        While the summaries of the defendants' recorded conversations may constitute

prospective witness statements and Jencks material should the agents who prepared them testify

at trial, the summaries are outside the scope of Rule 16(a)(1) and their disclosure is not

appropriate at this juncture.  Rule 16(a)(2) explicitly recognizes that the production of witness

statements is governed solely by the Jencks Act, which does not require production until after the

witness testifies at trial.  See 18 U.S.C. § 3500; Degen v. United States, 517 U.S. 820, 825

(1996) ("no general right to obtain the statements of the Government's witnesses before they

have testified").

                    b.        No Showing of Materiality under Brady

        The government recognizes, however, that this does not end its obligation to disclose

material favorable to the defendants.  See Armstrong, 517 U.S. at 475 (Breyer, J., concurring in

part) ("the work-product immunity for discovery in Rule 16(a)(2) prohibits discovery under Rule

16 but it does not alter the prosecutor's duty to disclose material that is within Brady") (quoting

23

2 C. Wright, Federal Practice and Procedure § 254, at 81 and n.60 (2d ed. 1982) (footnotes omitted)).

The government has an obligation to disclose evidence favorable to the defendants that is material to guilt.  See Brady, 373 U.S. at 87.  For evidence to be material "there must be 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  United States v. Johnson, 519 F.3d 478, 488 (D.C. Cir. 2008) (quoting United States v. Strickler, 527 U.S. 263, 280 (1999)).  "[T]he mere possibility that an item of undisclosed information might have helped the defense . . . does not establish 'materiality' in the constitutional sense."  United States v. Agurs, 427 U.S. 97, 109-10 (1976).  "The defendant bears the burden of showing a reasonable probability of a different outcome."  Johnson, 519 F.3d at 488 (citing Strickler, 527 U.S. at 291; United States v. Gale, 314 F.3d 1, 4 (D.C. Cir. 2003)).

"To force disclosure by the Government, Defendant must offer more than mere conclusory allegations that the documents he seeks are material."  United States v. Secord, 726 F. Supp. 845, 846 (D.D.C. 1989) (citing United States v. Cadet, 727 F.2d 1453, 1466 (9th Cir. 1984)).  The defendant must show more than "mere speculation that files . . . may contain Brady information."  United States v. Haire, 371 F.3d 833, 841 (D.C. Cir. 2004) (citing United States v. Williams-Davis, 90 F.3d 490, 514 (D.C. Cir. 1996) ("It is unwise to infer the existence of Brady material based on speculation alone.") (citation omitted)).  It is insufficient simply to claim that the government has not provided everything that it is obligated to disclose under Brady.  See United States v. Calhelha, 456 F. Supp. 2d 350, 369 (D. Conn. 2006).

Here, the Mushriquis have not made an adequate showing that the requested internal FBI

24

and DOJ documents are material under <u>Brady</u>.  The Mushriquis rely on two general propositions.

First, they speculate that the government must still have undisclosed <u>Brady</u> evidence in its files.

They attempt to buttress this speculation by pointing out that the government has produced

certain documents, which, they argue, is proof that there must be more of the same that the

government is refusing to disclose.  This sort of speculation is not enough to require the

government to turn over its files or to establish that the government has failed to honor its <u>Brady</u>

obligations.  <u>See, e.g.</u>, <u>United States v. Navarro</u>, 737 F.2d 625, 631-32 (7th Cir. 1984) ("A due

process standard which is satisfied by mere speculation would convert <u>Brady</u> into a discovery

device and impose an undue burden upon the district court").

Second, through their requests, the Mushriquis attempt to expand the reach of <u>Brady</u> to

such a broad extent that, if granted, their motion would convert the rules designed to ensure due

process and fairness into discovery devices – which they were never intended to be.  By scope

alone, the Mushriquis seek documents as far back as April 2007, even though the charged

conduct commences in May 2009.  (<u>See</u> Mushriquis Mot. at 13.)   <u>Brady</u> does not "create a

broad, constitutionally required right of discovery."  <u>Bagley</u>, 473 U.S. at 675 n.7; <u>see</u> <u>United</u>

<u>States v. Caro</u>, 597 F.3d 608, 619 (4th Cir. 2010) ("We have often noted that <u>Brady</u> requests

cannot be used as discovery devices.").  Indeed, a "defendant's right to discover exculpatory

evidence does not include the unsupervised right to search through the [government's] files,"

<u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 59 (1987), nor does it require the prosecution to deliver its

entire file to the defense, <u>see</u> <u>Agurs</u>, 427 U.S. at 109.

1.      <u>Management of Individual 1</u>

More specifically, the Mushriquis speculate that internal FBI reports "may show" that

25

Individual 1 was authorized to entrap the defendants or that he exceeded his authority, or "may also document" the lengths to which Individual 1 was instructed to pursue the defendants, or "may reveal" why Individual 1 did not invite the Mushriquis to a meeting.  (See Mushriquis' Mot. at 17.[8])  With nothing more than bare speculation, the Mushriquis cannot demonstrate the existence of favorable material under Brady.  By relying on language that the internal FBI reports "may show" or "may reveal" information relating to Individual 1, which they then summarily conclude is material, the Mushriquis essentially concede that they cannot meet their burden.  See Caro, 597 F.3d at 619 ("Because Caro can only speculate as to what the requested information might reveal, he cannot satisfy Brady's requirement of showing that the requested evidence would be 'favorable to [the] accused.'") (emphasis added) (citation omitted).  As one court has explained, in comments applicable here, "[c]riminal defendants may not embark on a broad or blind fishing expedition among documents possessed by the government on the chance that something impeaching might turn up."  United States v. Young, No. 05 CR 56, 2007 WL 756729, at *2 (E.D. Pa. Mar. 7, 2007).

### 2.   Management of the Undercover Operation

The Mushriquis also speculate that the reports approving and renewing the undercover operation will evidence "the absence of any predisposition," "[the] lack of success in [the] pursuit of the Mushriquis," and the expenditure of enormous resources in the undercover operation.  (Mushriquis Mot. at 18.)  The Mushriquis, however, fail to provide any support or

---

[8]      Giordanella similarly speculates, though without a trace of argument, that the application seeking authorization for Individual 1 to work as a government informant may be relevant to the defendants' entrapment defense and Individual 1's credibility.  (See Giordanella Mot. at 10.)

other substantiation demonstrating that the reports would contain or reveal any of the proffered

evidence.  At best, the Mushriquis offer mere conclusory allegations that the documents they

seek are material.  See United States v. Walker, No. 96 CR 736 (HB), 1997 WL 327093, at *2

(S.D.N.Y. June 12, 1997) (recognizing, in the context of Rule 16, that while "it is difficult for the

defendant to ascertain the materiality of the information contained in the government's files

without having seen them, something more than a mere statement of possible materiality is

necessary").  Such conclusory allegations simply do not confer the right on the Mushriquis to

search through internal FBI reports in the hope that they may find something that they think may

be useful in some way.  See Ritchie, 480 U.S. at 59.

3.       On-Site Review of the Undercover Operation

The Mushriquis argue that despite producing the actual report of the FBI on-site review

examining the undercover operation and a related response report, the government improperly

withheld other documents relating to that review.  (See Mushriquis Mot. at 19-22.)  The

Mushriquis, however, do not identify what information those documents purport to contain or

how that information would be favorable.  Instead, they speculate that "[t]his material may also

be the source of substantial impeachment" and conclude, without any support, that it will

demonstrate the lengths to which the FBI was willing to go to pursue the defendants.  (Id. at 20.)

Without more, the Mushriquis fall well short of their required burden.

This is especially true given the fact that the government has already disclosed to the

defendants the potential Brady information.  Consistent with providing full and liberal discovery,

the government has produced the entire reports in unredacted form – going above and beyond

what is required by Brady.  Indeed, the government has no obligation to produce the actual

27

reports themselves.  As long as the defendant is "aware of the essential facts that would enable

him to take advantage of the exculpatory evidence," Brady does not require disclosure of the

evidence.  Spirko v. Mitchell, 368 F.3d 603, 609 (6th Cir. 2004) (quoting United States v. Todd,

920 F.2d 399, 405 (6th Cir. 1990)); see Conley v. United States, 323 F.3d 7, 30 (1st Cir. 2003)

("Brady does not protect a defendant who is aware of essential facts that would allow him to take

advantage of the exculpatory evidence at issue."); United v. Biaggi, No. 87 CR 265 (CBM),

1987 WL 28632, at *2 (S.D.N.Y. Dec. 11, 1987) ("This court discerns no requirement imposed

by Brady or its progeny that the actual documents be disclosed.") (citing United States v. LeRoy,

687 F.2d 610, 618 (2d Cir. 1982)).

      In other words, the government could have satisfied its obligation merely by disclosing

the information without ever having produced a report.  The government, however, provided

what was actually in the FBI's files.  Moreover, to the extent the reports contain impeachment

material, it involves only minor, non-substantive failures to comply with internal FBI-imposed

requirements relating to obtaining prior approval or concurrence for certain activities and

documenting contacts with subjects of the investigation and Individual 1.  Notwithstanding those

technical violations, the report concluded that the overall undercover operation was "effective

and efficient."

      Having more than put the defendants on notice of this potential impeachment evidence,

the government has satisfied its Brady obligation.  See Biaggi, 1987 WL 28632, at *2 ("The

Government need only put defendants on notice of exculpatory and impeachment evidence and

leads to such evidence.  It need not disclose the 'nuances' of such evidence, no matter how

evocative those nuances may be."); see also United States v. Rittweger, 524 F.3d 171, 180-81

28

(2d Cir. 2008) (opining that "[i]t is not feasible or desirable to specify the extent or timing of disclosure <u>Brady</u> and its progeny require, except in terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made.").

4.      <u>Accounting of the Undercover Operation</u>

The Mushriquis argue that in addition to the expense reports and receipts produced by the government showing the reimbursements made by the FBI to Individual 1 for expenditures during the undercover operation, they are entitled to internal FBI documents "itemizing" those expenditures, as well as internal "FBI accounting records" showing the costs of the undercover operation.  (<u>See</u> Mushriquis Mot. at 25-26.[9])  In support of their argument, the Mushriquis contend the reports and records should reveal "the salary and benefit costs" of the FBI agents and, "on information and belief," show the costliness of the operation.  (<u>See</u> <u>id.</u> at 26.)

The Mushriquis' conjecture as to the materiality of internal FBI accounting records and documents, however, is insufficient to compel production.  See <u>United States v. Duval</u>, 496 F.3d 64, 75 (1st Cir. 2007) (defendants' theory that additional exculpatory evidence could exist in informant payment records, fostered by the government's pattern of non-disclosure, deemed to be a "shot in the dark" insufficient to establish a <u>Brady</u> violation).

Significantly, the government already has produced to the defendants expense reports and receipts showing the reimbursements made by the FBI to Individual 1 for expenditures during the undercover operation.  Having recognized as much, the Mushriquis complain that the expense records were indiscriminately scattered throughout the production, complicating their

---

[9]      Giordanella also seeks expense and accounting records related to the undercover operation.  (<u>See</u> Giordanella Mot. at 7-8 (Points 18 and 25).)  Giordanella, however, does not attempt to show why he is entitled to the requested expense and accounting records.

review.  Contrary to the Mushriquis argument, the documents relating to the expense reports and

receipts were produced to the defendants the same way they were gathered and maintained by

the FBI as the investigation progressed.  See United States v. Dunning, No. CR 07-1390-PHX-

MHM, 2009 WL 3815739, at *1 (D. Ariz. Nov. 12, 2009) ("Brady does not mean that the

Government must take the evidence that it has already disclosed to Defendant, sift through this

evidence, and organize it for Defendant's convenience.").

In any event, "there is no constitutional requirement that the prosecution make a

complete and detailed accounting to the defense of all police investigatory work on a case,"

Agurs, 427 U.S. at 109 (quoting Moore v. Illinois, 408 U.S. 786, 795 (1972)), and the

Mushriquis have provided no authority to the contrary for an accounting of an undercover

investigation or the salary and benefit costs for the investigative agents.  Indeed, the available

precedent on the matter is decidedly at odds with such a request and clearly demonstrates that the

Mushriquis are not entitled to the materials.  See United States v. McCleskey, No. CR-3-95-

010(1)(3), 1997 WL 1774877, at *4 (S.D. Ohio Mar. 10, 1997) (denying requests for the

government to disclose its expenditures in connection with the prosecution of this case, such as

"the portion of the agents' and prosecutors' salaries which are allocable to this prosecution,"

because the defendant "cited no authority which supports this request"); United States v.

Lockheed Corp., No. 194-CR-226, 1994 WL 16057052, at *4 (N.D. Ga. Nov. 29, 1994) (request

for government to produce "performance review, salary, and other related information for any

testifying Government agent or employee to determine what awards or bonuses are given with

respect to successful investigations" on the ground that "such information reflects on the

possible bias of the witness," denied because "such information is not encompassed by Brady.");

30

United States v. Kennedy, 819 F. Supp. 1510, 1520 (D. Colo. 1993) (denying "requests for information as to the cost to the government of the investigation of this case, the amount of time spent by agents on this case" because no showing that the information was impeaching or material); cf. United States v. Robinson, 439 F.3d 777, 779-80 (8th Cir. 2006) (defendant in tax-evasion prosecution could not discover "internal documents used by the government to calculate gross receipts, business expenses and taxes owed," even though the lack of those documents may have "made trial preparation extremely difficult.") (internal quotation marks omitted).

5.    FBI and DOJ Guidelines, Manuals and Policies

The Mushriquis and also Wier seek internal FBI and DOJ documents that set forth procedures governing undercover operations and cooperating witnesses.  (See Mushriquis Mot. at 22-23; see also Wier Mot. at 4 (Point 15).)  Although Wier does not provide any legal support for his request, the Mushriquis assert that they are entitled to the documents under Rule 16 or pursuant to Brady.  (See Mushriquis Mot. at 23.)  Both arguments are without merit.

The government has already produced all discoverable information relating to the direction, guidance, instruction and management of Individual 1 during the undercover operation.  Indeed, the government has exceeded its obligations in many instances, by providing, for example, the unredacted report of the FBI on-site review and related response report.  The Mushriquis fail to show that, in addition to all of this previously produced material, they are also entitled to certain internal handbooks and manuals.  The Mushriquis' reliance on United States v. Safavian, 233 F.R.D. 12, 18 (D.D.C. 2005), is not persuasive, in that the court's fact-bound finding, that certain General Services Administration ("GSA") procedures and guidelines relating to ethics opinions and disciplinary actions were "material to the preparation of the

31

defense," does not establish the materiality of the internal FBI and DOJ documents sought by defendants here.[10]  Id.

On the contrary, the assertion that they "are entitled to introduce in evidence the specific policies that were violated in order that the jury may fully understand the limitations imposed by the FBI on its agents," and the suggestion that such evidence could give rise to an entrapment defense, is at odds with case law addressing the production of such internal guidelines in the context of undercover investigations.  In United States v. Johnson, 872 F.2d 612, 619 (5th Cir. 1989), for example, the court affirmed the district court's ruling that the government was not required to produce FBI guidelines governing the use of criminal informants.  The court found that the guidelines were "neither exculpatory nor do they contain material which could be used for impeachment purposes," reasoning that because the guidelines did not create substantive or procedural rights, "defense counsel failed to show how such Guidelines were relevant for the asserted purpose of establishing entrapment or how they could have been used to impeach [the agent's] credibility."  Id.

In United States v. Norita, No. 09-00026, 2010 WL 1726184 (D. N. Mar. I. Apr. 2, 2010), the court initially ordered the government to produce the section of the DEA Agent's Field Manual pertaining to the use of confidential informants.  In subsequently vacating that order, the court found that the defendants had failed to show that the manual was "material" for purposes of Rule 16(a)(1)(E):

---

[10]      In Safavian, the defendant was charged with making false statements to a GSA ethics officer and obstructing a GSA Office of Inspector General investigation.  See Safavian, 233 F.R.D. at 13.  Documents prepared by such a "victim" agency clearly are in a different category of materiality than those of an investigatory law enforcement agency.

Beyond conclusory assertions that the Agent's Field Manual will help to cross-examine agents and confidential informants in this case, which are not enough, the defendants have made no showing that the Agent's Field Manual will "'refute the Government's arguments that the defendant[s] committed the crime[s] charged.'" . . . The defendants have already been provided with sufficient discovery concerning the confidential informants and the circumstances of the confidential informants' contacts with the defendants for the defendants to attempt to refute the proof those agents and informants may offer that the defendants committed the crimes charged.

Id. at *6 (internal citations omitted); see also United States v. Miller, 874 F.2d 1255, 1266 (9th Cir. 1989 (affirming district court's decision to exclude the FBI's Manual of Administrative Operations and Procedures, where the defendant alleged that the FBI agents who questioned him had violated its provisions, and noting that whatever marginal probative value the manual had was "outweighed by its potential for confusing the jury and wasting the court's time"); United States v. Marbelt, 129 F. Supp. 2d 49, 56 (D. Mass. 2000) (denying discovery of Customs Service Internal Guidelines on Undercover Operations because "a showing that the Customs Service had not followed its internal guidelines is not a valid defense to the crime charged"); United States v. Kennedy, 819 F. Supp. 1510, 1520 (D. Colo. 1993) (denying discovery of "internal rules of the investigative agencies, and for information regarding any agent having broken the rules," because there was no showing that the information was impeaching or material); United States v. Smith, 817 F. Supp. 1366, 1369 (E.D. Ky. 1993) (granting motion to exclude internal FBI operations manual because "[s]uch internal agency guidelines do not confer rights on any party . . . The law of entrapment governs this case, and whether FBI agents complied with internal guidelines is not relevant.").[11]  In keeping with this authority, the

---

[11]      In considering requests for the internal policies and procedures, courts have properly taken into account the sensitive nature of the documents at issue as well as the investigatory and law enforcement privilege.  See Landry v. F.D.I.C., 204 F.3d 1125, 1134-37

defendants are not entitled to the requested FBI and DOJ internal procedures.

> 6.      Summaries and Transcripts of Recorded Calls and Meetings

The Mushriquis seek summaries and transcripts prepared by the FBI of the recorded meetings and calls between Individual 1 and the defendants.  (See Mushriquis Mot. at 32-34.[12]) The Mushriquis maintain, "on information and belief," that the summaries and transcripts would document certain meetings and calls that they claim were not recorded by the government.

The government has produced all of the recordings between Individual 1 and the defendants and provided a report documenting any call that was not recorded due to a malfunction with the equipment.  The Mushriquis thus have all of the recordings in existence in this case.  With the actual recordings in hand, they cannot meaningfully argue that summaries or transcripts prepared from the recordings are material under Brady.  Nevertheless, the government will provide transcripts of the recordings as they become finalized and produce, in advance of trial, the summaries prepared by any agent who should testify as a witness at trial, in accordance with its obligations under the Jencks Act.[13]

---

(D.C. Cir. 2000) (discussing the privilege); Friedman v. Bache Halsey Stuart, 738 F.2d 1336, 1341-43 (D.C. Cir. 1984) (same) (quoting Black v. Sheraton Corp. of America, 564 F.2d 531, 541-542 (D.C. Cir. 1977)); see also Marbelt, 129 F. Supp. 2d at 56 (taking into account "the extremely sensitive nature of the internal guidelines of the Customs Service" in denying discovery of the United States Customs Service Internal Guidelines on Undercover Operations).

[12]      Wier also makes a request for the summaries of the recordings but fails to support it with any argument or analysis.  (See Wier Mot. at 4 (Point 14).)

[13]      In addition, Giordanella makes a request for documents relating to the arrest or apprehension plan of the defendants.  (See Giordanella Mot. at 6 (Point 8).)  Giordanella fails, however, to articulate any legal or factual basis whatsoever for disclosure of these particular documents.  As is clear from the analysis above, any internal government documents setting forth the government's "arrest or apprehension plan" fall squarely within the protections of Rule 16(a)(2) and lack the requisite materiality under Brady.  See United States v. Phillips, No. 06-CR-47, 2009 WL 1918931, at *4 n.1 (N.D. W. Va. July 1, 2009) (declining discovery of arrest

c.      No Brady Found in Internal FBI and DOJ Files

Even if the Mushriquis had not relied on conclusory allegations and speculation and were able to make an appropriate showing that the requested internal FBI and DOJ reports and other documents relating to Individual 1 and the undercover operation were material, the government has reviewed all of the internal reports and documents in the FBI and DOJ's files and, except for what has already been produced, found no exculpatory material under Brady.  The government remains aware of its continuing disclosure obligation and, mindful that it has an "affirmative duty to resolve doubtful questions in favor of disclosure," will provide any favorable material should it come into the government's possession.  United States v. Hsia, 24 F. Supp. 2d 14, 30 (D.D.C. 1998) ("it is not the court's role to 'referee . . . disagreements about materiality and supervise the exchange of information,' . . . and the Court has little choice at this juncture but to accept the government's representation that it will immediately disclose any and all Brady material that it has, or discovers that it has, in its possession.") (citations omitted); see Ritchie, 480 U.S. at 59 (the prosecutor's decision as to whether exculpatory Brady information exists is usually final).

For all of the foregoing reasons, the defendants are not entitled to the requested internal FBI and DOJ reports and other documents relating to Individual 1 and the undercover operation, and the Mushriquis' motion to compel should be denied.

B.      Armor Is Entitled to Assert a Claim of Privilege

The Mushriquis, Wier and Giordanella seek documents and information provided by Armor to the government in connection with the company's voluntary disclosure of possible

_____

plan).

illegal conduct at the company.  Specifically, the Mushriquis seek documents and information

relating to Individual 1 that were provided to the government by Armor.  (See Mushriquis Mot.

at 10.)  Wier seeks documents relating to Armor's termination of Individual 1 and documents or

"the substance of verbal disclosures" made to the SEC and DOJ by Armor regarding wrongdoing

or questionable conduct by Individual 1.  (See Wier Mot. at 6-7 (Points 24 and 26).)  Giordanella

seeks documents relating to Individual 1's termination, documents reflecting communications

between the government and Armor, documents produced by Armor to the SEC, and documents

regarding Armor's negotiations with DOJ.  (See Giordanella Mot. at 6 (Points 10, 13 and 14) and

11-12.)  As stated above and explained in more detail below, the government has agreed to

produce most of the requested documents pending resolution of Armor's privilege claims and

following the entry of a protective order pertaining to those documents.  The remaining materials

are not discoverable and thus the defendants' request for them should be denied.

   1. Background

  In 2007, Armor conducted an internal investigation into possible illegal conduct at the

company and voluntarily disclosed the conduct to the DOJ and SEC.  As a result of Armor's

voluntary disclosure, DOJ and SEC conducted multi-year investigations into possible violations

of law by Individual 1 and others at the company.  In connection with DOJ's investigation and

Armor's voluntary disclosure, Armor produced approximately five million pages of documents,

approximately 33 boxes of materials containing the contents of Individual 1's office at the time

he was terminated from Armor, and electronic materials (collectively the "Armor Materials").

The Armor Materials include historical documents created in the course of business at Armor

that were potentially relevant to DOJ's investigation into allegations of criminal conduct at

Armor, as well as interview memoranda and other documents generated in connection with Armor's internal investigation.

Prior to the production of the electronic materials, Armor used an electronic filter to identify and remove documents protected from disclosure by the attorney-client privilege and the attorney work product doctrine ("Protected Materials").  However, in case the electronic filter failed to identify and remove Protected Materials, Armor, DOJ and the SEC executed a Non-Waiver and Inadvertent Disclosure Agreement ("Agreement"), in which the parties agreed that an inadvertent disclosure of Protected Materials would not constitute a waiver of the attorney-client privilege or the attorney work product doctrine.  (See Attachment 1.)  Additionally, the Agreement states that (1) Armor shall be permitted to withhold documents and information created on or after February 1, 2007, to prevent the disclosure of work product generated at the request of counsel during the company's internal investigation, (2) Armor shall have a standing request for the return of inadvertently disclosed privileged information, and (3) upon request by Armor, the government shall delete from its databases any inadvertently produced privileged documents.  (See id.)

The documentary materials Armor provided to the government were produced pursuant to an understanding that the government would not contend that Armor's production constituted a waiver of any applicable privileges.  Additionally, throughout the investigation, Armor took steps to protect its work product and its privileged documents.  For example, when Armor provided interview memoranda to the government, the transmittal letter stated that:

> The interview memoranda are attorney work product and are being provided pursuant to a limited, non-subject matter, waiver.  By providing them to the government voluntarily, neither Armor Holdings, Inc. nor Kane Kessler, P.C. intends to waive any privilege with respect to other communications or work

37

> product relating to the subject matter of the interviews recorded in the memoranda
> or of the investigation generally.

(See Attachment 2.)  Additionally, on many occasions, Armor noted in its production letters that documents had either been redacted or withheld from production on the grounds that they were protected from disclosure by the attorney-client privilege and/or the work product doctrine. Armor also requested, in all of its transmittal letters, confidential treatment of the materials produced given the confidential, proprietary and sensitive nature of the items.

In light of the requests made by Armor in the course of its voluntary production and the potentially privileged nature of certain materials provided by Armor, the government contacted Armor prior to producing any of the Armor Materials to the defendants in this case.  The government explained to Armor – as it has to the defendants and the Court – that although Rule 16, Brady and Giglio do not require the production of many of the Armor Materials, the government has no objection to producing the Armor Materials to the defendants in response to their requests.  However, given the potentially privileged and sensitive nature of the Armor Materials, it was appropriate to afford Armor the opportunity to object to the production of any of the Armor Materials to protect its attorney-client or work product privileges.[14]

On May 12, 2010, Armor sent a letter to the government authorizing it to produce several categories of Armor Materials that relate to Individual 1, subject to the entry of a protective order governing the use of those documents.  (See Attachment 3.)  On May 13, 2010, the

---

[14]    The Mushriquis incorrectly contend that "the government waited until 9:50 PM on May 13, 2010, the night before this Motion was due, to reveal that it was deferring to the demands of Armor Holdings."  (Mushriqui Mot. at 10.)  The government has consistently advised that it was consulting with Armor prior to producing the Armor Materials, as highlighted in the government's discovery notice of April 1, 2010, and cited by the Mushriquis in their motion.

government forwarded this letter to the defendants and stated that it would produce the

categories of documents authorized by Armor once the conditions identified by Armor were met.

(See Attachment 4.)  The government further stated that if the defendants had any questions

concerning the documents or Armor's conditions regarding the production of the documents,

they should contact Armor's counsel.  (Id.)  To the government's knowledge, none of the

defendants have contacted Armor's counsel to express concern regarding Armor's position on

the production of the Armor Materials or to negotiate the conditions identified in Armor's letter.

        2.    <u>Mushriquis' Argument</u>

The Mushriquis argue that they are entitled to the production of documents and

information relating to Individual 1 that were provided to the government by Armor.[15]  They

acknowledge that the government has agreed to produce most of the materials they seek but

argue that the government's position, that it will produce the documents pursuant to the

conditions identified by Armor to protect its privilege and work product, is untenable.  (See

Mushriquis Mot. at 11.)  The Mushriquis contend that the government has impermissibly "out-

source[d] its discovery obligations under Rule 16 and <u>Brady</u> to a private party and its attorneys"

who have "no standing" in the criminal case.  (Id.)  The Mushriquis' argument is misplaced.

Although Armor is not a party to the criminal case, it does have standing to object to the

disclosure of the Armor Materials.  <u>See, e.g.</u>, <u>United States v. The Williams Companies, Inc.</u>,

---

[15]    Wier and Giordanella also request documents and information relating to
Individual 1 that were provided to the government by Armor.  (See Wier Mot. at 7 (Points 24
and  26); Giordanella Mot. at 6 (Point 10).)  However, they offer little or no support for their
requests.  Wier, for example, seeks to compel the government to produce "the substance of
verbal disclosures" by Armor.  (Wier Mot. at 7 (Point 26).)  He fails to articulate any basis for
compelling the government to create, and then produce, documents that are not in existence – a
request clearly outside the bounds of Rule 16.

562 F.3d 387, 392-93 (D.C. Cir. 2009) (permitting a third party company to pursue interlocutory

appeal of an order requiring the government to produce company materials previously provided

in connection with a voluntary disclosure); United States v. American Telephone & Telegraph,

642 F.2d 1285, 1291-95 (D.C. Cir. 1980) (holding, in a civil case, that a third party has standing

to intervene to protect its privilege because "without the right to intervene in discovery

proceedings, a third party with a claim of privilege in otherwise discoverable materials could

suffer the obvious injustice of having his claim erased or impaired by the court's adjudication

without ever being heard.") (internal quotation omitted).  Accordingly, the government is not

"out-sourcing" its discovery obligations.  Rather, it is abiding by the agreement it entered into at

the time it obtained the documents, while also endeavoring to provide the defendants with broad

discovery.

 The government repeatedly has stated that it does not object to the production of any of

the Armor Materials to the defendants.  However, the government recognizes that Armor has a

right to protect its attorney-client privilege and its attorney work product and as such, has sought

to allow Armor to exercise that right in pursuing its privilege claims before producing the

materials to the defendants.[16]

---

[16] The Mushriquis argue that Armor has waived its privileges thereby precluding the government from withholding discovery.  (See Mushriquis Mot. at 12-13.)  While they attempt to support that argument with respect to the work produce privilege by relying on In re Subpoena Duces Tecum, 738 F.2d 1367 (D.C. Cir. 1984), that case is factually distinguishable in several important respects.  First, the third party there was attempting to use a partial waiver to exact an advantage from one adversary, while also using it as a shield to protect itself from another adversary.  In contrast, here, Armor is not trying to exact an advantage against the defendants; it is merely attempting to protect itself from being harmed in a case to which it is not even a party. Second, the third party there had no reasonable expectation that the disclosed materials would be kept confidential, see id. at 1372, whereas here, Armor and the government executed a non-waiver and inadvertent disclosure agreement and Armor requested confidential treatment of all

3.    Giordanella's Argument

In addition to seeking documents produced by Armor that relate to Individual 1,
Giordanella seeks documents regarding Armor's negotiations with DOJ.  (See Giordanella Mot.
at 6 (Point 13).)  He argues that these documents bear on the credibility of Individual 1 as a
witness.  (See id. at 11.)  Beyond this bare assertion, however, Giordanella offers no support for
his contention.  Indeed, there is no genuine explanation for how documents related to
negotiations between the government and Armor, which had terminated Individual 1 prior to its
negotiations with the government, could bear on Individual 1's credibility.  As such,
Giordanella's argument fails.

Giordanella's request for materials relating to Armor's disclosure to the SEC is similarly
flawed.  (See id. at 6 (Point 14).)  Beyond the empty claim that "because the government
contends that the Defendants are responsible for each Defendants' conduct," Rule 16 requires the
government to produce Armor's disclosure to the SEC, Giordanella offers no support for his
request.  (Id. at 12.)  Indeed, he does not explain why the government's alleged contention in this
criminal case entitles him to materials produced by Armor to the SEC, neither of which is a party
to this case, in connection with a civil case involving different facts, transactions, individuals,
and entities.  He merely states that "[c]learly, this is entirely reasonable and pertinent to the
defense case."  (Id.)  This conclusory and unsupported allegation simply does not make out a
claim for the materials he seeks.  In any event, the government does not possess and is unaware
of any materials that Armor produced to the SEC that is not otherwise contained in the Armor

---

of the Armor Materials at the time of production.  Therefore, In re Subpoena Duces Tecum does
not extinguish Armor's right to advance its attorney work product privilege.

Materials produced to DOJ.

      C.      Defendants Are Not Entitled to Documents Produced by Individual 1 and His
              Attorneys and Communications Between Individual 1's Attorneys and DOJ and SEC

The Mushriquis, Wier and Giordanella request documents provided to the government by Individual 1 or his attorneys, and written communications between Individual 1's attorneys and DOJ and SEC.  In particular, the Mushriquis seek production of a CD containing 1069 pages of documents related to Individual 1's employment and financial affairs and 30 boxes of documents taken from Individual 1's offices and apartment.  (See Mushriquis Mot. at 7-9; see also Wier Mot. at 5-6 (Point 19).)  Although the government advised the Mushriquis that it would review the CD and produce any discoverable documents, the Mushriquis argue that no such review is necessary because they are per se entitled to any documents provided by Individual 1's counsel to the government.  (See Mushriquis Mot. at 8.)

The Mushriquis' position is wholly unsupportable as neither Rule 16 nor Brady require the government to produce documents obtained from a cooperating witness irrespective of the relevance or materiality of the documents.  Nevertheless, the government has produced the documents from the CD, with the exception of Armor-related documents, and has agreed to produce the Armor-related documents once a protective order governing the Armor Materials is entered.  Additionally, the 30 boxes of documents the Mushriquis seek were provided to the government by Armor during its internal investigation, not by Individual 1.  As the government has indicated, it will produce those materials to the defendants, pending the resolution of Armor's privilege claims.

Wier also seeks oral and written communications between the DOJ or SEC and attorneys representing Individual 1 regarding "proffers of information that Individual 1 could provide,"

information Individual 1 did provide, and "negotiations leading to a potential disposition of criminal charges or SEC claims."  (Wier Mot. at 6-7 (Point 25).)  Similarly, Giordanella seeks communications between the government and Individual 1, Armor or their attorneys.  (See Giordanella Mot. at 6 (Point 13).)  Wier and Giordanella, however, fail to state how or why they are entitled to these communications.  The communications are not material to their defense or otherwise discoverable under Rule 16, and the government is unaware of any Brady or Giglio information contained in them.[17]

D.    Defendants Are Not Entitled to Documents or Information of Prospective Witnesses

Godsey and Morales request all documents, including plea agreements and statements of offense, relating to three co-defendants, who they apparently believe may ultimately testify at trial in this case.  (See Godsey and Morales' Motion ("Godsey Mot.") at 4 (Point K).)  Giordanella requests interview reports and notes from witnesses supposedly interviewed by the government.  (See Giordanella Mot. at 8 (Point 23).)  While the defendants have the ability to access and review publicly filed documents in this case, such as those in connection with defendant Daniel Alvirez, they are not entitled to statements of potential government witnesses at this time.

It is the Jencks Act, rather than Rule 16, that governs the disclosure of prospective witness statements and controls the timing of that disclosure:

---

[17]    Without citing any authority, Giordanella also seeks "documents submitted or presented to the government by Kirkland & Ellis regarding its investigation into PPI." (Giordanella Mot. at 8 (Point 24).)  Giordanella does not explain, nor can he, why documents produced to the government by Kirkland & Ellis, outside counsel for a private equity company that purchased certain assets from Protective Products Inc., after Giordanella had left the company following his indictment, are relevant, let alone material, to his defense.

> In any criminal prosecution brought by the United States, no statement or report
> in the possession of the United States which was made by a Government witness
> or prospective Government witness (other than the defendant) shall be the subject
> of subpoena, discovery, or inspection <u>until said witness has testified on direct
> examination in the trial of the case</u>.

18 U.S.C. § 3500(a) (emphasis added).  The Jencks Act does not obligate the government to

produce statements until after the witness has testified on direct examination.  <u>See</u> 18 U.S.C.

§ 3500(b) ("After a witness called by the United States has testified on direct examination, the

court shall, on motion of the defendant, order the United States to produce any statement (as

hereinafter defined) of the witness which relates to the subject matter as to which the witness has

testified.").

The Act therefore does not afford a right to early production of prospective witness

statements.  <u>See</u> <u>United States v. Tarantino</u>, 846 F.2d 1384, 1414 (D.C. Cir. 1988) ("The Jencks

Act directs that in a criminal prosecution, statements made by government witnesses or

prospective government witnesses are not open to discovery or inspection by the defense until

said witnesses have testified on direct examination in the trial of the case.").  This is so despite

the fact that early disclosure might assist a defendant in preparing for trial.  <u>See</u> <u>id.</u> at 1414-15

(no entitlement to early disclosure of Jencks Act statements even when the statements may have

assisted in cross-examining other witnesses called by the government earlier in the trial); <u>In re

United States</u>, 834 F.2d 283, 287 (2d Cir. 1987) (Jencks Act controls statements by witnesses

and district court has "no inherent power to modify or amend the provisions of that Act").

Notwithstanding the limited extent of the government's obligations in this regard, the

government plans to provide Jencks Act material, as is customary in this district, one month

before trial so the defendants have a reasonable opportunity to make use of the material at trial.

44

See Tarantino, 846 F.2d at 1415 n.12 (noting that "trial judges, with the consent of the government, routinely fashion discovery procedures that entail production of Jencks material before trial or prior to direct examination, in order to facilitate the defense's preparation for cross-examination.  Such a sensible procedure was used in this trial, and the defense received the bulk of the Jencks material 48 hours prior to direct testimony by government witnesses.").

Godsey and Morales also request to know whether Morales is the individual identified as "Co-conspirator 1" in the superseding information filed with respect to Alvirez.  (See Godsey Mot. at 4 (Point L).)  Godsey and Morales appear to argue that they are entitled to that information in order to "investigate" prior bad acts under Rule 404(b).  (See id. at 5.)

Rule 404(b) requires the government to provide defendants "reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown" of "[e]vidence of other crimes, wrongs, or acts."  At this stage of the case, the government has not yet determined whether or to what extent it will seek to offer at trial evidence of other criminal activity by the defendants, including any prior bad acts by Morales.[18]  Should the government decide to seek to introduce such evidence, it will provide reasonable notice of its intention as required by Rule 404(b).

Though Rule 404(b) sets no minimum time for action in this respect, the government, in accordance with customary practice in this district, plans to provide notice of other crimes or bad acts that it will seek to introduce at trial pursuant to Rule 404(b) one month before trial.  See

---

[18]     Indeed, as to the search warrant evidence, the government has yet to review that material because, at the defendants' request, the government has put in place filter team procedures, to protect potentially privileged information and ensure that the prosecution team is not exposed to it.  Only after that material is reviewed will the prosecution team be in a position to determine whether it contains any potential Rule 404(b) evidence.

United States v. Blount, 502 F.3d 674, 678 (7th Cir. 2007) (one week sufficient); United States

v. Watson, 409 F.3d 458, 465-66 (D.C. Cir. 2005) (48 hours sufficient); United States v.

Preciado, 336 F.3d 739, 745 (8th Cir. 2003) (several days sufficient).

E.      Defendants Are Not Entitled to Individual 1's Tax Returns

The Mushriquis, Giordanella and Wier request tax returns filed by Individual 1.  (See

Mushriquis Mot. at 27-28; Giordanella Mot. at 7 (Point 18 ); Wier Mot. at 7 (Point 29).)  But the

defendants articulate no factual or legal basis for the relevance or materiality of the sought-after

returns, other than the Mushriquis' conclusory assertion that "his tax returns comprise potential

impeachment material that is discoverable under Rule 16, Brady, and Giglio" because of

Individual 1's alleged "history of embezzlement, money laundering, and other financial crimes."

(Mushriquis Mot. at 27.)  Moreover, contrary to the defendants' claim, the tax returns (with the

exception of certain amended returns for 2003 to 2005, addressed below), are not within the

possession of DOJ – nor are they in the possession of an agency closely aligned with the

prosecution.  Accordingly, the defendants' request for Individual 1's tax returns should be

denied.

The Mushriquis' blanket assertion that the tax returns are discoverable under Rule 16,

Brady and Giglio is without merit.  Without a modicum of factual support, the defendants

demand that the government procure and provide tax returns that they assert "comprise

potential impeachment material."  (Mushriquis Mot. at 27 (emphasis added)).  Neither Rule 16

nor Brady and Giglio provide the basis for such a speculative request.  The tax returns are not

"material" pursuant to Rule 16, because the defendants' purported justification for the returns

does not give rise to "a strong indication that [the returns] will play an important role in

uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." United States v. Marshall, 132 F.3d 63, 68 (D.C. Cir. 1998). Neither does the defendants' blatant speculation as to the existence of Brady information in the returns they seek create an obligation under Brady, Giglio, or its progeny for the government to produce them. See United States v. Williams-Davis, 90 F.3d 490, 514 (D.C. Cir. 1996) ("'[I]t is unwise to infer the existence of Brady material based upon speculation alone. . . . '[U]nless defendant is able to raise at least a colorable claim that the [disputed material] contained evidence favorable to [him] and material to his claim of innocence or to the applicable punishment,'" no Brady violation will be established.") (citations omitted). Nonetheless, although the government takes the position that the tax returns are not material, it has already produced those returns of Individual 1 that are in its possession, which include certain amended returns for tax years 2003, 2004 and 2005.

The fact that the defendants fail to demonstrate the relevance and materiality of the returns should alone suffice to defeat their claim, but they also fail to show that the government can properly be tasked with obtaining additional returns not in its possession. It is well established that the government's discovery obligations extend beyond "the individual prosecutor . . . to the others acting on the government's behalf in the case." Kyles v. Whitley, 514 U.S. 419, 437 (1995). The D.C. Circuit has found that the prosecution's Brady obligations include a "duty to search" files of agencies "closely aligned with the prosecution." United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992). In Brooks, the court found that the "close working relationship" in that case between the Washington metropolitan police and the United States Attorney for the District of Columbia gave rise to a duty to search police department files.

47

See id. But no such relationship between the prosecution team and the Department of Treasury and its component agency, the Internal Revenue Service ("IRS"), exists here.

The only relationship the Mushriquis allege is that an IRS representative, working with prosecutors from the Southern District of New York, was present at a single proffer session with Individual 1 and members of the prosecution team on March 20, 2008.  Even assuming that unsupported allegation were true, a single contact with an IRS representative investigating separate crimes, in another state, wholly unrelated to the defendants, over a year before the charged conduct (which did not result in tax charges), does not constitute a "close working relationship" such that the IRS can be considered part of the team investigating or prosecuting this case.  See United States v. Morris, 80 F.3d 1151, 1169 (7th Cir. 1996) (finding that knowledge of the IRS and other agencies that were not part of the team investigating or prosecuting the case could not be imputed to the prosecution); United States v. Stofsky, 527 F.2d 237, 244 n.7 (2d Cir. 1975) (declining to impute knowledge of the information in government witness's tax returns on file with the IRS to the prosecution, because "[s]uch a rule, which would obligate the prosecutor to anticipate [the witness's] perjury with respect to the source of the funds from which the income reported in the tax returns was derived, would be not only extremely burdensome but of doubtful utility"); United States v. Stein, 424 F. Supp. 2d 720, 723 (S.D.N.Y. 2006) (holding that government's disclosure obligations did not extend to civil audit files possessed by civil side of IRS, where criminal unit of IRS was directly involved in prosecution, because "[w]hile the prosecution's disclosure obligation in some circumstances may extend to materials beyond the knowledge of the individual prosecutors assigned to a case, it does not extend to the collective knowledge of the entire United States government or even to

48

the entire government agency concerned."); <u>United States v. Robertson</u>, 634 F. Supp. 1020, 1025

(E.D. Cal. 1986) ("The IRS is neither closely connected to the United States Attorney's Office

nor an arm of the prosecution.").

The defendants' reliance on <u>United States v. Safavian</u>, 233 F.R.D. 12 (D.D.C. 2005), to

the contrary, is misplaced for several reasons.  It is true that in its opinion, the court found – for

purposes of Rule 16(a)(1)(B)(i), governing relevant written or recorded statements by a

defendant that are in the government's possession, custody, or control – that the term

"government" included "any and all agencies and departments of the Executive Branch of the

government and their subdivisions." <u>Id.</u> at 14.  But the court made clear in a subsequent opinion

that the government's duty to search was nonetheless bounded by a "rule of reason":

> While, in this Court's view, the term "government" encompasses all Executive
> Branch agencies and departments and the obligation to search files extends
> beyond agencies 'closely aligned' with the prosecution, it should be apparent that
> prosecutors are not required to search, or cause to be searched, the files of all
> Executive Branch agencies and departments in every criminal case.  <u>Both the duty
> to search and the imputation of knowledge necessarily are bounded by a rule of
> reason.</u>

<u>United States v. Safavian</u>, 233 F.R.D. 205, 206-07 & n.1 (D.D.C. 2006) (emphasis added).

In this case, the "rule of reason" operates to foreclose the defendants' far-reaching and

unfounded demand for Individual 1's tax returns.  But even assuming, <u>arguendo</u>, that the

<u>Safavian</u> decisions could be read as requiring the government to search all Executive Branch

agencies and their subdivisions that are not aligned with the prosecution, such a reading is

contrary to established precedent, and the decision is not controlling here.  <u>See, e.g.</u>, <u>United

States v. Libby</u>, 429 F. Supp. 2d 1, 7 (D.D.C. 2006) (declining to adopt <u>Safavian</u>'s "broad

reading" of applicable caselaw); <u>see also</u> <u>United States v. Pelullo</u>, 399 F.3d 197, 218 (3d Cir.

49

2005) (finding no duty to search a division of the Department of Labor because the fact "that

other agents in the DOL participated in this investigation does not mean that the entire DOL is

properly considered part of the prosecution team"); <u>United States v. Morris</u>, 80 F.3d 1151, 1169

(7th Cir. 1996) (holding that <u>Kyles</u> cannot "be read as imposing a duty on the prosecutor's office

to learn of information possessed by other government agencies that have no involvement in the

investigation or prosecution at issue"); <u>United States v. Bryan</u>, 868 F. 2d 1032, 1036 (9th Cir.

1989) ("[A] federal prosecutor need not comb the files of every federal agency which might have

documents regarding the defendant in order to fulfill his or her obligations under Rule

16(a)(1)(C)."); <u>United States v. NYNEX</u>, 781 F. Supp. 19, 25 (D.D.C. 1991) ("The FCC, an

independent regulatory agency, is not allied with the Justice Department in prosecuting this

matter, and accordingly FCC files need not be searched); <u>Robertson</u>, 634 F. Supp. at 1025

("[G]iving 'government' its broadest reading by expanding it to include all federal agencies

(such as the IRS) would not only wreak havoc, but would give the defense access to information

not readily available to the prosecution.").

The defendants' argument also is misplaced because the defendants in <u>Safavian</u> were not

seeking to compel disclosure of tax returns held by the IRS, which are subject to the strictures of

26 U.S.C. § 6103, governing the release of returns and return information.  As both the statute

and case law interpreting it make clear, the government does not have access to the returns in the

first instance, even assuming that the defendants had successfully demonstrated the materiality

of the returns, which they have not.  Under Section 6103(i)(1), to obtain release of return or

return information, only certain federal prosecutors may authorize an application for an <u>ex parte</u>

order by a federal district court judge or magistrate.  Upon receipt of the application, the judge or

magistrate <u>may</u> grant such order upon making three threshold findings, including that there is

reasonable cause to believe that the information is or may be relevant to a matter relating to the

commission of a specific criminal act.  <u>See</u> 26 U.S.C. § 6103(i)(1)(B).

In <u>United States v. Recognition Equip. Inc.</u>, 720 F. Supp. 13 (D.D.C. 1989), the court

found that this statutory scheme precluded it from ordering the disclosure of returns and return

information sought by the defendants.  The court also rejected the defendants' reliance on Rule

16 to the contrary, finding the rule "inapposite because the United States attorney is not in

possession of [the returns and return information]."  <u>Id.</u> at 13.  As the court explained, while

Section 6103(i)(4)(A)(ii) authorizes the use of disclosed returns and return information "to the

extent required by order of a court pursuant to section 3500 of title 18, United States Code, or

rule 16 of the Federal Rules of Criminal Procedure," the subsection "<u>presupposes</u> that the tax

returns and tax information at issue are already in the possession of the government under

subsection (i)(1)."  <u>Id.</u> (emphasis added) (citing <u>Robertson</u>, 634 F. Supp. at 1027); <u>see also</u>

<u>United States v. Lochmody</u>, 890 F.2d 817, 823-24 (6th Cir. 1989) (finding that the prosecution

never had possession of the returns of a government witness pursuant to Section 6103(i)) (citing

<u>United States v. Bibby</u>, 752 F.2d 1116, 1124-25 (6th Cir. 1985)); <u>United States v. Jackson</u>, 850

F. Supp. 1481, 1504 (D. Kan. 1994) (denying defendants' motion for production of tax returns of

the government's central witness, because the prosecution did not have "ready access" to them

under the statutory scheme set forth in Section 6103(i)(1) so "as to require production under

Rule 16 or <u>Brady</u>").

Finally, with respect to Individual 1's United Kingdom tax returns, it should be apparent,

and the defendants do not argue otherwise, that these returns are not within the possession of the

United States, and that the UK Customs and Tax Department – HM Revenue and Customs – is not an agency closely aligned with the prosecution in this case.

F.     Defendants Are Not Entitled to Further Documents Reflecting
       Assistance in Obtaining or Renewing Licenses and Registrations

The Mushriquis request materials related to assistance provided to Individual 1 from the Departments of State and Commerce in obtaining or renewing licenses and registrations permitting him to operate as a broker or exporter of defense articles.  (See Mushriquis Mot. at 28-30.[19])  They argue that the materials may evidence consideration granted to Individual 1 and thus bear on his motive to cooperate.  (See id. at 29-30.)

The Mushriquis do not dispute, nor can they, that they have received materials produced by the government that show Individual 1 was permitted to obtain and renew licenses from the State Department so he could continue to operate as a broker of defense articles during the undercover investigation.  Not only has the government produced the licenses but it has provided documents showing that, by virtue of being licensed, Individual 1 was able to make money from his consulting business while he was working with the FBI.  The government has further produced materials documenting the money Individual 1 made as a licensed broker during that time.

Despite the fact that the government has produced all of the discoverable materials related to Individual 1's work as a licensed broker while cooperating with the FBI, the

_____

[19]     Giordanella also seeks documents relating to correspondence between any "US law enforcement agency and the Department of State" regarding Individual 1's ability to conduct commercial activity overseas.  (See Giordanella Mot. at 7 (Point 16).)  Giordanella, however, articulates no factual or legal basis for the relevance or materiality of the documents nor does he offer any support for his claim that he is entitled to documents from "any US law enforcement agency" regardless of whether the agency is closely aligned with the prosecution team.

Mushriquis seek additional documents in connection with licenses obtained by Individual 1.

Though the Mushriquis do not identify what materials they seek other than references to "grants

of leniency" and "forms of consideration" to Individual 1, the government is unaware of any

such materials in its possession.  (See id. at 29.)  To the extent the Mushriquis seek other

impeachment material relating to Individual 1's work as a licensed broker while cooperating

with the FBI, the government has provided ample evidence enabling the defendants to attack

Individual 1's "motive to cooperate" and undermine his credibility.  (See id. at 30.)  Where, as

here, there is sufficient evidence to impeach a government witness, additional documents that

would provide the same kind of impeachment evidence are ordinarily deemed cumulative and

hence immaterial.  See United States v. Brodie, 524 F.3d 259, 268-69 (D.C. Cir. 2008) (holding

that evidence that a cooperator was involved in a fraudulent loan application was cumulative and

thus not material because it was "the same kind of impeachment evidence" as evidence of the

cooperator's involvement in fraudulent appraisals); see also United States v. Emor, 573 F.3d

778, 783 (D.C. Cir. 2009) (finding no Brady violation where government had already produced

the same kind of impeachment evidence and stating that "cumulative impeachment evidence is

generally not material because the marginal effect of additional impeachment is relatively small

and unlikely to result in a different outcome"); United States v. Oruche, 484 F.3d 590, 599 (D.C.

Cir. 2007) (Brady did not require disclosure of witness's admission that she lied to police

because the admission was cumulative).

      To the extent the Mushriquis request the government to gather materials in the possession

of the Departments of State or Commerce, they have not established that those departments

participated in the investigation or were otherwise "closely aligned" with the prosecution.  See

Brooks, 966 F.2d at 1503.  Without any analysis other than a citation to Safavian, discussed

above, the Mushriquis cannot show that those departments performed any role other than

carrying out their ministerial licensing functions – a far cry, under Safavian's "rule of reason,"

from the close working relationship required to obligate the government to search their files.

      G.      Defendants Are Not Entitled to Records from CIA and Other Agencies

Bigelow seeks "any and all records documenting reports and/or the cooperation of

[Bigelow] in reporting and combating corruption in the Republic of Georgia" allegedly held by

several government agencies, including the Central Intelligence Agency ("CIA").  (Bigelow's

Motion ("Bigelow Mot.") at 2 (Point 3).)  Bigelow asserts that this information may be

exculpatory under Brady because it might somehow negate his predisposition to engage in

corrupt acts in this case.  (See id. at 3-4.)

As an initial matter, Bigelow's alleged reporting of corruption in Georgia is, if anything,

probative of his recognition that it is illegal to pay bribes to foreign officials, and not his lack of

predisposition to commit the crimes charged here.  See United States v. Washington, 106 F.3d

983, 999 (D.C. Cir. 1997) (affirming district court's refusal to admit evidence of police officer's

commendations to rebut that officer's predisposition in the context of government undercover

operation); United States v. Marlinga, 457 F. Supp. 2d 769, 776 (E.D. Mich. 2006) ("The fact

that Defendant allegedly refused bribes on some occasions does not make it more likely that he

refused the bribes allegedly offered in this case.").  Indeed, the recordings in this case are replete

with acknowledgments by Bigelow that he was specifically aware of the Foreign Corrupt

Practices Act and its anti-bribery provisions; yet Bigelow readily agreed to participate in the

corrupt Country A deal, and undertook numerous acts in furtherance of the conspiracy.

Moreover, the agencies with which Bigelow allegedly shared this information – CIA, Department of Defense, Office of Defense Cooperation, and State Department – were not involved in the investigation or closely aligned with the prosecution, and Bigelow does not argue to the contrary.  See Brooks, 966 F.2d at 1503.  Because none of these agencies was involved in the investigation or prosecution of this case, it is not warranted – even under a "rule of reason" analysis – to require the government to canvas those agencies for information.  See Pelullo, 399 F.3d at 218; NYNEX, 781 F. Supp. at 25.

In any event, as Bigelow readily admits, he knows what contacts he had with government agencies related to corruption in Georgia since he initiated those contacts and has named the government agencies with whom he claims to have communicated.  As the original source of the information with first-hand knowledge of any and all communications, Bigelow is well-positioned to take advantage of this information at trial.  His request for the government to search for confirmation of what he already knows is not supported by Brady.  See United States v. Derr, 990 F.2d 1330, 1335 (D.C. Cir. 1993) ("Brady only requires disclosure of information unknown to the defendant."); United States v. Coker, 514 F.3d 562, 570 (6th Cir. 2007) (citation omitted) (Brady does not apply "when the information is readily available to the defense from another source"); Conley, 323 F.3d at 30 ("Brady does not protect a defendant who is aware of essential facts that would allow him to take advantage of the exculpatory evidence at issue."); Spirko, 368 F.2d at 405 (same); United States v. Gonzales, 90 F.3d 1363, 1368 (8th Cir. 1996) ("[T]he government need not disclose evidence available to the defense from other sources or evidence already possessed by the defendants); United States v. Blackley, 986 F. Supp. 600, 603 (D.D.C. 1997) ("For an item to be Brady it must be something that is 'being suppress[] by the

prosecution.'" (citation omitted)); <u>Orena v. United States</u>, 956 F. Supp. 1071, 1095 (E.D.N.Y. 1997) (citing <u>United States v. Zuckson</u>, 6 F.3d 911, 918 (2d. Cir. 1993) ("There is no 'suppression' where defendant or his attorney 'either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence.'")).

     Nevertheless, as the government has indicated to Bigelow, in light of the specific information he provided about contacts with the CIA (unlike the information with regard to the other named agencies), the government has sought to determine what documents, if any, exist in connection with Bigelow's alleged reporting of corruption to the CIA.  When the government receives this information, it will make any disclosures consistent with its <u>Brady</u> obligations.

     Finally, Bigelow seeks any information provided to any government agency regarding Bigelow or his company, Heavy Metal Armory, in connection with Bigelow's alleged reporting of corruption in Georgia.  (<u>See</u> Bigelow Mot. at 2 (Point 4).)  It is unclear exactly what Bigelow requests here, but neither the FBI nor DOJ provided any information to any other federal agency in connection with Bigelow's reporting of corruption allegations, and if Bigelow provided such information then, once again, presumably he is aware of it.  To the extent Bigelow is requesting that the government undertake a search of every federal agency for any communications relating to Bigelow's alleged reports of Georgian corruption, that request should be denied even under the broadest possible interpretation of <u>Brady</u> as not bounded by the "rule of reason."  <u>See Safavian</u>, 233 F.R.D. at 206-07 & n.1; <u>see also Bryan</u>, 868 F.2d at 1036 ("[A] federal prosecutor need not comb the files of every federal agency which might have documents regarding the

defendant in order to fulfill his or her obligations under Rule 16(a)(1)(C).").[20]

H.    Defendants Are Not Entitled to Individual 1's Bank Records

Giordanella and Wier both request bank records of Individual 1.  (See Giordanella Mot. at 7 (Point 18); Wier Mot. at 5 (Point 18).)  Their request should be denied, in the first instance, because neither defendant advances any kind of argument regarding the materiality of the bank records, a prerequisite for their disclosure under Rule 16, or makes any kind of showing whatsoever that they are entitled to records not found in the government's files.

Nevertheless – as neither Giordanella nor Wier acknowledge – the government has already produced to defendants those bank records of Individual 1 that are in its possession, along with thousands of other pages of documents relating to Individual 1.  Both Giordanella and Wier fail to show that they are entitled to any further discovery.  See, e.g., United States v. Shepard, No. 04-CR-1, 2009 WL 2780995, at *6 (N.D. Fla. Aug. 28, 2009) (finding no Brady violation where government did not obtain or produce government witness's bank records, even assuming that the records would have impeached the witness's testimony and shown him to be involved in criminal activity).

I.    Defendants Are Not Entitled to Individual 1's Drug and Alcohol Records

Giordanella and Wier seek medical records of Individual 1.  Without even identifying a specific time frame, Giordanella seeks documents "[r]elating to the psychiatric and/or

---

[20]    Without any factual basis or legal support, Wier requests CIA records and United Nations investigatory documents relating to Individual 1.  (See Wier Mot. at 7 (Points 27 and 28).)  The failure to demonstrate the relevance and materiality of his requests under Rule 16 or Brady, coupled with the fact that the CIA and the United Nations are not involved in or closely aligned with the prosecution in this case, forecloses Wier's demand for the same reasons articulated above.

psychological treatment of [Individual 1] including, but not limited to, all records related to his treatment for drug and/or alcohol addiction, including the names of the facilities where he received treatment." (Giordanella Mot. at 7 (Point 17).) Wier similarly demands "any and all documents and records reflecting the nature and extent of [Individual 1's] drug treatment history." (Wier Mot. at 2 (Point 5).) These far-ranging requests for discovery should be denied.

To be clear, notwithstanding Giordanella's wholly unsupported claim that any items in Individual 1's possession are by definition in the government's possession, the government does not have any such records. That fact alone should dispose of defendants' request, because neither the government, nor any other agency "closely aligned with the prosecution," can provide what is not in its possession. See United States v. Brooks, 966 F.2d 1500, 1503-04 (D.C. Cir. 1992); see also United States v. Sarras, 575 F.3d 1191, 1214-15 (11th Cir. 2009) (affirming district court's denial of defendant's motion to require government to produce medical records of main government witness, because the records were not in the government's possession, custody, or control).

Even if the government were subsequently to obtain any such records, Giordanella and Wier's broadly-phrased requests reach too far. Neither defendant even identifies a specific time frame for the records. See, e.g., United States v. Moore, 923 F.2d 910, 912-13 (1st Cir. 1991) (finding no Brady violation where government did not disclose witness's consultation with a therapist 10 years previously). Moreover, the records sought are confidential in nature and may implicate the protections of the psychotherapist-patient privilege, set forth by the Supreme Court. See Jaffee v. Redmond, 518 U.S. 1, 15 (1996) ("[W]e hold that confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are

58

protected from compelled disclosure . . . .").

Finally, consistent with its <u>Brady</u> obligations, the government has already produced Individual 1's drug test results while working with the FBI.  To the extent the government obtains any exculpatory or impeachment evidence relating to Individual 1's drug or alcohol use or treatment, it will provide this information promptly.

     J.    <u>Defendants Are Not Entitled to Search Warrant Affidavits</u>

Giordanella seeks all affidavits for all domestic and foreign search warrants.  (<u>See</u> Giordanella Mot. at 8 (Point 22).)  As noted above, the government has unsealed and produced to the relevant defendants who have so requested the affidavits relating to the search warrants executed at their businesses and residences located in the United States.  Additionally, the government has agreed to provide the search warrant affidavits for those locations to any other defendants, provided they can articulate the grounds upon which they are entitled to the requested affidavits.

As an initial matter, the government does not dispute that the defendants are entitled to the affidavits supporting the search warrants executed at their respective residences and offices so they can assess the viability of a challenge to the validity of the search, but Giordanella does not argue – nor does it appear he can – that the defendants have standing to challenge the searches of other defendants' residences and offices such that they are entitled to the affidavits supporting those searches.  <u>See</u> <u>Rakas v. Illinois</u>, 439 U.S. 128, 140-50 (1978) (for standing under the Fourth Amendment to contest the legality of a search or seizure, a defendant must show that he has a reasonable expectation of privacy in the place searched or the item seized by demonstrating sufficient facts that he had a legally cognizable privacy interest in the place

searched or the items seized).

Even if Giordanella were able to establish standing, he fails to articulate why he is entitled to all of the search warrant affidavits.  Instead, he merely argues that, because "the government contends that the Defendants are responsible for each Defendants' conduct," all domestic search warrant affidavits are pertinent to his defense and must be produced under Rule 16.  (See Giordanella Mot. at 12.)  Such a statement, even if it were not deficient for being wholly conclusory, does not establish that the affidavits are material to the preparation of his defense.

It is insufficient to show that the requested material "bear[s] some abstract logical relationship to the issues in the case."  United States v. George, 786 F. Supp. 11, 13 (D.D.C. 1991) (citing United States v. Secord, 726 F. Supp. 845, 846 (D.D.C. 1989); United States v. Ross, 511 F.2d 757, 762-63 (5th Cir. 1975)); see also United States v. Caaicedo-Llanos, 960 F.2d 158, 164 n.14 (D.C. Cir. 1992).  "There must be some indication that pretrial disclosure of the disputed evidence would [enable] the defendant significantly to alter the quantum of proof in his favor."  George, 786 F. Supp. at 13.  Here, because the charges in this case were brought well in advance, and without the benefit, of any of the evidence from the search warrants, Giordanella cannot realistically argue that obtaining the affidavits so he can use them to challenge that evidence would enable him significantly to alter the quantum of proof in his favor.[21]

Giordanella also seeks all foreign search warrant affidavits.  He makes this request

---

[21]     Even though Giordanella does not rely on Brady or Jencks as a basis for requesting the affidavits, the government has reviewed the affidavits and determined that they do not contain any Brady material.  Should any of the affiants on the search warrants testify at trial, the government will produce the affidavits in accordance with its obligations under the Jencks Act.

despite the fact that those searches, as repeatedly represented by the government, were not conducted by the government or at its request but instead by an independent foreign government entity in connection with its own criminal investigation.  The government is not in possession of any affidavits from the searches conducted by the City of London Police in the United Kingdom and any affidavits, to the extent they exist, are presumably with United Kingdom authorities, and not in the possession of the government.  See United States v. Mejia, 448 F.3d 436, 444 (D.C. Cir. 2006) (rejecting argument that government was obliged to obtain information in foreign country by way of MLAT: "The government's obligation was to comply with Rule 16, and there is no dispute that it did so.  Having authority 'to seek' tapes or transcripts through a treaty is not the same thing as having 'the power to secure them.'").

K.      Defendants Are Not Entitled to Correspondence Between Mishkin and His Attorneys

Wier seeks emails or other correspondence between defendant Saul Mishkin and his attorneys regarding the legality of the Country A transaction.  (See Wier Mot. at 3 (Point 8).) Not surprisingly, Wier fails to offer any support or even any argument for why he is entitled to such documents – because no such support or credible argument exists.  The documents Wier seeks are not relevant, let alone material, to his defense.  Any advice Mishkin may have received regarding the legality of the Country A transaction is irrelevant to Wier, as he had no knowledge of the advice at the time he engaged in the transaction.  See United States v. West, 392 F.3d 450, 457 (D.C. Cir. 2004) (a defendant may avail himself of an advice of counsel defense only where he makes a complete disclosure to counsel, seeks advice as to the legality of the contemplated action, is advised that the action is legal, and relies on that advice in good faith).  Accordingly, Wier's request should be denied.

L. <u>Defendants Are Not Entitled to Duplicate Images of Their Computers</u>

The Mushriquis request duplicate images of their laptop computers that were seized on January 18, 2010, asserting that "[r]emarkably, the government refuses to provide a copy of the image, even though it told the Court it would do so." (Mushriqui Mot. at 30.) What is remarkable is the defendants' omission of one critical fact: the government has already returned the laptop computers in question. Accordingly, the Mushriquis are in possession of the very data they purport to have been denied. Should any disputes about the content of the laptop computers subsequently arise, the Mushriquis will be able to have their own experts examine and analyze the computers.

To require the government to make an additional copy of <u>its</u> copy defies common sense. Rule 16 does not call for the imposition of such a costly, burdensome, and wholly unnecessary procedure. Unlike other cases where courts have addressed the sufficiency of inspection procedures for computers seized and retained by the government, here, the government immediately created a duplicate image of the Mushriquis' laptop computers. The government then returned the original computers to the Mushriquis. <u>Cf.</u> <u>United States v. Cox</u>, 190 F. Supp. 2d 330, 334 (N.D.N.Y. 2002) (denying defendant's request that the government return seized computer or provide copy, where the government agreed to make the computer available for inspection). The government has thus amply fulfilled its obligations under Rule 16(a)(1)(E)(iii), which requires it only to "permit the defendant to inspect and to copy" items in its possession, by returning to the Mushriquis the very "items" that were obtained from them.

M. <u>Government Has Produced the Emails from FBI Avondale Account</u>

The Mushriquis request the complete contents of avondalegroup@hotmail.com, the email

account used by one of the FBI agents to communicate with Individual 1.  (See Mushriquis Mot. at
23-25.)  The Mushriquis claim that the Avondale account "almost certainly contain[s] information
not found in the e-mails from the Bistrong account" and assert "[o]n information and belief," that
additional emails "may well be found in the Avondale e-mail account."  (Id. at 24.)

As the government advised the defendants, it has produced all of the emails from the Avondale
account, notwithstanding the fact that most of the emails fall outside of the Jencks Act and do not
trigger disclosure at this time.  Any speculation that the Avondale account may contain other
unproduced emails is unfounded and wholly insufficient to support a request for production.  See
United States v. Driver, 798 F.2d 248, 250 (7th Cir. 1986) ("Driver's speculation that the
government might not have disclosed all of the information in its possession about the co-
conspirators falls far short of establishing that the prosecution suppressed exculpatory evidence").
Because the government has produced to the defendants every single email sent or received from
the Avondale account, bar none, the Mushriquis' argument must fail.[22]

N.       Requests for Documents that Have Been Produced or Do Not Exist

As addressed above in response to certain requests, the defendants seek materials in a
number of categories that, to the extent they exist, have already been produced by the government.
As a result, the materials in those categories are not properly subject to a motion to compel.  (See
Giordanella Mot. at 5-8 (Points 2, 4-7, 9, 11, 12, 15 and 18-21); Godsey Mot. at 2-3 (Points D-F, H

---

[22]       The Mushriquis also request, without any substantiation or other support, an
image of the hard drive of the laptop computer used by Individual 1 during the undercover
operation on the grounds that it "may also show that [Individual 1] was withholding information
even from his FBI handlers."  (Mushriquis Mot. at 25.)  Such rank speculation, however,
amounts to nothing more than "a shot in the dark," that does not even come close to triggering
the government's obligation under Brady.  See Duval, 496 F.3d at 75.

and I); Wier Mot. at 1-6 (Points 1-4, 6, 7, 9-13, 16, 17, 20 and 21); and Bigelow Mot. at 1 (Point

1).)  In addition, the government has produced other categories of materials not specifically

addressed above, including: (1) an explanation of the abbreviations used on the whiteboard at the

jail in Las Vegas, Nevada, where the defendants were detained following their arrests, (see

Mushriqis Mot. at 31-32); (2) the recorded telephone calls obtained by the government of the

defendants while in custody following their arrests, (see Godsey Mot. at 3 (Point G)[23] and Bigelow

Mot. at 2 (Point 2)); and (3) the FBI reports documenting the transfer, loss and attempted recovery

of certain emails from Individual 1's account, (see Wier Mot. at 6 (Point 23)).  As a result, the

materials in these categories too are not properly subject to a motion to compel.  Finally, the

defendants have made requests for still other categories of materials or information that are

premature or overly broad.  For these reasons, as addressed at points above, these requests should

be denied.  (See Godsey Mot. at 3 (Points A and J); Bigelow Mot. at 2 (Point 4).)

.   .   .   .

As set forth above, the defendants' motions to compel should be denied, except as

otherwise indicated in this section.

## BILL OF PARTICULARS

Several defendants sought a bill of particulars with 35 specific requests for information.

The government provided responsive information to the first 18 requests, even though the

information sought was contained in the discovery.  Because the remaining information related to

the government's anticipated proof at trial and not the charges in the case, the government

---

[23]     Godsey and Morales and Bigelow also seek audio and video recordings from the
Las Vegas jail following their arrests.  (See Godsey Mot. at 3 (Point G).)  As previously
indicated, except for the telephone calls, the government is unaware of any other recordings.

indicated that the information was not properly discoverable through a bill of particulars.  The

defendants now seek that information in their motion.

I.      Legal Standard

Under Rule 7(c) of the Federal Rules of Criminal Procedure, an indictment need only set

forth a "plain, concise and definite written statement of the essential facts constituting the

offense."  Additional details, in the form of a request for a bill of particulars, are not appropriate

unless the indictment is too vague to inform the defendant of the nature of the charges to allow the

preparation of a defense, avoid unfair surprise, and preclude double jeopardy.  See Wong Tai v.

United States, 273 U.S. 77, 82 (1927); United States v. Butler, 441 F.2d 1191, 1193 (D.C. Cir.

1987).  "[I]f the indictment is sufficiently specific, or if the requested information is available in

some other form, then a bill of particulars is not required."  Butler, 441 F.2d at 1193.

"A bill of particulars is not a discovery tool or a device for allowing the defense to

preview the government's theories or evidence.  It properly includes clarification of the

indictment, not the government's proof of its case."  United States v. Anderson, 441 F. Supp. 2d

15, 19 (D.D.C. 2006).  Therefore, it is not the purpose of the bill of particulars to provide for

"whole sale discovery of the Government's evidence," United States v. Edelin, 128 F. Supp. 2d 23,

36 (D.D.C. 2001) (citing United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990)), nor should it

be used as a substitute for discovery, or as a means of informing the defendant of every shred of

evidence which the government intends to present, see Ramirez, 54 F. Supp. 2d 25, 29 (D.D.C.

1999).  "[A] bill of particulars is not meant to be a tool for the defense to obtain pre-trial disclosure

of all the evidence held by the government [nor does] [t]he Government . . . have a duty to furnish

all the facts that the defendant wants."  United States v. Cisneros, 26 F. Supp. 2d 24, 55 (D.D.C.

65

1998).  Rather, "[t]he purpose of a bill of particulars . . . is to give the defendant only that

minimum amount of information necessary to permit the defendant to conduct his <u>own</u>

investigation."  <u>United States v. Grasso</u>, 173 F. Supp. 2d 353, 367 (E.D. Pa. 2001) (emphasis in

original).

The Court has broad discretion regarding whether a bill of particulars is appropriate.  "The

determination of whether a bill of particulars in necessary rests with the sound discretion of the

trial court and will not be disturbed absent an abuse of that discretion."  <u>United States v. Mejia</u>,

448 F. 3d 436, 445 (D.C. Cir. 2006).

II.    <u>Argument</u>

The defendants acknowledge that "the Government need not particularize all of its

evidence," (Defendants' Memorandum ("Defs. Mem.") at 12), yet that is precisely what they ask

the Court to order the government to do.  The Court should deny their requests because the

detailed superseding indictment and the substantial discovery provide more than adequate notice to

the defendants of the charges they face.  The defendants' requests are far out of step with the

courts in this Circuit, which have consistently rejected defendants' attempts to use a bill of

particulars to tease out the government's legal theories and trial evidence.  To the extent

defendants seek additional factual information, their requests are simply "ill-designed attempts at

general pre-trial discovery," and not appropriate for a bill of particulars.  <u>Torres</u>, 901 F.2d at 234-

35.

A.    <u>Defendants Are Not Entitled to Specific Details of the Overarching Conspiracy</u>

The bulk of the defendants' requests seek detailed legal information about the charged

conspiracies and the manner in which the government intends to prove an overarching conspiracy

at trial.[24]  For example, the defendants seek "the particulars in support of charging each Defendant

in one overarching conspiracy"; "all overt acts" that the government intends to prove at trial; the

"time place and circumstance" under which each defendant conspired; and all acts showing

"interdependence" or "overlap" among the conspirators.  (See Defendants' Motion ("Defs. Mot.")

at 2-3.)  The stated basis for these and similar requests is that the defendants do not believe that

there is sufficient evidence of "confederation" among them.  (See Defs. Mem. at 5.)  Again, the

defendants do not claim that they do not understand the charges; they say that they do not agree

with them.

        The defendants' disagreement with the charges does not entitle them to the particularized

evidence they seek.  The D.C. Circuit has made clear that where an indictment sets forth the basic

allegations underpinning a conspiracy charge, no more is required.  See Mejia, 448 F.3d at 445.  In

Mejia, the court rejected a defense request for a bill of particulars seeking specific information

about the government's conspiracy charge because "[t]he superseding indictment identifies what

the object of the conspiracy is as is required . . . provides a time period of the conspiracy . . .

identifies the statutes that the object of the conspiracy violated . . . has an identification of the

proper mens rea required under [the relevant statutes] [and] identifies at least five countries where

the conspirators acted."  Id. at 445.  Here, the government has gone well beyond the basic

allegations the court found satisfactory in Mejia and supplied far more detailed information about

---

[24]        The defendants make 14 separate requests in their motion, but in their legal
memorandum they specifically address only two general categories of information to which they
claim they are entitled: (1) specific details of the alleged overarching conspiracy and (2)
disclosure of all known unindicted co-conspirators and their overt acts in furtherance of the
conspiracy.  (See Defs. Mem. at 7, 13.)  The government agrees that all of the defendants'
requests fall under these two broad categories, and has therefore responded in kind to the
defendants' two general requests.

the charged conspiracies in the superseding indictment and in the discovery.

Similarly, in Butler, the court rejected a request for specific details about the "approximate times and the places at which [the defendant] entered and exited the alleged conspiracy," finding that the 11-month time frame supplied by the government was sufficient, and "[m]ore specific information about the times and places that [the defendant] participated in the alleged conspiracy was not required by law." Id. at 1194.  As Mejia and Butler make clear, the defendants' attempts to use a bill of particulars to seek additional details and evidence about the charged conspiracies here run counter to the law of this Circuit and should be denied.

In view of this authority, courts in this district have consistently rejected requests for particularized information about conspiracy charges.  For example, in United States v. Bourdet, 477 F. Supp. 2d 164 (D.D.C. 2007), the defendants requested a bill of particulars similar to the one here "that details any words, acts, or deeds by defendants that the Government believes support the conspiracy charge."  Id. at 184.  Despite a "relatively spare" indictment, the court, citing Mejia and Butler, ruled that because the indictment sets forth a time period for the conspiracy, identified three countries in which the defendants took acts in furtherance of the conspiracy, and specified the conspiracy's object, the statutes violated, and the appropriate mens rea, no more specific information was required.  Id.  The court's analysis applies with even more force here in view of the "speaking" superseding indictment.  The superseding indictment, together with the discovery, contains more than sufficient information about the details of the conspiracy, particularly where discovery for each defendant has largely been made available to all defendants.  See United States v. Glover, 583 F. Supp. 2d 5, 14 (D.D.C. 2008) (denying bill where "[the defendant] has received discovery not only of communications involving her, but also of communications involving the

68

other co-defendants charged with her in the superseding indictment.").

Courts in this district have considered and consistently rejected the same requests for conspiracy details through a bill of particulars that the defendants make here.  See, e.g., Glover, 583 F. Supp. 2d at 13-14 ("[T]he government is not required to prove how or when the conspiracy was formed, the details of any meeting or when the defendant joined the conspiracy."); United States v. Palfrey, 499 F. Supp. 2d 34, 51 (D.D.C. 2007) ("[T]he Government is not required to disclose its evidence as to the details of the activities of the[ ] co-conspirators, nor it is required to disclose its theories. . . ."); United States v. Brodie, 326 F. Supp. 2d 83, 91 (D.D.C. 2004) ("Nor is the government required to prove how or when the conspiracy was formed, the details of any meeting or when the defendant joined the conspiracy."); Edelin, 128 F. Supp. 2d at 37 ("The voluminous discovery already provided to the defendants in this case more than compensates for the lack of a bill of particulars.").[25]  Defendants offer no sound reason to deviate from this well-settled authority rejecting the very same evidentiary details the defendants seek here.

Defendants elected to base their legal arguments principally on district court cases from the Second Circuit, but there, as here, the law is clear that a bill of particulars cannot be used for the "[a]quisition of evidentiary detail."  Torres, 901 F.2d at 234.  The defendants' reliance on United States v. Lino, No. 00 CR 632 (WHP), 2001 WL 8356 (S.D.N.Y. Jan. 1, 2001), a pension fund case, does not help their cause.  (See Defs. Mem. at 10-11.)  The conspiracy charge there involved

---

[25]    This analysis does not apply with any less force to cases brought under the FCPA. See United States v. Young & Rubicam, Inc., 741 F. Supp. 2d 334, 349 (D. Conn. 1990) (finding in an FCPA case that "[t]o require specification of the formation of the conspiracy, the place and date of each defendant's entrance into the conspiracy, the substance or a copy of the conspiracy, and specification of the manner in which the conspiracy operated would unduly restrict the government's proof at trial.").

several conspirators who engaged in temporally distant and distinct schemes, involving wide-ranging predicate acts, and the indictment provided only "sparse detail." Id. at *7, 12-13. Lino is a far cry from the instant case, where the conspiracy is confined to an overarching transaction more limited in time and scope that involved concerted activity as set forth in a detailed superseding indictment.[26] See United States v. Patterson, No. 03 CR 283 (WHP), 2002 WL 31890950, at *10 (S.D.N.Y. Dec. 27, 2002) (distinguishing Lino and denying a bill of particulars because "the charges in the Indictment are straightforward, detailing a single marijuana distribution scheme over a period of approximately six months . . . . [that] alleges a series of overt acts, identifies a number of alleged co-conspirators, and describes, with specific dates and locations, a conspiracy that is not of exceptional duration or breadth.").

The few district court cases defendants cite from this district do not support their claim of entitlement to more specific details about the charged conspiracies and the manner in which the government expects to prove them. Those cases involved indictments that the courts found to be so deficient or convoluted that the defendants could not adequately defend the charges. See Ramirez, 54 F. Supp. 2d 25, 30 (D.D.C. 1999) (Friedman, J.) (indictment provided "little detail"); United States v. Hsia, 24 F. Supp. 2d 14, 31 (D.D.C. 1998) (Friedman, J.) (indictment alleged defendant impeded lawful function of INS but failed to explain how); United States v. Trie, 21 F. Supp. 2d 7, 21 (D.D.C. 1998) (Friedman, J.) (indictment did not identify the false statements with

---

[26]   United States v. Bin Laden, 92 F. Supp. 2d 225 (S.D.N.Y. 2000), an international terrorism case cited by the defendants, is also distinguishable. (See Defs. Mem. at 9-10.) The court there tied its decision to grant a bill of particulars to the specific facts of that case, where, unlike here, there were 15 named defendants, 267 discrete criminal offenses, and five conspiracies, with overt acts alleging broad categories of conduct, over a long period of time, in various countries around the world. See id. at 236, 239 & n.24.

which the defendant was charged and "portions of the indictment are difficult to follow").[27]  In

sharp contrast to the indictment deficiencies identified by Judge Friedman in <u>Trie</u>, <u>Hsia</u> and

<u>Ramirez</u>, the superseding indictment here sets forth the government's basic charging theory, and

supplies far more detail about the charged conspiracies that the "short and plain statement" that

Rule 7 of the Federal Criminal Rules legally requires.

      The defendants' fall-back argument appears to be that, "given the unique circumstances of

this prosecution," the Court should set aside the weight of authority in this Circuit and exercise its

discretion to order a bill of particulars.  (<u>See</u> Defs. Mem. at 13.)  Defendants provide no legal

authority and little explanation for why they claim they are somehow entitled to more

particularized information in the context of an undercover operation.  If anything, the opposite

conclusion is true.  Unlike drug conspiracy cases – not uncommon in this district – which may

involve spare charging documents coupled with wide-ranging predicate acts and temporally

distinct aspects to the charged conspiracies, the conspiracy charges here are based on conduct over

a limited time period set forth in great detail in the superseding indictment, including specific dates

and locations of meetings, wire transfers, emails and other specific information about how the

conspiracy progressed.

      This is not a case where the facts underpinning the government's conspiracy charges come

from multiple cooperators whose statements have not yet been turned over; the bulk of the

evidence here consists of recorded meetings and telephone conversations already in the possession

---

[27]    The defendants' reliance on <u>Trie</u> is particular inapt since Judge Friedman clarified
in <u>United States v. Anderson</u>, 441 F. Supp. 2d 15 (D.D.C. 2006), that <u>Trie</u> was a "unique case
because of the convoluted theory on which the defendant was indicted and the way in which the
indictment was drafted."  <u>Id.</u> at 19.  The same cannot be said here.

of the defendants.  The defendants may claim that the additional evidentiary details they seek from

the government may be helpful to them, but those details are not necessary to understand the

charges.  Therefore, as courts in this Circuit and elsewhere have held time and time again, such

requests are not appropriate for a bill of particulars.

      B.     The Request for Names of Known Unindicted Co-Conspirators is Premature
            and Defendants Are Not Entitled to Disclosure of Co-Conspirators' Overt Acts

          1.     Names of All Known Unindicted Co-Conspirators

The defendants also request the names of all known, unindicted co-conspirators and any

overt acts they undertook.  (See Defs. Mem. at 13.)  The defendants rely on United States v.

Palfrey, 499 F. Supp. 2d 34 (D.D.C. 2007), for the proposition that "disclosure of the names of

alleged co-conspirators is not uncommon in conspiracy cases, and particularly in cases alleging

nonviolent offenses. . . ."  Id. at 52.  While the weight of authority, as set forth above, is decidedly

against the disclosure of evidentiary detail or the government's anticipated proof at trial, the case

law is more mixed relating to the disclosure of the names of unindicted co-conspirators, with some

courts granting disclosure and others denying it.

Although the disclosure of the names of unindicted co-conspirators is not required as a

matter of law, see, e.g., Mejia, 448 F.2d at 445-46, Torres, 901 F.2d at 233-34, United States v.

Rey, 923 F.2d 1217, 1222 (6th Cir. 1991); United States v. DiCesare, 765 F.2d 890, 897-98 (9th

Cir. 1985), the government nevertheless is willing to make a disclosure at an appropriate time

closer to trial.  By doing so, any such disclosure will avoid compromising the government's

ongoing investigation.  See United States v. Nachamie, 91 F. Supp. 2d 568, 572 (S.D.N.Y. 2000)

(citing "risk of compromising continuing investigation" as factor counseling against pretrial

disclosure of known, co-conspirator names).  In light of the fact that a trial date has not yet been

set and may not be until the end of the year given the Court's comments concerning its upcoming trial calendar, the government agrees to comply with the defendants' request, at a reasonable time in advance of trial, once that date is scheduled.

2.     Co-Conspirator Overt Acts

The defendants' demand for disclose of all overt acts undertaken by any co-conspirator that the government intends to prove at trial should be denied.  Even those courts that have ordered disclosure of co-conspirator names have not ordered disclosure of all co-conspirators' overt acts. See, e.g., Ramirez, 54 F. Supp. 2d at 30 ("[t]he Court is not expressly requiring that the government provide the defendants with all overt acts taken by anyone in furtherance of the conspiracy. . . ."); Palfrey, 499 F. Supp. 2d at 51 ("Although Defendant is entitled to the names of the alleged co-conspirators . . . the Government is not required to disclose its evidence as to the details of the activities of those co-conspirators, nor is it required to disclose its theories. . . ."). This makes sense since courts have consistently rejected efforts to force the government to provide all overt acts for the defendants themselves.  See, e.g., Trie, 21 F. Supp. 2d at 23 ("To require the government to identify all alleged overt acts, many of which may be innocent in themselves or may be incidental meetings, conversations or phone calls, in furtherance of the alleged conspiracies would be a heavy burden indeed and not essential to the preparation of a defense."). Even if defendants were entitled to this information, which they are not, the government would not be in a position until shortly before trial to make such disclosures.

Accordingly, the government is prepared to disclose at a reasonable time before trial the names of all known, unindicted co-conspirators, but the Court should reject the defendants' request for disclosure of all overt acts undertaken by known, unindicted co-conspirators.

.   .   .   .

In view of the foregoing, the defendants' motion for a bill of particulars should be denied

in its entirety, subject to the Court revisiting at a later time the government's disclosure of the

names of known, uncharged co-conspirators.

<u>CONCLUSION</u>

The government has provided extensive discovery in this case and has accommodated the

defendants in numerous instances by providing discovery far beyond what is required by the rules.

As demonstrated above, some of the defendants' requests for discovery and bill of particulars go

too far.  Because the defendants request material and information that is not authorized by relevant

statute, applicable rules, Constitutional obligation and governing law, the Court should deny their

motions to compel discovery and motion for bill of particulars except as otherwise indicated in this

response.

Respectfully submitted,

DENIS J. McINERNEY                    RONALD C. MACHEN JR.
Chief, Fraud Section                        United States Attorney
                                                     In and For the District of Columbia


By: _____/s/_____        _____/s/_____
      HANK BOND WALTHER                          MATTHEW C. SOLOMON
      D.C. Bar # 477218                                  NY Bar # 3055209
      Acting Deputy Chief                              Assistant United States Attorney
      LAURA N. PERKINS                              Fraud & Public Corruption Section
      D.C. Bar # 479048                                  United States Attorney's Office
      Trial Attorney                                      555 4th Street, N.W., Room 5233
      JOEY LIPTON                                       Washington, D.C. 20530
      IL Bar # 6225473                                  (202) 353-2457
      Trial Attorney
      Criminal Division, Fraud Section
      U.S. Department of Justice
      1400 New York Avenue N.W.

74

Washington, D.C. 20530
(202) 307-2538 (Walther)
(202) 616-8917 (Perkins)
(202) 514-0839 (Lipton)