UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,           :   Docket Nos. CR09-335 (RJL)
                                    :
                 Plaintiff,         :   June 17, 2010
                                    :
                                    :   2:00 p.m.
v.                                  :
                                    :
AMARO GONCALVES, JEANA              :
MUSHRIQUI, JOHN M. MUSHRIQUI,       :
DAVID PAINTER, LEE M. WARES,        :
PANKESH PATEL, OFER PAZ,            :
ISRAEL WEISLER, MICHAEL SACKS,      :
JOHN BENSON WIER, III, HAIM         :
GERI, YOCHANAN R. COHEN, SAUL       :
MISHKIN, R. PATRICK CALDWELL,       :
STEPHEN GERARD GIORDANELLA,         :
ANDREW BIGELOW, HELMIE              :
ASHIBLIE, DANIEL ALVIREZ, LEE       :
ALLEN TOLLESON, JOHN GODSEY,        :
MARK MORALES, and JONATHAN          :
SPILLER,                            :
                                    :
                 Defendants.        :
. . . . . . . . . . . . . . .       :



TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Plaintiff:              HAROLD BOND WALTHER, ESQ.
                                LAURA PERKINS, ESQ.
                                MATTHEW SOLOMON, ESQ.
                                JOEY LIPTON, ESQ.
                                U.S. Department of Justice
                                1400 New York Avenue, N.W.
                                Third Floor
                                Washington, D.C.  20005

APPEARANCES (continued):

| | |
|---|---|
| For the Defendant Goncalves: | JEREMY D. MARGOLIS, ESQ.<br>ROBERT ANDALMAN, ESQ.<br>Loeb & Loeb, LLP<br>321 North Clark Street<br>Suite 2300<br>Chicago, Illinois  60654 |
| For the Defendant John Mushriqui: | DAVID STANLEY KRAKOFF, ESQ.<br>JAMES PARKINSON, ESQ.<br>Mayer Brown, LLP<br>1999 K Street, N.W.<br>Washington, D.C.  20006 |
| For the Defendant Jeana Mushriqui: | CHARLES S. LEEPER, ESQ.<br>BARRY GROSS, ESQ.<br>Drinker Biddle & Reath, LLP<br>1500 K Street, NW<br>Washington, DC 20005 |
| For the Defendant David Painter: | PETER ROBERT ZEIDENBERG, ESQ.<br>DLA Piper, LLP<br>500 8th Street, N.W.<br>Washington, D.C.  20004 |
| For the Defendant Lee M. Wares: | DANNY C. ONORATO, ESQ.<br>Onorato & Schertler, LLP<br>601 Pennsylvania Avenue, N.W.<br>Washington, D.C.  20004 |
| For the Defendant Ofer Paz: | BRIAN HEBERLIG, ESQ.<br>Steptoe & Johnson, LLP<br>1330 Connecticut Avenue, N.W.<br>Washington, D.C.  20036 |
| For the Defendant Wayne Weisler: | MICHELLE J. SHAPIRO, ESQ.<br>LARA COVINGTON, ESQ.<br>Wilson Sonsini Goodrich & Rosati, PC<br>1301 Avenue of the Americas<br>New York, New York 10019 |

```
For the Defendant Michael        DAVID BARGER, ESQ.
Sacks:                           Greenberg Traurig, LLP
                                 1750 Tysons Corner Boulevard
                                 McLean, Virginia 22102


(Appearances continued on the next page.)



Appearances (Continued.)


For the Defendant Yochannan
 Cohen:                          DAVID Z. CHESNOFF, ESQ.
                                 G. ALLEN DALE, ESQ.
                                 Law Offices of G. Allen Dale, Esq.
                                 601 Pennsylvania Avenue, NW
                                 Washington, DC 20004


For the Defendant Saul           BRITTNEY HORSTMAN, ESQ.
Mishkin:                         201 South Biscayne Boulevard
                                 Suite 905
                                 Miami, Florida  33131


For the Defendant R. Patrick     KATHERINE JOANNE SEIKALY, ESQ.
Caldwell:                        Reed Smith
                                 1301 K Street, N.W.
                                 Suite 1100 East Tower
                                 Washington, D.C.  20005


For the Defendant Stephen        PAUL CALLI, ESQ.
Gerard Giordanella:              Carlton Fields
                                 100 SE Second Street
                                 4000 International Place
                                 Miami, Florida  33131


For the Defendant Andrew         LAWRENCE JACOBS, ESQ.
Bigelow:                         543 10th Street West
                                 Bradenton, Florida  34205


For the Defendant Helmie         CHARLES BURNHAM, ESQ.
Ashiblie:                        Burnham & Gorokhov, PLLC
```

```
                                    1739 Clarendon Boulevard
                                    Arlington, Virginia  22209


For the Defendant Lee Allen       JOSEPH S. PASSANISE, ESQ.
Tolleson:                         Law Offices of Dee Wampler Joseph
                                        Passanise
                                  2974 E. Battlefield
                                  Springfield, Missouri 65804


APPEARANCES (Continued.)

For the Defendant John            MICHAEL J. MADIGAN, ESQ.
Godsey:                           Orrick, Herrington & Sutcliffe
                                  1152 15th Street, N.W.
                                  Washington, D.C.  20005


For the Defendant Mark            STEVEN J. McCOOL, ESQ.
Morales:                          Mallon & McCool, LLC
                                  1776 K Street, N.W.
                                  Suite 200
                                  Washington, D.C.  20006


Court Reporter:                   PATTY ARTRIP GELS, RMR
                                  Official Court Reporter
                                  Room 4700-A, U.S. Courthouse
                                  Washington, D.C. 20001
                                  (202) 962-0200


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
```

P R O C E E D I N G S

COURTROOM DEPUTY:  Ladies and gentlemen, when the name of your client is called, please stand in the gallery and say present.  Calling criminal case 09-335, United States of America versus Amaro Goncalves.  Would counsel introduce themselves?

MR. LIPTON:  Good afternoon, your Honor, Joey Lipton, Laura Perkins, Matthew Solomon and Hank Walther for the Government.

MR. MARGOLIS:  Jeremy Margolis and Rob Andalman for Mr. Goncalves.

THE COURT:  Welcome back.

COURTROOM DEPUTY:  United States of America versus John M. Mushriqui.

MR. KRAKOFF:  Good morning, your Honor, David Krakoff and Jamie Parkinson for John Mushriqui.

THE COURT:  Welcome back.

COURTROOM DEPUTY: United States of American versus Jeana Mushriqui.

MR. LEEPER:  Good afternoon, your Honor, Charles Leeper and Barry Gross for Jeana Mushriqui.

THE COURT:  Welcome back.

COURTROOM DEPUTY:  United States of America versus David Painter.

MR. ZEIDENBERG:  Good afternoon, your Honor, Peter Zeidenberg for Mr. Painter.

1            THE COURT:  Welcome back.

2            COURTROOM DEPUTY:  United States of America versus Lee

3    Wares.

4            MR. ONORATO:  Good afternoon, your Honor, Danny Onorato

5    on behalf of Mr. Wares.

6            THE COURT:  Welcome back.

7            COURTROOM DEPUTY:  United States of America versus

8    Pankesh Patel.

9            MR. BRUCE: Good afternoon, your Honor, Eric Bruce on

10   behalf of Mr. Patel who is present in the court.

11           THE COURT:  Welcome back.

12           COURTROOM DEPUTY: United States of America versus Ofer

13   Paz.

14           MR. HEBERLIG:  Good afternoon, your Honor, Brian

15   Heberlig on behalf of Mr. Paz.

16           THE COURT:  Welcome back.

17           COURTROOM DEPUTY:  United States of America versus

18   Wayne Weisler.

19           MS. SHAPIRO:  Good afternoon, your Honor, Michelle

20   Shapiro and Laura Covington for Mr. Weisler.

21           THE COURT:  Welcome back.

22           COURTROOM DEPUTY:  United States of America Michael

23   Sacks.

24           MR. BARGER:  Good afternoon, your Honor, David Barger

25   on behalf of Mr. Sacks.

1          THE COURT:  Welcome back.

2          COURTROOM DEPUTY:  United States of America versus John

3    Benson Wier, III.

4          MR. FOSTER:  Good afternoon, sir, Todd Foster for

5    Mr. Wier.

6          THE COURT:  Welcome back.

7          COURTROOM DEPUTY:  United States of America versus Haim

8    Geri.

9          MR. BRUCE:  Good afternoon again, your Honor, Eric

10   Bruce on behalf of Mr. Geri.

11         THE COURT:  United States of America versus Yochanan R.

12   Cohen.

13         MR. DALE:  Good afternoon, your Honor, Allen Dale and

14   David Chesnoff on behalf Mr. Cohen.

15         THE COURT:  Welcome back.

16         COURTROOM DEPUTY:  United States of America versus Saul

17   Mishkin.

18         MS. HORSTMA:  Good afternoon, your Honor, Brittney

19   Horstman on behalf of Mr. Saul Mishkin.

20         THE COURT:  Welcome back.

21         COURTROOM DEPUTY:  United States of America versus R.

22   Patrick Caldwell.

23         MS. SEIKALY:  Good afternoon, your Honor, Katherine

24   Seikaly on behalf of Mr. Caldwell.

25         THE COURT:  United States of America versus Stephen

1  Giordanella.

2          MR. CALLI:  Good afternoon, your Honor, Paul Calli on

3  behalf of Mr. Giordanella.

4          THE COURT:  Welcome back.

5          COURTROOM DEPUTY:  United States of America versus

6  Andrew Bigelow.

7          MR. JACOBS:  Good afternoon, your Honor, Lawrence

8  Jacobs on behalf of Mr. Bigelow who is present.

9          THE COURT:  Welcome back.

10          COURTROOM DEPUTY:  United States of America versus

11  Helmie Ashiblie.

12          MR. BURNHAM:  Good afternoon, your Honor, Charles

13  Burnham on behalf of Mr. Ashiblie who is present in court.

14          THE COURT:  Welcome back.

15          COURTROOM DEPUTY:  United States of America versus Lee

16  Allen Tolleson.

17          MR. PASSANISE:  Good afternoon, your Honor, Joe

18  Passanise on behalf of Mr. Cohen.

19          THE COURT:  Welcome back.

20          COURTROOM DEPUTY:  United States of America versus John

21  Gregory Godsey.

22          MR. MADIGAN:  Good afternoon, your Honor, Michael

23  Madigan and Sara Cowles on behalf of Mr. Godsey.

24          THE COURT:  Welcome back.

25          COURTROOM DEPUTY:  And United States of America versus

1   Mark Morales.

2          MR. McCOOL:  Good afternoon, your Honor, Steven McCool

3   on behalf of Mr. Morales.

4          THE COURT:  Welcome back.  All right, counsel, it took

5   a while to sort out who is going to argue who, what, how and

6   why, but I think we finally have a batting order here.  It took

7   a while to concoct it here.  Thanks for your patience.  I think

8   we are accommodating everyone that wants to speak.  They may not

9   be getting as much time as they would like, but the true test of

10  great lawyering is if you can synthesize it down to a manageable

11  amount of time so let's see how good you are.

12         We are going to hear first on the Bill of Particulars

13  defense first, the Michelle Shapiro team I guess; and then

14  Mr. Solomon is going to speak for the Government in between.  So

15  defense gets 15 minutes, the Government gets 15 minutes, and the

16  defense gets a five-minute rebuttal.

17         MS. SHAPIRO:  Hello again, your Honor.  Michelle

18  Shapiro from Wilson Sonsini on behalf of Israel Weisler.  Let me

19  begin by extending Lisa Prager's apologies for not being here

20  today.  She had a long-standing trip planned before the Court

21  scheduled this hearing than, and she didn't want to

22  inconvenience everyone by requesting a new date.

23         THE COURT:  That's fine.

24         MS. SHAPIRO: Six months ago the 22 Defendants were

25  charged in 16 separate indictments.  At that time the Government

1    averred that those indictments charged a single overarching

2    conspiracy and all of us, your Honor included, scratched our

3    heads.  Have no fear, assured the Government, once you review

4    the discovery, you will understand our allegations.  You will

5    know what each Defendant's role was in the conspiracy.  You will

6    know who their alleged co-conspirators are and, if discovery

7    isn't enough, don't worry, said the Government, we will provide

8    any additional information quote, "about what the contours of

9    the conspiracy are," end quote in a Bill of Particulars.

10         Flash forward a few months and Defendants received a

11   massive amount of discovery and a Superseding Indictment which

12   does little more than conglomerate the 16 individual indictments

13   and slap on a giant caption.  The Government in its Opposition

14   to our Motion said that this detailed speaking indictment

15   together with the voluminous discovery produced to date contains

16   more than sufficient information about the details of the

17   conspiracy.

18         Well, with all due respect to the Government, a

19   speaking indictment?  Who speaks this way? In describing the

20   manner and means of the conspiracy, the Superseding Indictment

21   over and over again states that the Defendants would agree to

22   pay a commission and that they would agree to inflate their

23   prices and that they would participate in meetings and in using

24   this odd subjunctive tense, the indictment gives the false

25   impression that the Defendants met together as a group; but upon

1    careful reading of the indictment coupled with a review of the

2    discovery, it appears that that never happened at least not

3    until the very end of the conspiracy after all the deals had

4    already been struck.

5           So the Defendants are left to wonder what does it mean

6    to say that they would agree to do certain things or that they

7    would participate in meetings? With whom exactly would they

8    agree? With whom would they meet? Did they actually agree? Did

9    they actually meet? When?  Where?  What association, if any, do

10   these Defendants have to one another?

11          The Government, of course, knows the answers to these

12   questions.  After all, they orchestrated and monitored this

13   scheme from the beginning and the Government is the central

14   actor and the only common participant in the events underlying

15   the indictment and yet they are holding this information close

16   to the vest.  Why?  It is not out of a concern for witness

17   tampering.  It is not out of a concern about destruction of

18   evidence.  It is solely to gain a tactical advantage.  We submit

19   that in the unusual context of this prosecution, your Honor

20   should exercise the broad discretion afforded to you and order

21   the Government to explain the contours of the overarching

22   conspiracy.

23          We are not looking for their evidence here.  It is

24   purely a legal issue.  What is the Government's overarching

25   conspiracy allegation? In its papers, the Government compares

1    this case to the drug distribution cases so often before this

2    Court, but in those cases the conspiracy is vertical.  The

3    Defendants are linked in a chain.  The guy selling on the corner

4    gets his drugs from the bag man who gets the drugs from his

5    supplier and so on up the chain.

6            As the D.C. Circuit recognized in United States versus

7    Tarantino, in drug distribution cases, each Defendant is aware

8    of his or her place in the chain and the vertical integration

9    quote "may raise the inference that each conspirator has agreed

10   with the others, some whose specific identity may be unknown to

11   further a common unlawful objective, e.g., the distribution of

12   narcotics."  End quote.

13           That's not remotely what we are dealing with here.  If

14   anything, we have a horizontal conspiracy.  These Defendants are

15   executives of separate companies that supply military and law

16   enforcement equipment.

17           THE COURT:  Now, wouldn't the Government's position be

18   that it is more like a wheel where at the hub of the wheel you

19   have got the informant and you have got the agents acting

20   undercover and then you have these spokes coming out from the

21   hub which are the individual Defendants, and then there is a

22   kind of a band tying together the spokes so that you have the

23   actual wheel itself? Wouldn't that be kind of their theory?

24           MS. SHAPIRO:  I don't know.  We have asked the

25   prosecution that question, and they have refused to answer.  We

1    asked that specific question in our discovery letter, and they

2    said we don't have to tell you that and we are not going to tell

3    you that.  If that is their theory, we submit that let's hear

4    that, let's get that out on the table and move forward because,

5    your Honor, so many decisions this Court is going to be faced

6    with over the upcoming months and possibly years may well

7    hinge --

8              THE COURT:  Years?

9              MS. SHAPIRO:  Well, you talked about 2011 for the trial

10   dates.

11             THE COURT:  One year.

12             MS. SHAPIRO:  One year.  Okay.  So many of the

13   decisions from Pretrial rulings like severance or joinder,

14   misjoinder, questions about how the trials will be grouped,

15   evidentiary issues once we get to trial, so much of it may well

16   hinge on the contours of this conspiracy that we think it makes

17   sense to lay it all out on the table now.

18             I mean we are not feigning ignorance when we say we

19   don't get it.  We truly don't understand.  Your Honor speculates

20   and perhaps you are absolutely right that this is a hub and

21   spoke conspiracy, but the Government, as I said, has never been

22   willing to tell us that.  There is really no reason to hold it

23   so close to the vest.

24             I mentioned the issue of the trial dates and your Honor

25   has said that we will likely have multiple trials in this case

1   so I think it is worth noting that while the Government is

2   reticent to answer our request for particulars now, the

3   proverbial cat will be out of the bag during trial number one.

4   Right?  We are going to hear all of this or at least certain of

5   the Defendants who are sitting at the table defending themselves

6   will hear it for the first time at trial and where will the

7   other Defendants be? They are going to be in the back of the

8   courtroom taking notes.  They are going to get it all so why

9   should the first trial group be the  sacrificial lambs that have

10  to go trial unprepared?

11         The purpose of Rule 7 F is to prevent surprise.  So,

12  your Honor, there is just no reason other than the Government's

13  tactical advantage to delay giving us this information now.

14         Rule 7 C requires an indictment to contain a plain,

15  concise and definite written statement of the essential facts

16  constituting the offense; and we submit that this indictment

17  doesn't get the job done.  In United States versus Onassis, this

18  Court held that the purpose of Rule 7 F is to quote "serve as an

19  aid in the search after truth and to remove elements of surprise

20  and chance from trials."

21         So as I say, let's get at the truth now so that we can

22  all prepare our defenses, avoid surprise at trial and so that

23  this Court can be best positioned to make other important

24  pretrial and trial decisions.

25         I would like to mention one other point which is that

1    in their papers, the Government has conceded that it will

2    provide the identity of the unindicted co-conspirators although

3    at some undefined future date.  Again, the Government hasn't

4    said that they are concerned about witness tampering or they are

5    concerned about the destruction of evidence.  Instead, the

6    Government says that they are still doing an ongoing

7    investigation.

8            Well, your Honor, that shouldn't be good enough.  The

9    Government indicted this case.  In fact, they, you know, as I

10   said before, they orchestrated this case from the beginning,

11   they timed it.  It would be enormously prejudicial to require

12   the Defendants to review the discovery twice, once now as we are

13   going through this pretrial phase and then once again at some

14   point before trial when we learn the identity of the

15   co-conspirators.  So we would ask that the Government be ordered

16   to produce the information now.

17           THE COURT:  In what form would you suggest that if it

18   were granted the Bill of Particulars would take? What would be

19   the information that would be required of the Government to

20   produce?

21           MS. SHAPIRO:  Well, your Honor, for starters, let me

22   just get out my copy of the indictment, each time the indictment

23   speaks of Defendants would participate in meetings, we would

24   like to know, A, did they actually participate in a meeting, who

25   specifically participated in those meetings, and when did they

1    occur? For some of the meetings the indictment does give us the

2    dates and the locations and for others it doesn't.  So what's

3    the burden on the Government to go back and fill in the missing

4    details?

5            When they say the Defendants would agree to inflate

6    their prices, who would they agree with? It is sort of a natural

7    progression.  When you read the sentence, I think it begs the

8    question.  So we would ask that the Government go back and fill

9    in those details.

10           We also have requests that deal with the conspiracy to

11   commit money laundering and the forfeiture allegation.  I mean

12   it is set forth in our proposed order and in our Motion, but

13   generally speaking, we would ask the Court to provide -- the

14   Government, excuse me -- to provide details about the unindicted

15   co-conspirators, about the time, the places and the

16   circumstances.  Most importantly, we would like to know what

17   kind of conspiracy are the Defendants charged with having

18   committed.  I have nothing further, your Honor.

19           THE COURT:  All right.  Thank you, Ms. Shapiro.

20           MR. LIPTON:  Good afternoon, your Honor, Mr. Solomon is

21   going to argue the Motion, but we thought it helpful for your

22   Honor and obviously  for the Bill of Particulars you can take

23   into account the discovery that's been produced to date.  So

24   since I am the one responsible for that, I thought I would lay

25   that quickly up, your Honor, and then Mr. Solomon will take over

1    if that's okay with the Court.

2            THE COURT:  I don't normally allow splitting of an

3    argument.

4            MR. LIPTON:  I agree, your Honor. It is a little bit

5    unusual.

6            THE COURT:  You have only got 15 minutes in total.

7            MR. LIPTON:  And we will be done before 15 minutes for

8    sure as defense was.

9            THE COURT:  All right.

10            MR. LIPTON:  Since, unfortunately, the information

11   about the discovery which we think is important for your Honor

12   to understand is with me.

13            THE COURT:  I think Solomon would know about that too,

14   wouldn't he?

15            MR. LIPTON:  He would.  He does.  We have put it

16   together and I can give it to you in a short, compact couple

17   minutes, your Honor. I promise.

18            THE COURT:  Well, give it a whirl.  See what you got.

19            MR. WALTHER:  I will get right to it. Obviously your

20   Honor does not know what discovery has been produced to date.

21   It is not in your purview so give perspective to not only the

22   Bill of Particulars Motion but also to the Motions To Compel

23   getting a brief overview would be important.

24            To date the Government has produced all of the phone

25   calls in the case involving Individual One with the Defendants

1  and the undercover agents, Individual One and the undercover

2  agents with non Defendants, Individual One with the FBI agents

3  in the case.  We have produced in the neighborhood of 24,000

4  calls.

5         To aid the Defendants in going through those, we

6  provided an index that is in chronological order and is

7  searchable by participant and date.

8         We have also produced all of the existing text messages

9  in the case which is in the neighborhood of 5,000 text messages.

10  Those are between the Defendants and Individual One, Individual

11  One and non Defendants, Individual One and the undercover

12  agents, and Individual One and the FBI agents.  We have produced

13  all of the recordings of the meetings in this case of which

14  there were 650 recordings of 230 meetings.  Those are between

15  Individual One and the Defendants along with the undercover

16  agents, Individual One and the undercover agents and non

17  Defendants as well.

18         We have also produced an index to help the Defendants

19  with regard to not only the recordings, but also the text

20  messages that are searchable by participant and date.  We have

21  provided all of the existing e-mails that relate to the charged

22  Country A conduct as well as the historical deals that predated

23  the charged conduct.  Of those e-mails there is approximately

24  30,000 and those are -- were provided to the Defendants in the

25  searchable format where they can search by sender and subject.

1    Those involve Individual One and the undercover agents,

2    Individual One and the Defendants, Individual One and the non

3    Defendants, Individual One and the undercover agents, and

4    Individual One and the FBI agents.  We just mention those other

5    categories outside of the Defendants because that's really not

6    in the purview of discovery, but we provided everything in terms

7    of recordings that the Government has in its possession.

8    The Government has also provided documents relating to

9    the charged Country A deal as well as documents relating to the

10   historic deals in terms of quotes, invoices, agreements, and the

11   products that were actually the subject of those deals.

12   The Government has produced the post-arrest statements

13   in the form of a 302, along with the agent's notes from those

14   post-arrest statements.  The Government has produced documents

15   related to Individual One, which obviously was a main subject of

16   issue with the Defendants, and among those documents are

17   documents related to Country A, also quotes, invoices,

18   licensing, paperwork and the like; also documents related to

19   historical deals that came from Individual One's actual files

20   involving export paperwork, notes, bank records and the like.

21   The Government has also produced the 302s of Individual

22   One as well as the agent's notes from those 302s.  The

23   Government has produced agreements between the FBI and

24   Individual One, first cooperation, report showing Individual

25   One's payments that the FBI made to him, drug tests that the FBI

1    made Individual One take, reports authorizing the illegal

2    activity that the Individual One was conducting at the direction

3    of the FBI as well as when he went on international travel, the

4    immunity agreement from the United Kingdom, the plea information

5    and Statement of Offense of Individual One, Individual One's

6    bank statements, his personal phone bills, reports documenting

7    the contact between the FBI agents and Individual One,

8    Individual One's e-mails that he provided to us as well as

9    Skype, text messages, and notes from Individual One.

10          The Government has also produced documents related to

11   Individual One while he was employed at Armor, his Armor

12   Holdings was his prior employer including amended tax returns

13   and W-2's.  Also we provided documents from the undercover

14   investigation file, the central file from the FBI including

15   3020s, as we discussed, 1023s which are similar to 302s, on-site

16   reports and bank statements that the FBI used in their

17   operation.

18          The Government has provided search warrant documents

19   and electronic material that was seized pursuant to the searches

20   known at the time of the Defendant's arrest.  That amounted to

21   approximately 242,000 pages or roughly 90 boxes plus a total of

22   over 75 computers and other electronic data.

23          What's noteworthy with regard to that is at the

24   Defendants' request, your Honor, the Government has put in place

25   filter team procedures because the defense attorneys were

1    concerned about there being privileged information.  The

2    Government agreed to that, and those documents are being

3    reviewed by the filter team.  The Defendants have that.  The

4    Government's prosecution team doesn't even have that yet.

5           Finally, your Honor, the Government has produced prison

6    calls of the Defendants while they were in custody at the Las

7    Vegas County Jail and when they were in BOP custody and in

8    between as well as bank records of the Defendants that were

9    obtained by the Government.  With that your Honor, I will turn

10   it over to Mr. Solomon.

11          THE COURT:  That was pretty quick.

12          MR. SOLOMON:  Good afternoon, your Honor.

13          THE COURT: Good afternoon.

14          MR. SOLOMON: Why the wind up?  Because, your Honor, a

15   Bill of Particulars is only appropriate when the indictment

16   together with the discovery are so infirm that the Defendants

17   are not on notice of the charges against them.  Our position,

18   your Honor, is that the 32-page speaking Superseding Indictment

19   in this case alone is more than sufficient to put these

20   Defendants on notice of the charges they face, the conspiracy

21   charge; and certainly together with the substantial discovery

22   the Government has already provided which includes an

23   exceedingly early Giglio and Jencks production on the part of

24   our cooperator months if not a year before trial, there can be

25   no serious argument that the Defendants don't understand what

1    they are facing in this case.

2         The indictment provides detailed information about the

3    Defendants and their companies.  It sets forth the conspiracy's

4    object, the manner and means which are, of course, just that, as

5    your Honor on knows. A manner and means is a way of explaining

6    generally how the conspiracy unfolded but wouldn't expect to see

7    particulars in the manner and means section of  an indictment,

8    as counsel insinuates.  That's not their purpose.

9         The purpose there is the overt act section and we

10   include over 100 overt acts, overt acts section, and the

11   Government includes, your Honor, over 100 overt acts in the

12   speaking indictment.  We only needed to include one to make the

13   indictment legally sufficient.  We included 100 with information

14   about who undertook those overt acts, when they were undertaken,

15   and the kind of detailed information, your Honor, that again is

16   well beyond the pleading requirements of Rule 7 and for pleading

17   purposes or certainly for purposes of a Bill of Particulars

18   requires no amplification to understand the charges.

19        Let me just quote Judge Friedman who the Defendants

20   cite four times in their Motion, the various opinions that Judge

21   Friedman has issued on this matter of Bill of Particulars.  He

22   says:  A Bill of Particulars is not a discovery tool or a device

23   for allowing the defense to preview the Government's theories or

24   evidence.  It properly includes clarification of the indictment,

25   not the Government's proof its case.

1           And make no mistake, your Honor, they want now pretrial

2    proof of our case.  They are essentially asking  us to turn over

3    or to produce for them a pros memo explaining how we are going

4    to prove the conspiracy in this case, and case after case, Court

5    after Court have held that is not an appropriate use for a Bill

6    of Particulars.

7           THE COURT:  Let me ask you this.  Now, Ms. Shapiro is

8    making a pitch that one of the big concerns or problems that

9    they are having here is figuring out what type of conspiracy

10   this is.  She argues, and I think sensibly, that this doesn't

11   appear to be a chain kind of conspiracy or what's commonly

12   referred to as a chain kind of conspiracy.  And I, of course,

13   suggested, as you heard, that the impression I got was that this

14   was more of a wheel kind of a conspiracy with spokes and kind of

15   a band tying them  all together.

16          Now, is there some reason why making that clear as to

17   the theoretical construct that the Government is operating under

18   is some problematic revelation, or would it in some way unfairly

19   harm the Government to kind of clarify that part of the puzzle?

20          MR. SOLOMON:  What we have given them, your Honor, are

21   all the facts necessary for them to understand and defend the

22   charges.  Whether this is a wheel and spoke conspiracy or a

23   chain conspiracy, again it remains to be seen what proof we

24   introduce at trial.  The Court has asked, I will answer the

25   question, this conspiracy probably has aspects of both, a hub

1     and spoke conspiracy and a chain conspiracy.  Most of the

2     Circuits that have weighed in on the issue say that in large

3     complex conspiracies it is isn't helpful to sort of pigeonhole

4     one theory or another theory because there is often aspects of

5     both.

6             Just as an example your Honor, we have alleged in the

7     Superseding Indictment obviously concerted activity on the part

8     of each of the conspirators.  That would suggest that there was

9     a common purpose.  There is the rim that your Honor was

10    referring to.  We have also alleged in the Superseding

11    Indictment how many of these conspirators work together with one

12    another.  For example, it is specifically alleged that

13    Mr. Painter and Mr. Wares and Mr. Spiller all worked together to

14    facilitate this conspiracy and, your Honor, also has proffered

15    information that Mr. Alvirez, for example, attended meetings of

16    other co-conspirators when they were being pitched on this

17    conspiracy.  So there is integration in terms of the overlap

18    among the participants and that's in the discovery.  It is in

19    the Superseding Indictment.

20            And, of course, there is also jointly undertaken

21    activity set forth in the Superseding Indictment. So for

22    purposes of clarification of the charges, we have done more than

23    enough at this stage, your Honor, to put the Defendants on

24    notice of what they face.  We just don't think it is appropriate

25    for us to have to have to commit and say, okay, this is a wheel

1    and spoke conspiracy.  Here is exactly how we are going to prove

2    it.  That's our evidence.  That's a legal theory, and there is

3    D.C. Circuit law, your Honor, that Defendants don't address at

4    all in their brief -- the Mejia case and the Butler case.  We

5    talked about both of them.

6           They make clear that where an indictment sets forth the

7    basic allegations underpinning a conspiracy such as approximate

8    dates, the statute violated, and the mens rea, no more is

9    required and bills are routinely denied, your Honor, in this

10   District and affirmed in this Circuit for bare bones indictments

11   that do no more than track the statute.  That's what's required

12   to understand the charges, just tracking the statute.

13          For example, Judge Bates in the Bourdet case and we

14   cite that in our brief, your Honor, there the Defendants sought

15   words, acts or deeds of the Defendant's that the Government

16   believe support the conspiracy charge.  Just what they seek

17   here.  Judge Bates said even though the indictment was

18   relatively spare, and it certainly is spare, your Honor -- I

19   have a copy, I pulled it off Pacer, that indictment is four

20   pages long -- even though the indictment was spare, Judge Bates

21   found it sufficient to permit the Defendants to understand the

22   charges and prepare a defense.

23          Judge, former Chief Judge Hogan the same thing in the

24   Glover case also cited in our brief.  Defendants there sought

25   conspiracy details, all overt acts, the same things Defendants

1    seek here and that indictment was also bare bones, four pages.

2    Judge Hogan rejected the Bill of Particulars in light of the

3    fact that all of the conspirators had access to each others'

4    communications through discovery just as they do here.

5            They have what we have in terms of the video and the

6    audio and the telephone conversations for the uncover operation,

7    that 11-month period that we have alleged that it took place.

8    They have the same information we do, and they can defend

9    themselves against the charges.  Clearly they understand the

10   charges, your Honor, because they are making substantive

11   arguments that they weren't all part of the same conspiracy.

12           So it doesn't make any sense to say, well, we don't

13   understand what the Government is accusing us of when in fact

14   they are attaching exhibits to the reply from each of the

15   Defendants where they try to explain to the Court, oh, no, your

16   Honor, we are not involved in this conspiracy, here is our

17   contacts with all these different people.  Clearly they get it,

18   your Honor.  What they want to do is they want to force the

19   Court or try to goad the Court into ruling pretrial whether

20   there is one conspiracy or, as those who go to trial will surely

21   try to allege, multiple conspiracies.  The Tarantino case from

22   the D.C. Circuit they cited makes clear that's a jury issue.

23   That's a jury issue.  That's not a pretrial issue, and we ask

24   the Court to reject any effort for the Government to have to

25   commit to a particular theory or it would have to fill in the

1   blanks for them what's already available for them in discovery

2   or would have to create a pros memo for them explaining how we

3   are going to prove our case before trial dates have even been

4   set.

5          THE COURT:  Now, what Mr. Ms. Shapiro's argument that,

6   well, the first group that goes to trial, say it is 4 or 5

7   people if you break them into five groups of 4 or 5, the first

8   group that goes to trial, the Government in that case will

9   obviously have to commit to whatever its theory is certainly as

10  it relates to those 4 or 5; and my guess is they are probably

11  going to have to commit even more fully because the way the

12  conspiracy is presently concocted in the Superseding Indictment,

13  the Government's position appears to be that they were all

14  conspiring together, all 22 of them and, therefore, there is at

15  least an allegation that there was a commonality of purpose to

16  some degree.

17         There may have been certain purposes that only a

18  certain subset shared; but as to the whole group of 22, there

19  was at least one purpose or more that they all shared.

20         Now, she says, well, if they are going to have to

21  commit to that in the first trial, that gives an unfair

22  advantage to those who don't go in the first trial because they

23  are going to be able to sit here, absorb it all, take it all in

24  in the trial, and then have the advantage of that.  What about

25  that point?

1          MR. SOLOMON:  Your Honor, that happens frequently and

2     some of the Courts have actually pointed out in dealing with

3     Bill of Particulars requests if there have been prior trials

4     that the Defendants' need for a Bill of Particulars is  lessened

5     by virtue of those trials, but I would point out that at trial,

6     even at trial, the Government is not going to be required, given

7     the conspiracy instruction in this Circuit, the Government is

8     not going to be required to prove to the jury or to prove to

9     your Honor this is a chain conspiracy, this is a hub and spoke

10    conspiracy.

11          We don't have to prove that there was a conspiracy.  It

12    was a commonality, a common purpose, interdependence and there

13    were common players in the conspiracy.  We are going to prove

14    that at the first trial, and people who go later will be able to

15    look at the first trial and see the evidence that we have and

16    certainly use whatever evidence they see fit; but I don't see --

17    there is certainly no legal principle that they have pointed

18    out, there is no case they have cited that somehow says that in

19    multiple Defendant cases, you are entitled to a Bill of

20    Particulars so that you are not disadvantaged at a later trial.

21    They just don't cite a single case for that proposition.  I

22    don't think it exists, your Honor.  We certainly haven't found

23    anything like that.

24          And just on the point of conspiracy law and that may be

25    part of the confusion, again, the D.C. Circuit has made clear

1    that whether an overarching conspiracy existed between

2    Defendants is a question for the jury.  Judge Lamberth said in

3    U.S. v Stover  576 F. Supp 2nd 134:  A single conspiracy may be

4    established when each co-conspirator knows of the existence of

5    the larger conspiracy and the necessity for other participants

6    even if he is ignorant of their precise identities.

7          So these issues the defense are throwing out in support

8    of a Bill of Particulars such as, well, we are business

9    competitors so how could we have conspired together? Conspiracy

10   law in this Circuit is clear, your Honor.  In almost every large

11   scale drug case, they are business competitors.  It doesn't mean

12   they can't conspire together. And they can make that argument to

13   a jury, but it not a cognizable legal argument for them to make

14   to you in support of a Bill of Particulars which, again, is to

15   clarify the proof.

16         The fact that they think they need the Government's

17   evidence is not the issue.  It is whether they need it to

18   understand the charges against them.  We would submit again in

19   their papers, both in their moving papers and also in their

20   reply, it is crystal clear these Defendants are more than

21   prepared to combat the charge of an overarching conspiracy with

22   the facts they have available; and to ask your Honor to order us

23   to do more, something that's been rejected by every District in

24   this -- by almost every Judge in this District and even Judge

25   Paul Friedman.  The cases they cite, by the way, your Honor, in

1    the Trie case, your Honor remembers Charlie Trie from 1998, a

2    Chinese national who pleaded guilty who had given a bunch of

3    money to the Clinton campaign illegally, in the Charlie Trie

4    case they point that as a District Court case that supports

5    their notion that a Bill of Particulars is warranted; but Judge

6    Friedman in a later case, Anderson, distinguished Trie and

7    basically said:  The reason I did a Bill of Particulars in that

8    case was because the legal theory was so convoluted and the

9    indictment so confusing that the Defendant didn't even know what

10   he was charged with.  That was a novel application of FECA law,

11   Federal Election Campaign Act law, in the felony context hadn't

12   been done before.  So Judge Friedman clarified that.

13          So even when you look at opinions like Trie, Shaw and

14   Ramirez that Judge Friedman wrote, all of those decisions

15   involved cryptic, convoluted indictments that were not

16   comprehensible and even when supplemented by the discovery

17   didn't put the Defendants on fair notice of what they are

18   facing.  That is a far cry from what we have here with very

19   detailed specific allegations during a concerted time period

20   where there has been fulsome discovery and radically early

21   discovery in terms of the Giglio of the cooperator, your Honor,

22   it just doesn't pass the straight face test for the Defendants

23   to come in and tell you we don't get it, your Honor.  We need

24   the Government to explain to us who was present at certain

25   videotaped meetings where they have the videotapes, or we want

1    the Government to come in and tell us the elements of conspiracy

2    and  how they are going to prove that when that's clearly a

3    matter for the jury; and even at trial the Government is not

4    going to have to go as far as the Defendants want you to order

5    us to go now, that is, to pinpoint the theory we are proceeding

6    under.  It is not required at trial. How could it be required in

7    the context of a Bill of Particulars?

8           One more quick point, your Honor.  They try to let off

9    the law because the law doesn't support them and basically say,

10   well, you can't look to drug cases, your Honor. Drug cases are

11   different.  They are distinguishable.  That's the word they use

12   in their reply. They don't explain how they are, but they are

13   distinguishable.

14          Logically the reverse is true, and Judge Friedman

15   probably said it best in the Ramirez case, a case they cite in

16   support of their position.  He says:  Bills of Particular are

17   all the more important in drug cases because of the spare

18   indictments that are routinely delivered in those cases.  Your

19   Honor has seen those over the years -- 3, 4, 5 pages.  There it

20   may make sense in some context for the Government to have to

21   supply the missing details because the Defendants may not

22   understand who are we being accused of conspiring with, where

23   did this conspiracy take place, what is the approximate time

24   frame, what's the mens rea?

25          Those are things we have to tell them in the

1    indictment.  We concede that. We have done it here.  More is not

2    required.  So if anything the fact that Bills of Particular are

3    routinely denied in drug cases in this District and in this

4    Circuit with Mejia and Butler is even more force to the

5    Government's argument in this case where we have done a 32-page

6    speaking indictment that a Bill of Particulars should not be

7    required here.

8          So for the first category of information they seek, all

9    of the details of conspiracy, we ask your Honor to deny that

10   entirely.  For the second category of information they seek, the

11   names of known, unindicted co-conspirators, we are going to give

12   them that information.  The law doesn't require us to, but we

13   are going to.  Your Honor expressed a concern about that early

14   on with corporations, for example.  They are going to get it.

15         We don't think it is the time for them to get it now.

16   We think it is premature because in the discovery that they

17   have, they know those people who are propositioned for this

18   undercover operation who may not have followed through with the

19   entire case.  They know who those people are because they have

20   the discovery. If they claim they don't know, they can ask us.

21   It is a discovery matter, and we will tell them.  There are

22   several individuals and we will give them those names.  So they

23   have that.  So they are not going to be blind sided at trial

24   with those people.

25         And for the companies they asked us in a letter for a

1    Bill of Particulars for those names.  What's company A?  What's

2    company B?  What's company C? We have given it to them.  They

3    have that information.  So there is no need for the Court to

4    order us to give them right now at this point without trial

5    dates being set the names of all known unindicted conspirators.

6    At a time closer to trial when our investigation has progressed

7    more and we can give them accurate information about that, we

8    will.  In the meantime, they are well equipped with the facts

9    they have to take a look at the conduct of those people who may

10   be co-conspirators in this case and, of course, they know all

11   the company names because we have given it to them.

12          So for that second category of information, your Honor,

13   we ask that you deny the names of unindicted known conspirators

14   now subject to revisiting that later at a point closer to trial.

15   Thank you.

16          THE COURT:  Thank you, Mr. Solomon.  Ms. Shapiro.

17          MS. SHAPIRO:  Your Honor, Mr. Solomon talks again about

18   these drug cases, and he asked how they are distinguishable.

19   One thing he didn't mention is that in drug cases the business

20   itself is per se illegal.  That's how it is distinguishable.

21          In our case, these men and women were selling items

22   that they are allowed to sell.  He touched upon the point that

23   we have made the argument that a lot of the Defendants are

24   competitors with each other and he says that that's common in a

25   drug case.  It is different here.  My client Israel Weisler

1    along with his business partner Michael Sacks, they sold armored

2    vests and so did Defendants John Jeana Mushriqui according to

3    the indictment and so did Defendant Cohen and Defendant Caldwell

4    sold armored vests; and yet somehow these men and women are

5    alleged to have gotten together at some unknown time and place

6    perhaps and agreed that even though it would be in their best

7    interests for each -- I mean one of them to sell more items to

8    Gabon, they are charged with a conspiracy to somehow work

9    cooperatively to sell each other's products?  I mean we are just

10   left scratching our heads because it doesn't make sense.  It is

11   not like a drug case.

12           If anything, this may be more like a false statements

13   case.  The Courts, including in this Circuit, routinely grant a

14   Bill of Particulars in a false statements case where the

15   Defendant understands that they are charged with making a false

16   statement, but they don't understand what exactly about their

17   statement is alleged to be false.  Again, the Courts routinely

18   say to the Government, well, you need to disclose to them how is

19   the statement false.

20           In our case we understand that our clients are charged

21   with a conspiracy, an overarching conspiracy, whatever that

22   means; but we don't understand exactly what they are alleged to

23   have done, what conspiratorial acts vis-a-vis one another they

24   are alleged to have taken.

25           The Government in their argument talks about how if we

1   want to know who was present at meetings, we could watch the

2   tapes.  Which tapes? I don't even know where to start.  There is

3   hundreds of hours of tapes.  I think we have 805 hours of tapes.

4   We have 57,000 recordings of phone calls, thousands of text

5   messages.  There is a lot of electronic files.

6           Mr. Lipton spoke about the categories of documents that

7   were produced, but unless the indictment points us to where we

8   are supposed to be looking, the discovery isn't enough; and the

9   case law is clear that discovery, voluminous discovery, is not

10  an answer for a Bill of Particulars.

11          THE COURT:  Let's talk about that conspiracy issue a

12  second.  Mr. Solomon certainly said or suggested that the law in

13  this Circuit is such that they wouldn't have to, at trial, they

14  would not be required to articulate and prove to a jury's

15  satisfaction whether it was a chain conspiracy or a hub and

16  spoke conspiracy.  You don't quarrel with the law on that issue?

17          MS. SHAPIRO:  No, but they would have to prove that

18  there was a common plan, that the Defendants together engaged in

19  a common plan, and the indictment doesn't take us far enough in

20  that vein.  We don't understand what the common plan was.

21          THE COURT:  Well, presumably the indictment on its face

22  gives, at least it is my sense, gives a pretty clear impression

23  that the informant and the two undercover agents had a, for lack

24  of a better way of putting it, a formulated approach to the

25  transactions in question that they were trying to see if these

1    various salespersons would engage in, certain percentages and

2    things like that for commissions above the average, et cetera.

3           Now, if they were to be able to demonstrate beyond a

4    reasonable doubt to the jury that the 4 or 5 Defendants,

5    whatever the number is in that first trial, all had that kind of

6    an agreement with the agents and with the informant, would it be

7    your position that you would not at that point still be able to

8    understand how you would defend against something like that?

9           MS. SHAPIRO:  Well, I don't know that that would be

10   enough.  I don't think that's all that the Government would be

11   required to do.  First, it wouldn't be enough to establish a

12   conspiracy amongst just the 4 or 5 Defendants that happen to be

13   thrown together for that trial.  I think the way the indictment

14   reads they are now alleged with -- they are charged with having

15   conspired with all 21 other Defendants.

16          So the Government would have to prove the identity of

17   each of those conspirators and when and where the particular

18   Defendant made an agreement to conspire with them.

19          THE COURT:  So you would think that the Court would be

20   required to hold the Government to the burden in order to get

21   over Rule 29 of introducing sufficient evidence in the case of,

22   say, the first five that each of the five in that case had some

23   type of discussion, some type of communication with all the

24   other 22 at some point in time so that the Government could

25   demonstrate that each of the five Defendants individually had

1    had an understanding or agreement, I should say, with all 21

2    others?

3              MS. SHAPIRO: I am not suggesting with whom that

4    agreement had to have been made, but at some point in order to

5    be convicted of a conspiracy, each Defendant would have had to

6    sign on to this bigger deal and so, yes, I believe the

7    Government would have to prove that the Defendant had an

8    agreement with their co-conspirators.

9              THE COURT:  So you would contend it wouldn't be enough

10   if the jury could find beyond a reasonable doubt that as to each

11   of the five Defendants in the hypothetical first trial, that

12   each of the five had the necessary requisite agreement with the

13   informant?

14             MS. SHAPIRO:  I don't know if that's enough.  I guess

15   really what we are saying by way of the Bill of Particulars

16   Motion is that we need the information, we need to better

17   understand what they are charged with and how -- what the nature

18   of the conspiracy is and then we can decide whether -- when we

19   prepare for trial, how to defend against that particular charge,

20   but right now we are just kind of shooting in the dark.

21             THE COURT:  Were you able by any chance to find in the

22   research you did any cases either from this Circuit or any other

23   Circuit, even the Ninth for that matter, where there were

24   multiple parties engaged in a conspiracy, a large number of

25   parties, and a subset were tried in one instance and the

1    Government limited its proof to prove that those in the subset

2    had a plan, agreement, with those who were in the hub, but

3    didn't prove that they had a similar understanding with all the

4    other spokes and, as a consequence of that, the conviction was

5    either upheld or overturned?  Were you able to find any case

6    like that?

7         MS. SHAPIRO:  To be frank, your Honor, we haven't gone

8    down that path.  We have been really focused on the Motion that

9    is before you which is a Bill of Particulars.  If it would be

10   helpful, we can certainly go back and take a look and supplement

11   our briefing, but I just don't know the answer.  I will say that

12   in the context of a Bill of Particulars, there is really a

13   dearth of case law because as you well know, so few of these

14   decisions are actually written, and when they are decided on

15   appeal, the standard is abuse of discretion.  So there is very

16   little written about the Bill of Particulars.

17        To address your Honor's question specifically, I don't

18   know the answer.

19        THE COURT:  All right.  Anything else?

20        MS. SHAPIRO:  I just want to address a couple of the

21   cases that the Government relies on.  We talked already about

22   the drug cases so I won't go there again.  They also talk about

23   United States versus Butler.  That's a mortgage fraud case.  In

24   that case, all of the Defendants are alleged -- all of the

25   Defendants were associated with the very same mortgage company.

1          There is an owner of the company and the President of

2     the company and the attorney for the company and the mortgage

3     broker.  It is a completely different circumstance than here

4     where again each of these people were salespeople for different

5     companies that in often cases were competing with one another.

6     So I don't think Butler is instructive.

7          Mejia is another drug conspiracy case so it is

8     distinguishable for the reasons that we pointed out.  So I know

9     the Government says that we don't have case law to support us;

10    but with all due respect, I don't think the case law supports

11    their position either.  There is just not a case that either

12    side has really found that addresses the exact question that's

13    put before the Court.  I submit that that's perhaps because this

14    is a unique circumstance.  The way this case was indicted is

15    unusual.

16          I think that the Court needs to grant the particulars

17    that we requested now so that all of these issues, we can just

18    deal with them, just get them all on the table because, as I

19    said earlier, so much is going to flow from the contours of the

20    conspiracy; and unless we understand that, we are all going to

21    be really struggling to figure out how to approach the trial

22    groupings and how to approach severance and how to approach

23    other pretrial and trial issues.

24          So there is just no practical reason for the Government

25    to have to hold this information close to the vest.  They have

1   it.

2           THE COURT:  Okay.

3           MS. SHAPIRO:  Thank you.

4           THE COURT:  Thank you very much.  Let's move on to the

5   next Motion, the Motion To Compel.  We have a number of speakers

6   in this one.  I think Mr. Leeper and Mr. Krakoff are going to

7   take the lead, so to speak, for the other defense counsel; and

8   they will have 20 minutes and the Government will have

9   20 minutes in response for the Lipton team, so to speak, and

10  then the Krakoff team will have five minutes of rebuttal.  Then

11  we will take a break because Patty is working awfully hard down

12  there.  Everyone speak slowly now, and then we will come back

13  and we will hear from seven I think it is or eight different

14  defense counsel who will have five minutes each and then the

15  Government will get to respond to that.  We will take a break in

16  between those and these arguments now.

17          So, Mr. Krakoff and Mr. Leeper, I don't know what order

18  you want to go in, but that's up to the two of you.

19          MR. KRAKOFF:  Mr. Leeper will lead off.

20          THE COURT:  That's fine.

21          MR. LEEPER:  Good afternoon, your Honor.

22          THE COURT:  Good afternoon.

23          MR. LEEPER:  The Mushriqui Motion To Compel lists ten

24  categories of documents that the Government has not given us.

25  They are listed in the first two pages of our Motion.  I am

1    going to address the first two categories of documents.

2    Mr. Krakoff is going to address most of the balance of those

3    categories.

4         The first two categories are the documents that were

5    produced to the Government by Bistrong himself and his personal

6    counsel which included documents that he had removed from his

7    office at Armor Holdings.  The second category are the documents

8    that Armor Holdings and its lawyers voluntarily produced to the

9    Government as part of their effort to curry favor with the

10   United States and avoid prosecution.

11        Regarding these two categories of documents, the

12   Government has conceded the Mushriqui's position that these

13   documents are discoverable under Rule 16, Brady, or both.  For

14   example, they say at page 40 of their opposition, the Government

15   repeatedly has stated that it does not object to the production

16   of any of the Armor Holdings materials to the Defendants.

17        So why haven't these documents been produced to us when

18   we asked for them three months ago?  The Government says in its

19   response it is because Armor Holdings hasn't authorized them to

20   produce these documents.  Now, I call that outsourcing the

21   Government's discovery obligations.  They say they are just

22   trying to have an opportunity for Armor Holdings to be heard.  I

23   suggest, your Honor, there is reason to question the

24   Government's motives here because the Government is the primary

25   beneficiary of these irrational obstacles that Armor Holdings

1    has thrown up to our discovery of these documents by preventing

2    us from getting this treasure trove of Brady material, most of

3    which is going to be quite useful in cross-examining the

4    Government's chief witness, Mr. Bistrong.

5         These documents unquestionably contain relevant

6    information.  For example, one of the cover letters that's

7    attached to the Government's response, I believe it is

8    attachment number two, describes all of these interview memos,

9    memos of interviews that Armor Holdings' lawyers did of Bistrong

10   three times and I think 16 other witnesses who they interviewed

11   about Bistrong's crimes.  Clearly this is material to the

12   defense of the Mushriqui's and the other Defendants.

13        We propose an outcome to this controversy, your Honor,

14   that's consistent with the facts, consistent with the law and

15   has the added benefit of being easy to execute.  You can break

16   these documents down into two categories or tranches.  The first

17   tranche is 15 categories of documents that have been identified

18   by Armor Holdings' lawyers themselves, and these can be and

19   should be produced to us immediately without need of a

20   Protective Order.

21        The second tranche are all the other Armor Holdings

22   documents that refer or relate to Bistrong, including his e-mail

23   files, his hard drive, all the documents he had in his office;

24   and these should be produced to us within ten days subject to a

25   Protective Order which I will talk about in just a minute.  But

1    before I get into the details of those two tranches of

2    production, I want to say a few words about these irrational

3    obstacles that have been thrown in our path by Armor Holdings'

4    lawyers.  They are described in a May 12th letter, May 12, 2010.

5    It is an attached as Exhibit 3 to the Government's response.

6              THE COURT:  Who represents them?

7              MR. LEEPER:  Wilmer Hale.  Apparently they found it to

8    be --

9              THE COURT:  Are they here today? Is Armor Holdings

10   counsel here?

11             MR. LEEPER:  I think they it to their tactical

12   advantage, your Honor -- I found.

13             UNIDENTIFIED SPEAKER:  We were told that we would have

14   an opportunity to speak at a later time.

15             MR. LEEPER:  They filed, as I believe you know, an

16   application for relief under a miscellaneous number.  Apparently

17   they thought it was to their tactical advantage to wait until

18   three weeks after we filed our Motion To Compel and four months

19   after we first asked for these documents to show up, but we will

20   be filing our opposition to that on Monday.

21             THE COURT:  Good.

22             MR. LEEPER:  Their objections, your Honor, fall within

23   three argument buckets, none of which hold water.  The first

24   bucket is this vague assertion that the documents that they

25   produced are somehow privileged.  Neither the Government nor

1    Armor Holdings in its letters or in this application have

2    provided a privilege log or otherwise demonstrated that any

3    particular document is privileged.  So they failed to meet their

4    fundamental burden of demonstrating that any of these documents

5    were ever privileged in the first place.

6          In any event, we have in this Circuit, as your Honor

7    knows, a trilogy of cases -- Permian Corporation, In Re:

8    Subpoena Duces Tecum, United States versus Thompson, all of

9    which have held that when a company in the voluntary disclosure

10   context produces privileged documents to the Government, it is

11   adversary.  That privilege is waived.

12         In fact, if you will look at the cover letters that are

13   appended to the Government's response, they were prepared by an

14   Armor Holdings counsel at the time, they even say that they are

15   waiving their work product privilege. Oh, they try to dress it

16   up.  They say it is a limited waiver.  It is not a subject

17   matter waiver, but the law in this Circuit is clear that's just

18   so much verbiage.  It is a waiver.

19         Subpoena Duces Tecum and the Thompson case both

20   entertain the possibility that there might be a circumstance

21   where in the voluntary disclosure context, privileged documents

22   could be produced without a waiver if there was an express

23   agreement by the Government that they would not disclose those

24   documents to anybody else, but there was no such express

25   agreement in Subpoena Duces Tecum, there wasn't such an express

1    agreement in Thompson and there is sure is not such an express

2    agreement here.

3            This case is like Thompson turned out to be.  You get

4    language from the Government and from the lawyers for the

5    company, a lot of loose terms are thrown around like

6    understanding and agreement; but when you drill down on them,

7    your Honor, and you press them, as I believe your Honor did in

8    the oral argument in the Thompson case, and you say where is it

9    written that the Government agreed not to produce these

10   documents to third parties who may be indicted in this case?

11   Lots of tap dancing. Oh, there were oral understandings.  There

12   were none either oral or written in this case, your Honor.

13           THE COURT:  In this case?

14           MR. LEEPER:  In this case.  It turns out there wasn't

15   in that case either.

16           The second argument bucket is that although the

17   Government has conceded that the Brady and the Rule 16 arguments

18   that the Mushriqui's have made Armor Holdings says its lawyers

19   should be the arbiters of what is material to our defense, its

20   lawyers should decide when the impeachment material has been

21   produced is enough and the rest is cumulative.

22           With all due respect, your Honor, Armor Holdings has no

23   standing to make arguments under either Rule 16 or Brady and

24   none of the cases that the Government has cited including the

25   Thompson case hold to the contrary.  They have standing to

```
 1    challenge the disclosure of privileged documents.  They have

 2    standing to ask for a Protective Order whenever trade secrets or

 3    proprietary information is going to be disclosed, but the matter

 4    of Brady and Rule 16 is the exclusive province of the parties

 5    and the Court.

 6         The third bucket, argument bucket, is that no Defendant

 7    should get access to any Armor Holdings' documents unless all

 8    defendants agree to Armor Holdings one-sided Protective Order.

 9    This Protective Order not only establishes some convoluted

10    two-step process where Armor Holdings' lawyers will decide what

11    documents we get and then give us an opportunity to come back

12    and beg for some more, that order also requires as a condition

13    to us getting any documents that all the Defendants in this room

14    abandon the argument that Armor Holdings waived its privilege

15    whenever it produced these documents to the Government in the

16    first place.

17         And the Government has partnered with Wilmer Hale to

18    advance this argument, this adhesive choice that they are trying

19    to foist on us as a condition to us getting any documents at

20    all.  This is an example, perhaps the best one in the case, your

21    Honor, of how the Government is trying to use these irrational

22    obstacles that are being erected by Armor Holdings' lawyers to

23    prevent us from getting access to this very information that is

24    going to enable us to undermine the credibility of their chief

25    witness.
```

1          THE COURT:  Is it your position that once the documents

2     were provided to the Government, that the Government alone had

3     the power to decide to what extent, if any, they would be

4     required to produce them consistent with their obligations under

5     Brady and Giglio, Jencks?

6          MR. LEEPER:  Well, it is the D.C. Circuit's position

7     that once the privileged document is produced, it loses any

8     privilege character.  With respect to whether the document once

9     in the hands of the Government is subject to Brady or subject to

10    Rule 16, that is the exclusive province of the Government.  They

11    have exercised their discretion in this matter with respect to

12    these documents, and they conceded our point.  They are not

13    opposing production of these documents to us on either Rule 16

14    or Brady grounds.

15         So we ask the Court to reject all three of these

16    arguments that Armor Holdings' lawyers have advanced and to

17    produce or order the production of all of the Armor Holdings'

18    documents relating to Bistrong, as I said, in two tranches.

19         I have handed up to the Court two documents, one of

20    which is a listing of 15 categories of Armor Holdings' documents

21    that refer or relate to Bistrong.  What you are looking at, your

22    Honor, is a verbatim excerpt from Wilmer Hale's May 12th letter,

23    May 12, 2010, to the Government.  It is an attachment to the

24    Government's response and Wilmer Hale says they have no

25    objection to production, immediate production of these documents

1    so long as we all agree to sign their one-sided Protective

2    Order.

3          Well, your Honor, that is an unreasonable and

4    unnecessary condition.  They have made no attempt to demonstrate

5    that those documents are privileged.  They have made no attempt

6    to demonstrate that those documents contain any proprietary or

7    trade secret information, and so they should be produced

8    immediately subject only to the condition that we Defendants

9    agree to use them in this case only  but no other restrictions.

10         By the way, I placed brackets around three of those,

11   the opening clauses in paragraphs I, J and K because, as I said,

12   it is a verbatim excerpt, but we would ask the Court to order

13   immediate production of the entirety of the interview memos that

14   are referred to in those three paragraphs, not just excerpts as

15   Wilmer Hale proposes.  There has been no demonstration that

16   those documents are privileged, and Wilmer Hale ought not be the

17   ones to decide what information in those memos is relevant to

18   our defense.

19         The second group of documents, your Honor, as I said

20   earlier, would cover Bistrong's e-mails, his hard drive, the

21   documents removed from his office, both removed by him and

22   turned over to his lawyers as well as the documents removed by

23   Armor Holdings' lawyers and provided to the Government that

24   refer or relate in any way to Bistrong.  As to that category,

25   your Honor, we propose that they should be produced within ten

1    days subject to a form of Protective Order such as the that one

2    I handed up to your Honor.  That Protective Order may look quite

3    familiar because it is based on the one that your Honor entered

4    after remand in United States versus Thompson.

5         Under this Thompson form, all of the documents get

6    produced at once.  It is not this convoluted two-step process.

7    There is a reservation of rights in that order, as your Honor

8    will recall.  The production to the Defendants doesn't waive any

9    residual privileges that the Williams Companies had in that case

10   or that Armor Holdings claims to have in this case by virtue of

11   producing the documents to us; but, of course, it doesn't

12   require us to abandon any of our arguments either.

13        The Thompson form also provides these documents with

14   all the protection that they are due in this case, your Honor.

15   Remember, before Bistrong's e-mail files or his hard drive was

16   produced, Armor Holdings' lawyers conducted a screening of that

17   electronic data.  It is referred to at page 37 of the

18   Government's response.  They applied search terms using the

19   names of all the Armor Holdings' lawyers, all their e-mail

20   addresses to make sure before they produced that electronic data

21   they would locate and redact any privileged information.

22        So it is theoretically possible, your Honor, that they

23   missed some historical privilege communication between Bistrong

24   and Armor Holdings' lawyers, but that theoretical possibility is

25   not enough to justify withholding that information from us

1    especially when the likelihood that any of those communications

2    involved Bistrong's schemes to bribe people, to embezzle money,

3    to launder money, it is pretty remote.

4              So they are not going -- those residual theoretical

5    e-mails if there are any in there will never play any part in

6    this case.

7              Let's not forget, your Honor, it has been four months

8    since we requested these documents.  Armor Holdings was on

9    immediate notice of our request.  If they haven't taken whatever

10   steps is necessary to review that electronic data or these

11   documents from Bistrong's office in that time period, the

12   consequence of that should fall on them.  It should not deny our

13   clients access to these records.  Thank you.

14             THE COURT:  Mr. Krakoff, hold off there.  I want to

15   hear the Government's response on this issue.  Then we are going

16   to take our break.  Patty has been going now an hour and 5 or

17   10 minutes.  That's long time.  So let's hear the Government's

18   response to that point, then take the break, come back and hear

19   Mr. Krakoff's argument and then the response to that and then

20   the various counsel who have five-minute points to make.

21             MS. PERKINS:  Thank you, your Honor.  Your Honor, with

22   regard to the Armor documents, I want to make clear what it is

23   that Armor has produced to the Government and what is in the

24   Government's possession.  Armor produced documents to the

25   Government in the course of a voluntary disclosure into

1   potential criminal conduct at the company.  That investigation,

2   that voluntary disclosure involved more than just Individual

3   One's conduct.  It involved some conduct at the company that was

4   completely unrelated to Individual One.

5          The Defendants contend that they are entitled to all of

6   that regardless of the fact that it doesn't relate to Individual

7   One or nor does it relate to --

8          THE COURT:  Let's break it into parts here.  What's the

9   Government's position as to the parts of the documents that only

10  relate to Individual One?

11         MS. PERKINS:  Your Honor, as we have repeatedly stated,

12  the Government doesn't have any objection to producing any of

13  those documents to the Defendants.  We have told the Defendants

14  that.  We have told the Court that.  We have told Armor that,

15  your Honor, and it is --

16         THE COURT:  Is it your understanding that

17  notwithstanding that, that they have objections to producing the

18  ones relating to the Individual One?

19         MS. PERKINS:  Your Honor, it is my understanding based

20  on their letter to the Government as well as their Motion to the

21  Court for relief from the Defendant's request that they do

22  object to some of the documents, the production of some of the

23  documents that relate to Individual One on the grounds that

24  there may be privileged documents in there and, your Honor, the

25  position that the Government has taken, we haven't taken this

1    position in order to delay production of the documents to the

2    Defendant.  We have taken this position because the privilege to

3    the extent that it exists, and we don't take a position on that

4    one way or the other, but to the extent a privilege exists

5    whether it be attorney-client privilege or attorney work

6    product, the privilege belongs to Armor, not to the Government.

7         And so what the Government has done here is give Armor

8    the opportunity to exercise its right to protect any privilege

9    that may apply to the documents.  So, your Honor, that's what we

10   have done, and we have continually maintained that subject to

11   Armor's protection of its privilege and their right to exercise

12   that, we will produce these documents to the Defendants.

13        THE COURT:  So let me be clear, let me have you be

14   clear about something.  You are at least implicitly representing

15   to the Court that the Government at no time required Armor when

16   it produced these documents relating to Individual One to waive

17   the privilege? Is that a fair statement?

18        MS. PERKINS:  Your Honor, I don't believe that the

19   Government did that at the time.  There was no Grand Jury

20   subpoena issued.  I don't believe they were compelled to produce

21   the documents, and I don't believe they were required to waive

22   any privileges in the production of the documents.

23        THE COURT:  Certainly the Court is aware of other cases

24   that I have had over the years where it was a condition to

25   cooperation --

1          MS. PERKINS:  I don't believe it was in this one.

2          THE COURT:  -- that they waive privileges.  So

3    apparently that wasn't one of the conditions in this case.

4          MS. PERKINS:  No, your Honor, it was not.

5          THE COURT:  All right.  Now, let's go over to the other

6    documents that don't relate directly to Individual One.  What's

7    your thinking on that?

8          MS. PERKINS:  Well, your Honor, as we have said, it is

9    our belief that several of the Armor documents are not

10   discoverable under Rule 16.  They are not Brady.  They are not

11   Giglio, but we will produce them to the Defendants in response

12   to their requests subject to Armor's potential privilege claims

13   here.  I understand based on Armor's filing to the Court that

14   Armor believes that in reviewing I believe it is 14,

15   approximately 14 million pages of documents is what they have

16   produced to the Government and that the burden --

17         THE COURT:  Excuse me.

18         MS. PERKINS:  Yes, your Honor.

19         THE COURT:  Did you just say that Armor has produced 14

20   million pages of documents?

21         MS. PERKINS:  Correct, your Honor.  The equivalent of.

22   I believe it is 5 million hard copy pages as well as 33 boxes of

23   documents that were seized from Individual One's office at Armor

24   Holdings, as well as I think the remainder falls in the

25   electronic materials that were produced to the Government.  So

1    it is quite a large sum of materials, your Honor, and Armor in

2    its papers has asserted that it would cost millions and millions

3    of dollars for them to review --

4          THE COURT:  No wonder Wilmer Hale is on this case.  Who

5    else could handle it?  14 million.

6          MS. PERKINS:  So, your Honor, as we have said, we don't

7    believe that some of those materials fall under Rule 16, Brady

8    or Giglio but we don't have an opposition or an objection to

9    producing those to the Defendants if they want 14 million pages

10   of documents, your Honor; but we believe that it is Armor's

11   right to -- that Armor has a right to exercise its privilege,

12   its right to protect its attorney-client privilege, and Courts

13   have recognized that a third party does have standing and

14   Mr. Leeper acknowledged that here.  He said that they do have

15   standing to do that, to protect their privilege.

16         THE COURT:  Yes.

17         MS. PERKINS:  That's all the Government has done here,

18   your Honor.  The Government has given Armor the opportunity to

19   do that.

20         THE COURT:  All right.  Mr. Leeper, you can have a few

21   minutes to do a rebuttal for that alone, just those arguments.

22         MR. LEEPER:  I won't need a few minutes, your Honor.

23   The Government doesn't have a horse in this race.  They have

24   made that clear.  We hear again these terms may be privileged.

25   When does the time come that the proponent of a privilege must

1    establish that the document was privileged in the first place

2    and the privilege was not waived?

3            THE COURT:  Remind why it is you want these documents

4    that don't relate to Individual One.

5            MR. LEEPER:  We don't.

6            THE COURT:  You don't?  Take those off the table then.

7    How many does that leave out of 14 million?

8            MR. LEEPER:  Well, I don't know, your Honor. This

9    figure of 14 or 15 million is just so much hyperbole.  That's a

10   calculation based on gigabytes or whatever in a hard drive and

11   in his e-mail file.  You know in today's world those things can

12   be searched electronically.  As I said earlier, they have

13   already searched that data electronically to identify and redact

14   any privileged information.  This may be privileged stuff, your

15   Honor, is just a delaying tactic.  Any privilege that existed

16   for any of that has been waived.

17           THE COURT:  All right.  We will take a ten-minute break

18   and come back and hear the remaining argument on the Motion To

19   Compel.

20           (Recess.)

21           MR. KRAKOFF:  Good afternoon, your Honor, again.

22           THE COURT:  Good afternoon, Mr. Krakoff.

23           MR. KRAKOFF:  Your Honor, I have a couple of boards

24   that I wanted to use and --

25           THE COURT:  Looks like we need an easel.

1           MR. KRAKOFF:  Yes. Well, I think we are not so equipped

2    in the ceremonial courtroom, but if that's too far, I can move

3    it up. Also we have given to you and you have got in front of

4    you the same thing and the Government has it also.

5           THE COURT:  I am fine.

6           MR. KRAKOFF:  I will let you know when we get to each

7    of those.

8           THE COURT: That's fine.

9           MR. KRAKOFF: Your Honor, as the Court knows, from the

10   very beginning of this case, from February 2nd when we were

11   arraigned, we have been seeking substantial discovery,

12   particularly about the central figure in the case Bistrong and

13   how the Government handled him, how they managed him because at

14   the core of this case, of this FCPA sting that they have

15   trumpeted at every conference and every opportunity, at the core

16   of it is entrapment.  This is nothing new.

17          The Court knows that that's what one of our critical

18   defenses is.  It is not our only defense, but it is one of our

19   critical defenses.  The law is clear.  The Supreme Court stated

20   very clearly in 1992 in the Jacobson's case, the Government

21   agents may not originate a criminal design, implant in an

22   innocent person's mind the disposition to commit a criminal act

23   and then induce the commission of the crime so that the

24   Government may prosecute.

25          So it is about Government inducement and it is about

1       whether or not there was a lack of predisposition.

2              So, your Honor, and I say that because it is important

3       to frame, to put that out up front so that the Court understands

4       the perspective that we bring to each of the discovery requests.

5              THE COURT:  Keep talking there, Mr. Krakoff.  I can

6       solve this problem while you are talking.

7              MR. KRAKOFF:  Okay.  Critical to the discovery when you

8       look at the discovery through the perspective of entrapment are

9       two things -- the credibility of Bistrong and the reliability of

10      the Government's investigation.  That's the management and

11      that's what the Supreme Court has spoken to, the reliability of

12      the Government's investigation.  That's what the Court said in

13      the Kyles  case, the Supreme Court.

14             But what we have, your Honor, is the Government is

15      trying to hide behind very narrow views of what Rule 16

16      requires, what is material to the defense, a very limited and

17      indeed distorted view of  what the Brady standard is in this

18      courthouse.  As Judge Friedman said in the Safavian case, it is

19      not about what would change the outcome of a case.  It is not a

20      looking back in the rear view mirror analysis.  You have to look

21      at things up front because no one can know what the outcome will

22      be.

23             And your Honor has already recognized these principles;

24      and from the very first Status Hearing, the Court said clearly

25      that the Bistrong materials had to be disclosed, on

1   February 17th, and we came back and on April 6th, we had another

2   Status Hearing.  The Court could not have been more clear.  It

3   gave the Government ten days to turn over all the Bistrong

4   materials.  It didn't matter what form they were in.  You said:

5   Now, with regard to Mr. Bistrong, obviously he stills falls

6   under the umbrella of discovery.  If he was under specific

7   directions, if he was being, you know, managed so to speak on a

8   day-to-day basis, if he was receiving direction if not orders

9   from his handlers as to how he was to conduct himself as an

10  undercover operative in this situation, I think to the extent

11  that that's reduced to writing anywhere, to the extent that's on

12  paper in the form of memos or any kind of notes that were taken

13  or whatever, I think you are going to have to produce those.  I

14  really do.

15          And you went on to say:  Now, I certainly would have

16  hoped that you would have done that by now.  They hadn't.

17          THE COURT:  I just got an update a little while ago

18  where there was mention of producing lots of Bistrong materials.

19  You heard it.  Was it incomplete?

20          MR. KRAKOFF:  Your Honor, that's a distraction of the

21  highest order.  It doesn't matter if the pile is this high.  The

22  good stuff may be over there in that redwell, and that's what we

23  think and that's what we think the Government is trying to limit

24  from us, to prevent us from seeing.

25          THE COURT:  So it is not even a situation where they

1    are holding it back until we get closer to trial you don't

2    think?

3           MR. KRAKOFF:  No, not at all, your Honor.  The Court

4    gave them ten days on April 6th, gave them ten days to file

5    reasons, to file a pleading on why they shouldn't have to turn

6    over any.  That was ignored.  That's the law of the case.  The

7    Court ruled, but we then have -- since then we filed our Motion.

8    We think that our Motion has been conceded.

9           The point here is, your Honor, that we continue to

10   negotiate and work with the Government.  We have had meetings.

11   We have had letters.  We have had e-mails back and forth.  We

12   are still at loggerheads.  We are still in substantial

13   disagreement despite the Court's clear guidance.

14          THE COURT:  Have they been able to in any way identify

15   or describe categories of Bistrong-related materials that

16   although they haven't produced them yet, they think they might

17   be able to produce them in the future or they plan to produce

18   them in the future, or the other extreme, under no circumstances

19   will they produce them?

20          MR. KRAKOFF:  Well, I am here to talk to the

21   Court about --

22          THE COURT:  The tax returns, that's been specifically

23   requested and I know that they have addressed that specifically

24   in pleadings.

25          MR. KRAKOFF:  Yes, they have and they have said they

1    won't turn them over.  They won't seek their disclosure or go to

2    the IRS to obtain them.  I will address that in a few minutes

3    specifically, but I think what we are talking about here, your

4    Honor, is not -- doesn't fall into the category as the Court

5    articulated of, well, they might give us something down the

6    road.  What we want to address here on the categories are things

7    that the Government has said they will not give to us.

8              THE COURT:  Ever?

9              MR. KRAKOFF:  At all. And as you can see, the

10   categories are pretty straightforward.  Mr. Leeper addressed the

11   first category.  That is documents given to the Government by

12   Bistrong, his counsel, or Armor.  That we have dealt with.  The

13   second category are internal FBI/DOJ documents on the management

14   of Bistrong and the undercover operation.

15             THE COURT:  No documents of that kind?

16             MR. KRAKOFF:  No.  We have some, but they have drawn

17   the line which I will get into in a minute.  Then we have FBI

18   and Justice documents related to an audit.  Again, we have

19   gotten some, but not all; and I will address the nonsense to

20   drawing a line in that category of documents.  We have got FBI

21   policies or guidance on undercover operations.  There are lots

22   of violations of the Government's -- the FBI's own guidelines.

23   They won't give us the guidelines.

24             We have some e-mail materials.  We have an accounting

25   of the undercover operation, the tax returns consideration to be

1    given Bistrong by State Department, Commerce Department, GSA to

2    keep him in operation, keep him going.  He needed his licenses.

3    Images of the laptops and some summaries of transcripts of

4    calls.

5         And I think, your Honor, it is important to give a bit

6    of factual background to put our requests which are specific and

7    we have developed, as I said, in substantial letter writing,

8    et cetera, with the Government so we know what their position

9    is, but I think it is important to have some factual background.

10        I am going to change the board here.  Hopefully I won't

11   knock it over.

12      (Pause.)

13      MR. KRAKOFF:  What this timeline is, your Honor, is, as

14   I will explain it, really is about the perspective that we have

15   looked at these documents through and that's through the

16   perspective of entrapment; and I think what you really need to

17   do to put our requests into context are to -- would be to go

18   back to the beginning of this investigation.  What happened to

19   Mr. Bistrong? Why are we here?

20        Well, we can see from the pleadings filed by Wilmer

21   Hale that Mr. Bistrong came into the attention of the Government

22   this way.  Back in January of 2007, one of his colleagues wrote

23   a letter to his employer  apparently saying the guy is involved

24   in no good.  Then we can see also from discovery that he then --

25   that they then taped a call.  They played -- they did their own

1    sting.  They taped a call.  Then they interviewed him, Armor

2    Holdings, and then they fired him.  Then they walked into the

3    Government and made their voluntary disclosure that Mr. Leeper

4    has told you about.  That would have been in the March, April,

5    of 2007 time frame.

6           So what did Mr. Bistrong do? What do we see from the

7    discovery that we have? Well, he was basically up a creek and so

8    he was a rat cornered.  He did the smart thing.  He got ahead of

9    the game.  He went out and he hired a prominent law firm known

10   to many of us in this courtroom, the DiGenova & Tunsing law firm

11   and they walked him into the fraud section of the Department of

12   Justice June 12th.  He came armed himself with three memos about

13   all the crimes that he had committed; and from that moment on,

14   your Honor, June 12th on, as you can see, that's the first date,

15   he was owned by the Government.  They owned him.

16          There was nothing -- and they set out from that point

17   forward to use him.  He had a tremendous motive as we all know

18   to do whatever they wanted him to do.  Why? Because he confessed

19   to literally decades of crimes, bribes in virtually -- in

20   numerous countries, Saudi Arabia, Iraq, Netherlands, Turkey,

21   Nigeria, France, all kinds of export control violations here and

22   in the UK.  He profited.  He stuck a ton of money in his own

23   pocket.  He had Swiss bank accounts.  This is who he was so we

24   know what was motivating him.  It was his 5K letter.  That's the

25   only thing he had going for him.

```
 1              So from that point forward, what happened? Well, they

 2     worked him and they had phase one of the investigation beginning

 3     in June of 2007, phase one.  They worked with him for 16 months

 4     in phase one.  They put him out there back in his, the industry

 5     that he came from, the armor industry, the military equipment

 6     industry.  He had been working in that industry for decades.

 7     This guy fell into their lap.

 8              As we all know, we all who work in this field who read

 9     the newspapers, the Department of Justice has invested hugely in

10     its FCPA program.  The number of attorneys at the fraud section

11     who are dedicated to this have increased over the years.  FBI

12     agents are dedicated to this, but for the first time they had an

13     insider who landed in their lap.  So this was like manna from

14     heaven and they worked him.  They put him out there.  They gave

15     him money.  They paid him.  They had a contract with him.  They

16     let him maintain consulting agreements with several of the

17     companies that are now under indictment so he could make more

18     money because he had to look legit to the people he was working

19     with.

20              But what happened, your Honor, is that they weren't as

21     successful in phase one as they thought they would be.  They

22     didn't have an undercover agent in phase one.  They didn't have

23     Gabon in phase one.

24              So by September of 2008, they reassessed and they made

25     a midcourse correction, and that's when they made this into an
```

1    official undercover operation.  They brought an undercover agent

2    in, added him to the team, and shortly after that they moved to

3    the Gabon strategy.

4          What do we learn after that from discovery? We learn

5    that once they got into 2009, shortcuts.  They took shortcuts

6    after they got into the Gabon issues, the Gabon phase, phase two

7    of the operation.  Now they are two years into the operation.

8    They cut corners.  They took shortcuts.  Their own audit, FBI's

9    own audit found substantial violations of their own internal

10   rules which we will get into in a minute because it is one of

11   the categories of documents that we are seeking production of.

12   So that's what happened, your Honor.

13         Now, what about John Mushriqui? Where does he stand in

14   all of this? The Government had not been successful in phase one

15   and what we can see from discovery is that, number one, John

16   Mushriqui never worked with Richard Bistrong prior to this.

17   They didn't have any business dealings prior to any of this.  He

18   was just somebody out there who happened to be in the armor

19   business.

20         In August, August 13th of 2007, now they are a couple

21   months into the operation, Mr. Bistrong lists John Mushriqui.

22   He is one of many who he lists to the FBI and the Department of

23   Justice in one of their debriefings; and so that's August, 2007.

24   What happened next? The FBI sicked Bistrong onto Mushriqui and

25   we can see from September 2007 up through the end of 2008,

1   16 months, 20 different contacts he made, that Bistrong made to

2   John Mushriqui, text messages, phone calls, messages and he

3   didn't get out of the batter's box, your Honor. Didn't get to

4   first base.

5          Indeed, and I want to turn to the third board, this is

6   what we learned from listening to all these tapes they have

7   given us, one by one, month by month.  What you see is that in

8   phase one they didn't get anywhere.  November 13th, Mushriqui --

9   or Bistrong leaves a message:  I have got to assume there is

10  some reason for our communication collapse.  That's already

11  November 13, 2007.  August 2008:  I have been trying to catch up

12  with you for only a year.  December 17, 2008:  Mushriqui, don't

13  disappear on me, please.  December 18, 2008:  I won't chase you

14  down any more.

15         So what's that tell us your Honor? It tells us that

16  they were relentlessly pursuing John Mushriqui for nearly a year

17  and a half.  They were pushed by -- he was pushed by the FBI

18  agents, he was on the list.  Don't forget John.  They didn't,

19  John Bistrong didn't, but what's it show? No predisposition,

20  none, zero.  Critical to the entrapment defense.  I raise that,

21  your Honor, because as we walk in and talk specifically about

22  these, the categories, you really have -- we ask the Court to

23  keep in mind our focus which is that there was no

24  predisposition.  We are looking at the credibility of Bistrong

25  and the reliability of the investigation because the

1    investigation is uniquely at issue here, your Honor.

2           So let's, if we could, I would like to now turn to the

3    first category or actually the second category on  our list and

4    I will put that one back up.

5       (Pause.)

6           MR. KRAKOFF:  And this is the category, your Honor,

7    Internal FBI Documents on the management of Bistrong.  What's

8    the Government's response? Well, number one, they say, well, we

9    have given you a lot of that.  Okay, that's fine.  We are happy

10   with that.  But the question is:  Did we get everything?

11          What else do they say? Well, you have got the tapes.

12   You have got hundreds of hours of tapes so, you know, that is

13   satisfactory.  Your Honor, that's like saying you can see

14   Pinocchio but we are not going to let you see Geppetto.  We have

15   a right to see how Geppetto carved up Pinocchio here, how they

16   created this guy, this puppet, what they did to manage him; and

17   as the Court said very, very clearly on April 6th, it doesn't

18   matter what form it is in, it doesn't matter how it is recorded,

19   it doesn't matter what kind of memo it is in, that's what the

20   Court said  even before we started putting these Motions in

21   front of you because of your experience and you know what is

22   required.

23          Well, what do they say? Well, some of these documents

24   are internal memos, internal FBI memos, and so Rule 16(a)(2)

25   gives us a privilege, an FBI work product privilege.  Well,

1    that's not what the Court anticipated at all.  Indeed, Rule

2    16(a)(1) trumps that if it is material.  Brady trumps anything

3    that might be considered to be an internal document.  It doesn't

4    matter where Brady material sits.  If it is in an internal memo,

5    that doesn't mean that it can't be produced.

6        What is very interesting, your Honor, is that the

7    Government has produced some internal documents, but they want

8    to draw the line apparently.  They want to cherry pick, and they

9    can't do that.

10       THE COURT:  What's the basis of the line they have

11   drawn as you understand it?

12       MR. KRAKOFF:  I don't understand it.  I honestly don't

13   understand it.  I know -- well, I can tell you the categories

14   of --

15       THE COURT:  They say it is privileged.  They told you

16   it is privileged.

17       MR. KRAKOFF:  I can tell you the categories of

18   documents which are interesting and I think quite are meaningful

19   just from their titles.  Weekly status reports within the FBI,

20   work plans within the undercover team, form 997, which are

21   approvals and renewals of this very investigation.  They don't

22   want to give us those.  And you can tell just from the titles of

23   these forms that there is going to be the same kind of

24   information there that we have already gotten and which the

25   Court said it doesn't matter what form it is in, what type of

1    memo it is in because these documents undoubtedly are going to

2    show how the investigation progressed, how it succeeded, how it

3    fails, how they managed, how they talked to this guy, where he

4    should go next, what their commentary was on the success or

5    failure of the investigation, the resources that they applied.

6            Those are the kinds of things that in an entrapment

7    case when the Government's investigation, the reliability of it

8    is at issue, is at the core of the defense, we are entitled to

9    that type of materials, your Honor. That's what the Kyles case

10   said, and that's what we are entitled to.

11           Now, turning to the second issue or category, the audit

12   of the undercover operation, that occurred in a -- and we have a

13   document, your Honor.  We have a May 5, 2009, audit report; and

14   that audit analyzed violations that had been of the undercover

15   operation's rules.  We have the audit report which is some I

16   believe seven pages where the Government appears to have drawn

17   the line, and Mr. Lipton will tell me if I am misunderstanding

18   this, where they appear to draw the line is they don't want to

19   give us any of the collateral documents, any of the related

20   materials, any of the underlying documents that went into the

21   preparation of that audit report which is a final report.  To us

22   frankly, your Honor, drawing that line is nonsensical.

23           THE COURT:  A financial audit to determine how the

24   money that was expended was actually spent or is it an audit

25   that goes into things beyond financial? In other words, the

1    effectiveness of the operation from an investigative point of

2    view, the effectiveness of the managers who were running it,

3    things like that.

4         MR. KRAKOFF:  The latter, your Honor. The interesting

5    when you look at -- it is called an audit and certainly I, when

6    I first looked at this, I thought it was going to be a financial

7    audit because that's the way I think of an audit -- but the

8    audit here was about holding up the conduct, the administration

9    of the undercover operation to the rule book, and there are a

10   myriad of rules which we will get into in a minute to see if

11   there were violations because at the outset of the

12   investigation, there were -- not only is there a rule book, but

13   there were certain things that were committed to writing that

14   they had to do.

15        We don't have that document and -- but what we found

16   out at the end of the line in this so-called audit report is

17   that, for instance, a supervisor told an undercover agent

18   directed him not specifically don't document your contacts with

19   Bistrong.  That was a violation of their rules.  Don't document

20   it.

21        Here we are we are trying get discovery and you have

22   heard us time and time again saying we need to know, get the

23   302s.  We need to get the 1023s that show how they managed this

24   guy.  Specifically told not to document it.

25        The second violation, they didn't document contacts

1      with him, with Bistrong.  A third violation, they didn't

2      document basic investigative facts.  A fourth, they let Bistrong

3      travel overseas without the requisite approvals.  Well, that's a

4      big deal to go overseas, to go to what you will hear about, you

5      may have heard about already, IDEX conference in Abu Dhabi.

6      They didn't get all the approvals.

7             They allowed Bistrong to be involved in an embezzlement

8      with one of the Defendants in this case without requisite

9      approvals.  They can do that, but they did it without the

10     requisite approvals.  They made an inaccurate proposal for the

11     undercover operation claiming success when there had not been

12     nearly the kind of success that they claimed. And so what you

13     have when you read --

14            THE COURT:  Who did the report, IG and FBI?

15            MR. KRAKOFF:  No, it is an internal committee within

16     the FBI.  In fact, I have a copy of it. Mine is -- I don't think

17     I have a clean copy.  I don't have a clean copy, but I can

18     proffer it.  It is actually Exhibit S to our pleading.  It is

19     under seal, as the Court knows, and I would also suggest the

20     Court look at Exhibit L.  They work together.

21            But the point is, your Honor, that when you read these

22     two reports that were done by the FBI agents themselves, that is

23     a group apparently a group not within the investigative group,

24     you see an investigation frankly, your Honor, that's out of

25     control.  It is extraordinary these kinds of violations.

1    That goes to the reliability of the Government

2    investigation.  Did the Government overreach here? When they got

3    to phase two with all the investment and resources that they had

4    made in this case for two years and then they start cutting

5    corners, but they don't want to give us the underlying

6    documents.  So that's where we are at loggerheads on that and we

7    think they should give us everything because, as the Court

8    knows, Cross-Examination of the FBI agents is going to be

9    painstaking.  They are very good witnesses.  It is page by page.

10   It is document by document.  It is impeachment by impeachment.

11   That's what we are titled to, your Honor. So that's another

12   category.

13        Just before I leave this one, though, just to kind of

14   put a fine point on the issues here that were observed by the --

15   those who were doing -- the FBI agents who were doing this audit

16   and one of their findings, as I said, was they didn't record,

17   they didn't document the contacts with Bistrong.  Well, the

18   instruction in the audit report was, okay, here is how you

19   correct that.  Do your 302s just in the old-fashioned way.  Sit

20   down at the typewriter and type them up from now on. That was

21   May 5th of 2009.

22        Well, guess what? Apparently the investigative, the

23   agents thumbed their nose at the audit report because we don't

24   see 302s after that that record and memorialize the contacts

25   with Bistrong.

1          So again, your Honor, we are talking about the

2     reliability of the investigation and it directly goes to an

3     entrapment defense which we must have the opportunity to fully

4     develop in the trial.

5          Okay.  A third category, the FBI and DOJ policies and

6     guidelines on undercover operations.

7          THE COURT:  I think I get the point on that one.  Why

8     don't you just go to the tax returns.

9          MR. KRAKOFF:  Okay.  The tax returns, this is just a

10    straight up stiff arm, your Honor.  I mean what they have given

11    us are amended returns that Mr. Bistrong filed for the years

12    when he was -- some of the years when he was involved in all

13    this international crime wave that he was -- that he did.

14         So what we have is the clean up, but what we don't have

15    is the original sin.  He is involved in tax evasion.  He filed

16    false tax returns undoubtedly, but they don't want to give us

17    the tax, the actual tax returns.  Well, they say there is a case

18    called from this Court United States versus Recognition

19    Equipment.  I tried that case with Bob Bennett 20 years ago and

20    Judge Revercomb we thought at the time, and I was assigned to

21    Judge Revercomb when I was in the U.S. Attorney's Office, great

22    man, but we thought he made a mistake in that case; and he ruled

23    that if the Government doesn't want to go to the IRS and request

24    the tax returns, they don't have to.

25         They cited that.  That case has they never been

1    followed by -- with all due respect to Judge Revercomb, it has

2    never been followed.  It is not good precedent here.  Indeed,

3    Brady trumps that.  Indeed, Rule 16(a) trumps that.  There could

4    not be more clear impeachment material than Bistrong's false tax

5    returns.

6            So the Government has also said on that, well, the IRS

7    was not part of the investigative team.  Well, that's not

8    correct because IRS showed up at one of the debriefings of

9    Bistrong up in New York at the Southern District of New York

10   U.S. Attorney's Office.  They were there.  They are part of the

11   team.  They may not have been as actively involved.  That

12   doesn't mean they are not part of the team.

13           So, again, that's just classic impeachment material,

14   your Honor.

15           THE COURT:  How about the Commerce Department?

16           MR. KRAKOFF:  Well, your Honor, when you think about it

17   and you go back to the history that I described of this case,

18   how did they maintain Bistrong's cover? They maintained his

19   cover by a contract to pay him, by allowing him to be a

20   consultant and make money, but most importantly, he had to have

21   the requisite licenses.

22           Well, how did he get them after he walked into the

23   office to the Fraud Section and, you know, fallen on his sword?

24   There had to be some help, had to be or else somebody was lied

25   to over at Commerce and State and GSA.

1          So it is just classic Giglio material, your Honor. The

2     assistance to Mr. Bistrong to keep his licenses, that was the

3     meal ticket for him.  He couldn't have conducted his -- the

4     undercover operation, but it was not just Bistrong's meal

5     ticket, it was the Government's meal ticket.  That's what they

6     had to -- they needed him to do their work.

7          So any help that they gave by help at Commerce, at

8     State, at GSA was a classic inducement.  We all know what that

9     is.  That is Giglio material.  That's got to be turned over.

10          Your Honor, I can address anything else, but that

11     really covers the issues that I was, specific issues that I

12     wanted to cover this afternoon.

13          THE COURT:  All right.  That's fine.  Thank you,

14     Mr. Krakoff.  Let's hear from the Government on those issues.

15          MR. LIPTON:  Thank you, Judge.

16          THE COURT:  You are welcome.

17          MR. LIPTON:  Judge, we understand that the Government

18     is held to a high standard and we have embraced that high

19     standard in our discovery obligations.  We have worked hard to

20     meet those obligations and will continue to do so.  To that end

21     the Government has produced significant and substantial

22     discovery, in many instances far exceeding the discovery

23     standards that we are held to.

24          In doing so we have literally emptied the case file and

25     produced all of the Government's evidence to the Defendants in

```
 1    ways frankly that in my experience in doing this  for 8 years, I

 2    have never seen.  We understand that the Defendants are not

 3    satisfied with that and think they are entitled to more.

 4    Mr. Krakoff articulated those and I formed a relationship with

 5    him and continue to like him more and more every day.  So I

 6    don't think there is anything personal as well as Mr. Leeper --

 7            THE COURT:  He is a likeable guy.

 8            MR. LIPTON:  Very.  What the Government has tried to do

 9    in addressing those arguments is addressing them in turn point

10    by point with applicable and supporting law even in the face of

11    requests, not so much with the Mushriqui's, but with some of the

12    other Defendants where there hasn't been a lot in the way of

13    argument; and we have been guided by DOJ's liberal discovery

14    rules and what we believe is a fair interpretation of the

15    discovery  --

16            THE COURT:  Is that what they call it? Does DOJ call

17    them liberal discovery rules?  Is that their choice  --

18            MR. LIPTON:  I believe they do. I can show you

19    something in that regard, your Honor. I will get the charts.

20            THE COURT:  They may have gotten more liberal recently

21    post Stevens.

22            MR. LIPTON:  I think they have gotten more liberal post

23    Stevens.

24            THE COURT:  Let's focus on these undercover operation

25    documents that Mr. Krakoff is concerned about.
```

1          MR. LIPTON:  Certainly, Judge.  If you will just allow

2    me to get into a little bit of background, I will get right to

3    those, but we told you about the discovery that we have produced

4    and we have cataloged that for you.  What we want to have you

5    keep in mind is that at bottom this is a tape case.  This is the

6    Defendants being recorded.

7          In fact, there has been a lot of talk in the briefings

8    and a little bit today about Individual One is the star witness

9    and it is worth noting that the case is not dependent on

10   Individual One.  There were undercover agents for the charged

11   conduct all along the way, and it is the Defendants whose voice

12   are on tape.

13         THE COURT:  Did they conspire with undercover agents?

14         MR. LIPTON:  No.  The Defendants?

15         THE COURT:  Yes.  The Defendants can't conspire with

16   undercover agents and Bistrong is kind of a crucial piece of the

17   puzzle for you all, isn't he?

18         MR. LIPTON:  Judge, we can put the case on without Mr.

19   Bistrong tomorrow.  We can put it on  even without undercover

20   agents.  We can use the tapes that are the Defendants' voice

21   with them committing the crimes, and we have to show the

22   requisite elements of a conspiracy that the Defendants among

23   themselves --

24         THE COURT:  Yes.  In other words, you would have to

25   show they were conspiring with one another.

1            MR. LIPTON:  And that's what our allegations and that's

2    what our proof will be at trial, your Honor, definitely.  So

3    that's sort of the focus just to let your Honor know where we

4    are coming from.  We have produced a lot of documents so much so

5    that it is more than what's been required and most of it has

6    been produced on an expedited basis as your Honor ordered.

7            So the Defendants don't have to argue about the typical

8    discovery issues that normally come up in 302s and notes and

9    e-mails as was the case in Safavian which the Defendants cite

10   often.

11           THE COURT:  This isn't a typical case, and there are a

12   lot of people who are of the opinion that, even some Courts are

13   of the opinion, that open file discovery is really preferable to

14   get to the bottom of the truth except to the extent that it

15   might be people at jeopardy, harm, risk and this is not, at

16   least as far as I understand it now, one of though cases where

17   people's lives are in jeopardy.

18           I am not aware of any allegations or any conduct that

19   suggested that anyone's life is in danger here, thankfully,

20   anyone's family is in jeopardy, their safety or anything like

21   that.  So there is a certain, let's say, inclination that one

22   might have to err on the side of inclusion rather than exclusion

23   especially on a matter of this size and complexity and

24   especially when the Government holds the upper hand in

25   controlling the information and in controlling and running the

1    operation.  This is not an everyday operation here.

2         So I am trying to understand how the management of this

3    particular key witness, central figure in this operation, Mr.

4    Bistrong, why the documents relating to how he is being handled

5    that pertain to the audit of this operation, why those are not

6    something that are central to the production of the Rule 16

7    material.  I am having a hard time understanding that.

8         MR. LIPTON:  Well, your Honor ordered and we understand

9    that we were to produce all Brady, Giglio, Rule 16 relating to

10   the management and direction of Individual One.  We understood

11   that.  We took it very seriously, and as we have repeatedly said

12   to your Honor and as we say again today in our brief, we have

13   produced all of that material.  Indeed, we have produced even

14   more than your Honor required.  We produced, for example, Jencks

15   Act material and other material that's not even covered by the

16   Jencks Act, and we have done that early.

17        THE COURT:  Maybe Mr. Krakoff and you are talking past

18   one another because unless I misunderstood him, he said that

19   there is a category of documents relating to the management of

20   Mr. Bistrong and the undercover operation that you have

21   identified and characterized as we don't have to produce.  Is he

22   wrong about that?

23        MR. LIPTON:  He is, yes.

24        THE COURT:  He has just got it wrong?

25        MR. LIPTON:  He is wrong, your Honor, and we have

1    produced everything that complies to the letter and the spirit

2    of your Honor's order, and we have told item in the brief that

3    we produced all of the ordered material relating to Individual

4    One.  We also --

5              THE COURT:  All of what material?

6              MR. LIPTON:  All the ordered material that your Honor

7    has indicated.  There was other requested documents such as

8    internal reports that they requested, and we indicated under the

9    discovery rules those weren't required to be turned over.  They

10   then said that there may be Brady information in those and we

11   said we didn't think that they had shown that they were

12   material, had passed the materiality standard.

13             But then we said we have looked at all of that material

14   that you used requested and we have not found Brady and we have

15   looked at it without regard to materiality.  So we looked at it

16   to see if it is helpful to the defense without regard to whether

17   or not they can make a showing because they are either

18   speculating on making conclusory statements and we have done

19   that, your Honor.  We have put it if our brief.

20             So their argument that we haven't proved the documents

21   that your Honor ordered is a little bit unclear as to why they

22   are making that allegation, but what is clear is that we have

23   fully complied with your Honor's order with regard to the

24   management and direction documents of Individual One and there

25   is really nothing else.  There is nothing else that's subject to

1   disclosure.

2          THE COURT:  Let's put aside the internal memos that you

3   have alluded to.  We will come back to those in a minute.  Now,

4   with regard to the audit of the undercover operation, are there

5   internal memos relating to that?

6          MR. LIPTON:  Yes.  Your Honor, we provided to them a

7   copy of this report.  It was called an on-site review, and we

8   have provided another document that relates to it.  We

9   understand that defense counsel may think that that's potential

10  impeachment information.  They largely overstate its

11  significance, but what we did is we went beyond our obligation

12  and we provided the actual document.  We didn't have to do that.

13  We didn't have to give them the report and the related document.

14         We could have just told them, for example, in a letter

15  that there were certain technical internal violations that the

16  FBI didn't even take any action on other than highlighting what

17  those were, and we can get into the merits of that, your Honor

18  and, you know, it is not the time and place, but it is not going

19  to be an issue that your Honor is going to find at all

20  troubling.

21         It is far oversold by defense counsel, but suffice it

22  to say we provided that all to them.  We gave it to them

23  unvarnished, unredacted.  We took it from our file and gave it

24  to them, something I haven't seen in the cases I have ever done

25  or heard about either.  What they are asking for now is more.

1    Aren't there more underlying reports that relate to that? But

2    there is no independent basis for them to get those reports, but

3    we have said we looked in those reports and there is no more

4    impeachment material.  There is no more Brady.  You have what we

5    have.  They obviously want more and they speculate that there is

6    more, but we have looked into it.

7         THE COURT:  So, for example, I think Mr. Krakoff said

8    that the audit report of the undercover operation had a list of

9    violations of the procedures that are supposed to be complied

10   with.  So if there are, for example, internal memos relating to

11   those violations, those have been produced?

12        MR. LIPTON:  We have produced one related memo, yes,

13   your Honor.

14        THE COURT: One what?

15        MR. LIPTON: We have produced one related memo that

16   addresses those violations and gave more --

17        THE COURT:  Are there other related memos to those

18   violations that you are not producing?

19        MR. LIPTON:  There is no other memos that have any

20   other additional information.  There very well may be internal

21   reports at the FBI that discuss something that is related to

22   that, but it is less full and they have all of the information.

23   There is nothing new.  There is nothing in addition.  There is

24   nothing that they are going to learn and these are internal FBI

25   documents in which another arm of the FBI was looking at it to

1    make sure that the investigation was running as it should and

2    then identified these violations, and we have provided that all

3    to them.

4         They have, your Honor, all the impeachment information

5    that they are going to need and we have looked at it and we can

6    tell your Honor that there is nothing else that falls within

7    Brady, there is nothing else that falls within Giglio; and

8    that's the representation here.

9         The Defendant Mr. Mushriqui has also made the argument

10   that there is certain documents related to the undercover

11   operation that don't go to the direction of management of Mr.

12   Bistrong; and we have indicated to them, your Honor, in our

13   brief that we have looked for those documents -- we have looked

14   at those documents and we have not found any Brady or Giglio in

15   those documents.  We went through the litany of it is not

16   discoverable under Rule 16, and we indicated why and we talked

17   about Rule 16(a)(2).

18        THE COURT:  Let's talk about the tax returns.  Now,

19   Mr. Krakoff seems to have some basis to believe, I didn't ask

20   him to articulate it in any detail, but he seems to have based

21   on his review of the discovery to date some basis to believe

22   that there may be evidence in the original tax returns,

23   especially when compared to the amended returns that demonstrate

24   that the original returns that were filed by Mr. Bistrong were

25   false.  He filed returns that were either inaccurate or

1    incomplete or whatever, and that if they could have access to

2    those and they could compare them to the amended returns, they

3    would be in a position to demonstrate that he filed under oath

4    false returns with the IRS.  Okay?

5         Now, he seems to have a basis for that belief.  Assume

6    for the sake of discussion he does have a good faith basis for

7    that belief.  Why won't you give him those returns because

8    filing false returns, that would be classic Giglio, would it

9    not? That's evidence of a crime.

10        MR. LIPTON:  Yes, your Honor.

11        THE COURT:  And, by the way, it is also evidence of

12   deception under oath, falsity.

13        MR. LIPTON:  Yes, your Honor.

14        THE COURT:  Or propensity to make false statements

15   under oath which if he is going to be a witness in front of a

16   jury, it is kind of central to his credibility.

17        MR. LIPTON:  Let me go through why we have already

18   provided more than we are required to provide.

19        THE COURT:  No, I just want you to answer the question

20   I asked you.  I don't want a general speech.  I just want to

21   know about those original returns as they compare to the amended

22   ones.  Are you standing there telling me that in no instance no

23   individual return if compared to the amended returns there

24   wouldn't be any evidence of false statements or a false return?

25   You are not representing that, are you?

1        MR. LIPTON:  No, we don't know.  They are not in the

2    Government's possession.

3        THE COURT:  Say again.

4        MR. LIPTON: They are not in --

5        THE COURT:  They are not in the Department's

6    possession?  Wait a minute.  You have the amend returns but you

7    don't have the original returns?

8        MR. LIPTON:  Correct, your Honor.

9        THE COURT:  Is there some reason why you wouldn't have

10   the original returns?

11       MR. LIPTON:  Yes, sir. I can explain. We got the

12   returns, the amended returns from Individual One.  He gave us

13   everything that he had in his possession.

14       THE COURT:  Right.

15       MR. LIPTON:  And we turned over everything in our

16   possession to defense counsel.  We didn't hold anything back.

17   They have what we have.

18       THE COURT:  You just accepted the amended returns

19   without asking for the originals?

20       MR. LIPTON:  Your Honor, we asked him for whatever he

21   had.  He didn't have the returns.  They are in the possession of

22   the IRS.

23       THE COURT:  Did you get in touch with the Tax Division?

24       MR. LIPTON:  I don't think there is an open case that

25   that would -- what they are asking us to do is go to the IRS and

1    get returns of a cooperating witness and that just isn't the

2    law.  That's not the law under Rule 16 or --

3         THE COURT:  I would think you would be interested in

4    knowing that since you are going to be putting him on the stand.

5         MR. LIPTON:  Of course, your Honor.  We have ways of

6    finding out information about him and there is going to be no

7    issue when he takes the stand that that's the case about what

8    the status of his returns and what he filed and what he did and

9    whether or not it was honest or --

10        THE COURT:  So I guess the bottom line is you don't

11   have in your possession right now those returns?

12        MR. LIPTON:  Absolutely not, your Honor.

13        THE COURT:  All right.

14        MR. LIPTON:  That's sort of goes into --

15        THE COURT:  And it sounds like you are also suggesting

16   that you have no intention to try to get them.

17        MR. LIPTON:  At this time, no, we don't, your Honor.

18        THE COURT:  You don't.  Okay.

19        MR. LIPTON:  And for rules that I know your Honor is

20   familiar with under the tax code --

21        THE COURT:  Yes.

22        MR. LIPTON:  -- we really don't have a basis at this

23   point to get them. They have to be --

24        THE COURT:  You don't have a basis?

25        MR. LIPTON:  Well, we don't have a basis under Title 26

1    to go and actually get them.  That's one of the cases that

2    Mr. Krakoff --

3              THE COURT:  Oh, I think you could require as part of

4    his cooperation with the Government that he produce his original

5    returns.  Now, I haven't researched that point, but I have no

6    doubt, zero, that is an as a condition to cooperation, that he

7    would provide you a copy of his original returns.  Or putting it

8    another way that he would waive his right to privacy under the

9    law as it relates to those original returns as part of his

10   cooperation with the Government because, after all, if

11   Mr. Krakoff is even partially correct that based on the evidence

12   here there is a good faith basis to believe that they might

13   demonstrate that he has lied previously under oath when he

14   submitted false returns, the Government needs to satisfy itself

15   I would think at a minimum as to his truthfulness under oath as

16   it relates to his original returns.

17             MR. LIPTON:  Yes.  Your Honor, if he has already told

18   us that stuff and he has indicated that he has filed --

19             THE COURT:  I am not asking you what he has already

20   told you.

21             MR. LIPTON:  I know, your Honor.

22             THE COURT:  I am asking whether you are going to get

23   it.

24             MR. LIPTON:  We can ask him for it, yes.  I don't think

25   that's a hard proposition.  It is what is in our possession and

1    if we were to get them, we would turn them over.  It is the

2    added step to asking us to go to the IRS.  Most of the Federal

3    cases, criminal cases, have cooperating witnesses and almost

4    every cooperating witness once they are charged and then they

5    cooperate doesn't declare their criminal proceeds.

6         THE COURT:  It might be an interesting legal question

7    as to whether or not a subpoena for those returns would be

8    legally authorizeable by this Court.

9         MR. LIPTON:  Yes, Judge.

10         THE COURT:  So we can do it the hard way or we can do

11    it the easy way, but I would suggest to the Government that the

12    easy way would probably be to tell him that consistent with his

13    cooperation that he has to waive his privacy rights as it

14    relates to those original returns.

15         I would think the Government needs to know what those

16    original returns indicate, especially if there is a good faith

17    basis to believe based on the discovery produced to date that a

18    fair comparison of the original with the amended would indicate

19    very quickly that the originals were filed under oath falsely.

20    Now, again, that's a good faith basis of Mr. Krakoff's based on

21    the discovery to date that he has had access to.

22         It certainly doesn't take rocket science ability to

23    figure out that if someone is receiving unlawful compensation

24    for deals that he is making with foreign countries in violation

25    of the Foreign Corrupt Practices Act prior to him becoming a

1  cooperator for the Government, it would probably stand to reason

2  that the person making those kind of unlawful commissions would

3  not report them on his tax return. That's just common sense.

4          MR. LIPTON:  Common sense.

5          THE COURT:  I don't have any evidence.  No one has

6  shown me any evidence or documents, but it would seem the me to

7  be common sense.  It would seem to me also that the Government

8  might want to be able to figure that out since there might be

9  tax charges here that he might be culpable for.  At a minimum,

10  they would relate to his credibility as a witness in the case.

11         So you do your own thinking on that subject. Obviously

12  I can't make you produce today what you don't have, but they can

13  request subpoenas.

14         MR. LIPTON:  Understood, your Honor.

15         THE COURT:  And you can oppose subpoenas.

16         MR. LIPTON:  Absolutely.

17         THE COURT:  We can do it the hard way.  There is an

18  easy way to do it too and, if a person is truly cooperating with

19  the Government, it seems to me part of that cooperation is

20  making those original returns available.  If they won't make

21  them available, I suspect, counsel, that you would have doubts

22  in your mind as to whether they are really being cooperative.

23  What is it exactly that they are hiding?

24         Certainly at this point the Fifth Amendment is not

25  going to be of much use to him if he is fully cooperating with

1    you.  I am not going to he how to investigate your case.  I am

2    just being practical here.

3           MR. LIPTON:  Everything your Honor is saying is true,

4    and there is no issue and we can tell him to do that.  What we

5    have done is what we are required to do is produce everything in

6    our custody.

7           THE COURT:  I understand.  I am actually shocked though

8    that you all didn't figure this out earlier on.

9           MR. LIPTON:  We hear you, your Honor.  If we produce --

10   once we get them we will certainly produce them, but right now

11   we don't have them.

12          THE COURT:  Okay.

13          MR. LIPTON:  That's what the basis of our Motion is.

14          THE COURT:   My dad used to say you can't get blood out

15   of a stone.  If you don't have them, you can't give them to me,

16   but that gets us to another level of concern.  So we will deal

17   with that later.

18          How about these Commerce Department and State

19   Department documents?

20          MR. LIPTON:  Yes, your Honor.  We have produced

21   licenses that Individual One received from the State Department.

22   We have produced documents showing that he operated as a

23   licensed broker from the State Department and the money that

24   Individual One has made while he was working with the FBI based

25   on the fact that he was able to get those licenses to operate as

1    a licensed broker.  So the Government has produced all the

2    discovery related to Individual One and those licenses.

3         We have looked in everything that we have, and there is

4    nothing else there.  I take it defense counsel would like us to

5    go to the State Department or go to the Commerce Department and

6    get documents from them, but we don't know of any documents that

7    exist that would provide any Brady, Giglio or even Rule 16.

8         So again everything that we have they have and we

9    understand that they have a theory as to how those licenses

10   might have taken place and I am sure they will be the subject of

11   Cross-Examination, but again we can't give what we don't have.

12   And we understand that they may be documents that go to, as

13   Mr. Krakoff said, inducement, leniency, inconsideration and we

14   don't know --

15        THE COURT:  You have searched your files to see if the

16   Department of Justice sent any communications to the Commerce or

17   the State Department with regard to Mr. Bistrong's licenses?

18        MR. LIPTON:  Correct.

19        THE COURT:  You have satisfied yourself as to those

20   documents that either were generated by the Department of

21   Justice or received by the Department of Justice in return from

22   the Commerce and the State Departments, those have been

23   produced?  Is that fair?

24        MR. LIPTON:  Those have not?

25        THE COURT:  Those have been produced.

1       MR. LIPTON:  Yes.  We don't know of any of those that

2   exist.  So, again, your Honor, we have produced everything that

3   we have.  They obviously have certain theories that they think

4   we are hiding or that we -- but we make the representation that

5   we have looked for those documents and they don't exist, your

6   Honor, so we can't produce what we don't have, but we have given

7   them everything so they know about licenses, they know about the

8   money.  They know that he was working for the Government at the

9   time while he was making that money.

10       THE COURT:  So as far as you know, the FBI and the

11  Department of Justice didn't make any special efforts to assist

12  Mr. Bistrong in getting these licenses during this period when

13  he was, so to speak, under their wing as an undercover

14  operative, right?

15       MR. LIPTON:  I think Mr. Krakoff had it,  he wrote that

16  portion of the brief, in which he said possibly the Government,

17  the Justice Department and the FBI let Mr. Bistrong take his

18  chances by filling out these applications and letting the State

19  Department do what they were going to do.  And that very well

20  may be right without going too far into what the Government's

21  theories are, but there is no documents that go to that.

22       There is no documents that are -- that show

23  communication between the State Department and the Commerce

24  Department that say, "Give Mr. Bistrong, Individual One, a

25  license," for example.

1           THE COURT:  Okay.  Anything else?

2           MR. LIPTON:  Your Honor, let me just go back to one of

3    the issues that Mr. Krakoff raised at the beginning about the

4    inducement -- excuse me -- about predisposition and the timeline

5    of entrapment.

6           The Government has gone through its files, and it

7    relates really to the undercover operation and contrary to the

8    Defendant's argument, there are no reports that show the

9    Defendants were pressured, induced or entrapped.  There is

10   nothing that shows that the investigation lacked reliability.

11   There is nothing that shows a lack of predisposition.

12          The Mushriqui's argue that the Government pursued them

13   relentlessly and unsuccessfully for months.  However, the

14   Mushriqui's know because their counsel at their counsel's

15   request came into the Government and we walked them through the

16   evidence.  And they are well aware that there is evidence that

17   the Mushriqui's committed crimes and historical deals before the

18   Country A deal that the Government has evidence of.

19          So it should come as no surprise to  your Honor or to

20   the Mushriqui's or their counsel when that conduct results in

21   charges as well as charges against possibly other Defendants

22   which will obviously constitute predisposition evidence against

23   the Mushriqui's and had we known that Mr. Krakoff was going to

24   produce an entrapment chart or entrapment timeline, we would

25   have brought a chart that showed the new charges and showed the

1    predisposition, but suffice it to say that the Defendants and

2    the Mushriqui's in particular, there is going to be no problem

3    with predisposition; and obviously that's for another day, but

4    there is certainly no exculpatory evidence, documents, material

5    in those internal reports related to the undercover operation.

6            THE COURT:  All right.

7            MR. LIPTON:  I think I addressed everything that your

8    Honor had addressed with Mr. Krakoff.  There is some other areas

9    that we have addressed in our brief.  We have covered everything

10   so unless your Honor has any other further questions --

11           THE COURT:  That's fine.

12           MR. LIPTON:  -- that's it.

13           THE COURT:  Mr. Krakoff, do you want a few minutes to

14   rebut?

15           MR. KRAKOFF:  Just one minute, your Honor. On the

16   management materials, I am a little unclear about what

17   Mr. Lipton is really saying that there are some internal reports

18   but they -- that do address some management or something about

19   Bistrong but that there is no Brady material in there? I am

20   just -- I am having a hard time understanding.

21           THE COURT:  I think he said he reviewed what they had

22   that they hadn't produced and that it didn't contain any

23   information in them that they would be required to produce

24   consistent with Brady or Giglio.  I think that's basically it.

25   He reviewed them.  They don't meet the standard, and that's what

1    we did.  We did the review.

2          MR. KRAKOFF:  What he didn't talk about specifically

3    were the approval documents, the renewal documents.  These are

4    reports that have to be submitted for approval and a memo that

5    gets authorization for an undercover operation, it is a big

6    deal, your Honor. What did they expect to accomplish? What are

7    their goals? What are their motives? They won't give that to us.

8    He didn't address that specifically.

9          The weekly status reports, I can't imagine what would

10   be in there other than how they managed Bistrong.  That's what

11   the undercover operation is about.

12         So as to the specific, these specific documents,

13   apparently they are saying they have looked at them, we have

14   satisfied our obligations, there is nothing that's responsive.

15   With all due respect, I think we have gotten to an issue where

16   there might be a fairly, a smaller set of documents that we

17   would ask the Court's involvement in, and we would submit that

18   these documents which we have tried to be as specific about as

19   possible should be, at a minimum, submitted to the Court for the

20   Court's review to see whether or not they really are going to

21   elucidate what we think is more about this management of

22   Bistrong, what the Government was trying -- what the  FBI was

23   trying to accomplish, what their objectives were, et cetera.  I

24   mean I don't want to belabor it.  So that's one request.

25         As to the tax returns, we would note that in the Plea

1      Agreement, we do have a Plea Agreement, that Mr. Bistrong

2      indicated that one of his obligations was to provide to the

3      Government upon request any document, record, or other evidence

4      relating to matters about which Government or any designated

5       U.S. or foreign law enforcement.  So it sounds like, you know,

6      they have his agreement.

7              THE COURT:  Yes.

8              MR. KRAKOFF:  We also have seen the information as to

9      Mr. Bistrong and he hasn't been -- he didn't agree to plead to

10     tax violation.  It  sounded like Mr. Lipton was suggesting that

11     they had talked to Mr. Bistrong and that Mr. Bistrong had

12     acknowledged some, shall we say, inaccuracies, falsehoods in his

13     original tax returns.

14             So this all kind of -- the way it all caches out is it

15     sounds like he admitted to tax violations.  They didn't require

16     him to -- they are not going to require him to plead guilty to

17     those, and they have got a waiver from him or an agreement to

18     provide other documents.  So as the Court says, we can do the

19     easy way or the hard way.  We will issue subpoenas if we have

20     to.

21             Finally, the one last thing I wanted to address and I

22     didn't want to -- oh, on the Commerce, State and GSA.  For all

23     we know there could have been contacts by the FBI with the

24     Commerce Department or the State Department, GSA for that

25     matter, and we would like to -- the Court to direct the

1    Government to determine whether or not there have been such

2    contacts.  Maybe they are just in handwritten notes, but it

3    seems unlikely that they would just leave him to his own devices

4    to potentially file false applications or relicensing

5    applications  with these agencies.

6          I mean maybe they did, but that seems -- maybe they had

7    a totally hands off position with State, Commerce and GSA.  That

8    seems unlikely to me.  If that's the case, we would like to have

9    that represented that there was absolutely no contact by the FBI

10   who  he worked with on a daily basis for two-and-a-half years.

11         And the last thing I  didn't want to neglect were the

12   FBI policies, the very policies and guidelines and rules that

13   were violated.  There is a whole list of different manuals and

14   guidelines that the Court may be familiar with that were

15   violated here.

16         The Field Guide for undercover operations, the

17   Confidential Human Source Policy Manual, the Confidential

18   Funding Guide, the Public Corruption Field Guide, the Attorney

19   General's Guidelines on Extraterritorial FBI Operations, the

20   Attorney General's Guideline on Domestic FBI Operations.  I mean

21   we must -- should be entitled to show to a jury not just that a

22   little report that says it has violated some guidelines --

23         THE COURT:  I didn't see a report obviously,

24   Mr. Krakoff.  Tell me if you can recall from looking at it

25   whether or not the report that notices these violations cites to

1    specific sections or paragraphs or portions of the manual

2    because it would seem to me at a minimum if the report is citing

3    to specific provisions, specific sections in the undercover

4    operations, say, manual or whatever, that at a minimum needs to

5    be provided as to what that is, because here you have a report

6    where a conclusion has been reached by an auditor citing to a

7    specific provision within the FBI's or the Department of

8    Justice's own procedures.  I think that -- but when you start

9    getting beyond that, well, then it starts looking like we are in

10   a fishing expedition here.  So you will need to have a little

11   something more than just speculation as to why --

12            MR. KRAKOFF:  It is not speculation.  I mean we can see

13   just at a cursory review and we can submit a one-page --

14            THE COURT:  Why don't we start with that.  Why don't

15   you put together your list of the specific sections of the

16   policy guidance manual or whatever it is that they are citing

17   with the specific citations to the section or the paragraph or

18   whatever because I haven't seen that.  I don't know how it

19   looks, but I think that would be a good place to start.

20            MR. KRAKOFF:  Okay.

21            THE COURT:  Get that list over to the Government and

22   let them look at it and see if it is consistent with what they

23   see in there.  If it is, then they can decide whether or not

24   that would be in any way legally inappropriate or appropriate or

25   acceptable or not, and then we can go from there.

1        MR. KRAKOFF:  We will do that expeditiously.  One of

2   the things you can see here is that there were stipulations,

3   they call them stipulations that were agreed for the operation

4   of this undercover operation.  It is a rule book it sounds like

5   that were in violation.  So we haven't gotten any of that stuff.

6   So we will submit that to the Government.

7        THE COURT:  All right.  Let me give you a little idea

8   where we are going here.  Fortunately, my wonderful Court

9   Reporter can stay a little late.  Unfortunately, I have a 5:30

10  urgent call that I have to take.  That's what that earlier

11  event was about.  It won't last long.  That's the good news.

12  Probably ten minutes at the most; but it is something that I

13  have to take.

14        So we are going to take a hopefully it will be about a

15  ten-minute break.  When we come back, I believe there is seven

16  counsel who I have allotted five minutes to.  That's 35 minutes.

17  That should get us to hopefully 6 o'clock give or take a minute

18  or two, and then the Government is welcome to respond to those

19  seven counsel at that point.  Hopefully it can be done in

20  15 minutes or something like that.  I don't want to -- as you

21  will quickly learn, as the air conditioning fades away, the room

22  will get much hotter and everyone will get crankier and everyone

23  will get short of patience, not me hopefully.

24        It is tough enough sometimes for Patty late at night.

25  A warm room is not a good idea either.  So why don't we stand

1   down for ten minutes hopefully, be in the ready position to

2   start at 25 of, and we will go back to this. Thank you.

3          (Recess.)

4          THE COURT:  Thank you, counsel.  The call look a little

5   longer than I had hoped, but I got it done.  Let's go to the

6   line up here of five-minute speakers.  The first one on the list

7   is Foster.

8          MR. FOSTER:  Yes, sir.

9          THE COURT:  I am going to try to stick to the five

10  minutes.

11         MR. FOSTER: I may take less than that, sir.

12         THE COURT:  That's good.

13         MR. FOSTER:  Judge, I have one main point to make and

14  that is in regard to the some of the argument I heard from the

15  Government as I was listening and, in particular, one of the

16  responses that they gave to one of our requests for production

17  of oral and written communications between the Government and

18  the attorney for Richard Bistrong.

19         Their response to our request is found on page 42 of

20  their response.  And what I kept hearing as I was listening to

21  Mr. Lipton is the Government takes the position I have looked at

22  the documents and there is nothing in the documents which I see

23  which is responsive or I have looked at the documents and there

24  is nothing which I see which is Brady, but that's not the

25  standard.

1          The standard  is a promise or an inducement or an

2     inference of a promise or an inducement whether it is given

3     orally or whether it is given in writing is just as

4     discoverable, just as material and we are equally entitled to

5     that representation to Mr. Bistrong.  Under Kyles versus

6     Whitley, the Government has the responsibility, not as this

7     gentleman to my left says to go through his files and to look at

8     his documents, but to affirmatively talk to the agents who are

9     responsible for handling Mr. Bistrong and they need to bring in

10    the handlers, they need to bring in the undercover agents, they

11    need to bring in whoever it is that had contact with this

12    gentleman or had contact with his lawyers and say, look, you

13    need to tell me about these conversations.

14         One of the specific items we asked about was for the

15    Government to provide us with the negotiations -- I am quoting

16    now -- "the negotiations leading to a potential disposition of

17    the criminal charges against Bistrong or the SEC claims."

18         The Government's response is that that information is

19    not material or otherwise not discoverable.  And, of course, it

20    is.

21         Mr. Bistrong got maybe the most sweetheart of all

22    sweetheart deals and I think, sir, you uncovered yet another

23    component of his deal today with his tax evasion.  He is looking

24    at a relatively minor number of months in jail.  In light of all

25    he has done, he is crazy to suggest that every conversation or

1    every suggestion is reduced into that final version of the Plea

2    Agreement is just not reality.

3           So for the Government to take the position as they did

4    with some of what we heard earlier on what they think here that

5    they don't have to disclose to us these material conversations

6    because it is not in writing, Judge, is just wrong and it is not

7    enough, in summation, it is not enough for these lawyers to go

8    through their files.

9           They need to bring the FBI in and talk to the

10   responsible people and then make the representation to us and

11   ultimately perhaps to you that they have explored and done what

12   the law requires them to do, and then I think he can say that

13   there is no Brady, that there is no Giglio because he has done

14   everything that he is supposed to do.

15          I would just ask, sir, that whatever order you issue in

16   this case that that include that obligation on the part of the

17   Government to fulfill that part of Kyles, that part of the

18   Brady, that part of Giglio.

19          THE COURT:  All right.

20          MR. FOSTER:  May I ask one indulgence?  Some of us are

21   trying to reach flights to get home tonight for other things.

22   Would it be okay with the Court if we were to leave before the

23   termination of proceedings?

24          THE COURT:  Absolutely.  Go right ahead.

25          MR. FOSTER:  Thank you very much, sir.

1           THE COURT:  No problem.  Mr. Chesnoff is next.

2           MR. CHESNOFF:  May it please the Court, your Honor, and

3   remembering your admonition of less is more, I will say this,

4   your Honor. I am going to talk to you about the need for the

5   Government to produce the drug counseling and drug therapy

6   records as well as the psychiatric records of the informant, Mr.

7   Bistrong.

8           I think it becomes very telling, your Honor, in light

9   of the comments that were made about the income tax returns that

10  the Government somehow in spite of a Cooperation Agreement in

11  which the cooperator is supposed to produce things that are

12  requested, somehow taking an ostrich approach to frailties or

13  real deceptive issues that may exist with respect to the

14  informant, they are not only proceeding at their own peril, they

15  are proceeding in violation of what they themselves

16  characterized as the more liberal discovery requirements of

17  their Attorney General.

18          For the Government not to think it has an affirmative

19  duty to find out whether or not this man is perjurer, which the

20  income tax returns would surely show, or for them not to acquire

21  his records of his drug usage and drug counseling and provide

22  that to us because, as Chief Judge Bazelon said as far back as

23  1973, the jury is entitled to understand that when we are

24  dealing with an addict, which the informant is, that in and of

25  itself leads to instructions.  They are entitled to understand

1    that an addict is deceptive and in the context of an entrapment

2    defense where over and over again this man engages in conduct to

3    entice people and act deceptively, all of this is connected.

4         I would respectfully ask the Court to direct the

5    Government to ask their informant about his drug activities, to

6    sign medical releases so they can get copies of his records

7    including his psychiatric records.  It is the same principle

8    that the Court observed with respect to the tax returns.  There

9    is an actual affirmative duty on their part to know the witness

10   that they are bringing to us.

11        This isn't some guy on the street who watched a bank

12   get robbed and becomes a witness and you don't want to intrude

13   on his privacy.  This man is operating as an agent.  I mean the

14   only thing he doesn't have is the badge.  For them to bury their

15   heads in the sand and to continually say,  well, we don't have

16   any and he hasn't given it to us, I mean they have a lot of

17   control over what this guy does and doesn't do.  Ask him.  Tell

18   him.  You can tell him. That's what cooperation means.

19   Cooperation doesn't just mean testifying to try to put people in

20   jail.  Cooperation means telling the whole story.

21        This man needs to tell the whole story of his

22   existence.  What led him to commit all the crimes he committed?

23   Perhaps it had to do with his addiction.  He was completely out

24   of control.  They have an obligation to find that out, your

25   Honor, and I would ask you to direct them to follow the

1  directive of their boss.  He couldn't have made it clearer.  I

2  have read the memo.  I assume they have.  Thank you, your Honor.

3         THE COURT:  Thank you, Mr. Chesnoff.  Mr. Jacobs.

4         MR. JACOBS:  May it please the Court, the Government

5  stood here before you a short while ago and said they have no

6  problem with predisposition of these cases and with these

7  Defendants.  Your Honor, as to Mr. Bigelow, we filed a Motion To

8  Compel.  The Government is actually trying to -- they say they

9  are trying to find some of this information, but what we have

10  requested is documents where my client actually reported to the

11  U.S. Government, to the Defense Department, State Department,

12  Office of Domestic Cooperation, and the CIA his concerns about

13  corruption in the Republic of Georgia where he had dealings with

14  their military and their sales.

15        Very briefly, in March of 2008, my client's name first

16  became known to Mr. Bistrong.  Within a few weeks Mr. Bistrong

17  had met him and in May within less than two months, there is

18  conversations that the Government has given us where Mr. Bigelow

19  is telling Mr. Bistrong that we don't provide any kind of

20  consideration or gratuities.  We do straight business.  If you

21  want it right, we are the guys.  If you want it slimy, call

22  somebody else.

23        A few days later, Mr. Bistrong is talking to Danny

24  Laverez and says, you know, Drew is saying, hey, I do it

25  honestly.  I am long term.  I don't mess around.  Referring to

1    Andrew Bigelow.  Two months later July, 2008 is when Mr. Bigelow

2    makes these complaints, and in my reply to the Government I have

3    given specific names as to who he made these complaints to about

4    the corruption.

5         The only name I did not include in the reply was the

6    name of the CIA agent which I will be happy to give the

7    Government, but I didn't think it appropriate to put it in a

8    public document.  We have given them the parameter as July 18,

9    2008, is when the complaints were made.

10        I would suggest to the Court -- well, I have to follow

11   up.  Within a week or two, actually within a week of

12   Mr. Bigelow's complaint to the Embassy in Georgia, to the

13   Department of Defense, to the Office of Defense Cooperation,

14   within a week Richard Bistrong is calling Daniel Alvirez and

15   saying:  Do you know that Andrew Bigelow complained about

16   corruption?  And Alvirez's response is a profanity that starts

17   with we're and then F'ed.  And Bistrong then says:  I am going

18   to call Bigelow and see what he thinks he is doing.

19        And he called Bigelow and says, you know, you may be

20   adversely affecting myself and Daniel Alvirez.

21        So this goes to, number one, predisposition which the

22   Government says we have no problem proving.  It goes to apparent

23   cooperation between the FBI and other authorities in Georgia

24   where obviously when they find out that my client has made

25   significant sales to the Republic of Georgia military, they are

1      checking it out to see if there is corruption there.

2              Information is going back from sources in the Republic

3      of Georgia to the FBI because within a week Bistrong knows about

4      it.  We submit that these are Rule 16 documents under

5      (a)(1)(e)(1).  We submit that they are Brady.  They are in the

6      possession of the Government, maybe not in the files of the DOJ

7      per se, but they are in the possession of the Government.  They

8      are not speculative.  It is an explicit request that's material

9      to the preparation of our defense and we are asking that your

10     Honor order pursuant to Brooks, pursuant to Safavian, pursuant

11     to Brady and the rules that you order that the Government locate

12     these documents and provide them.

13             THE COURT:  All right.

14             MR. JACOBS:  Thank you.

15             THE COURT:  Thank you, Mr. Jacobs.

16             MR. CHESNOFF:  Your Honor, may I ask you something?

17             THE COURT:  You have to wait until everyone else has

18     spoken.  Mr. Calli.  Oh, okay. Mr. Barger, you are going to

19     cover for Mr. Calli.

20             MR. CHESNOFF: I think he says Calli.  He asked

21     forgiveness nunc pro tunc.  He had to leave to catch a plane and

22     asked me to stand in for him and make his points if I may.

23             THE COURT:  That's fine.

24             MR. BARGER:  Thank you, your Honor.  Your Honor, I was

25     able to talk to the Government on the break and, if I get my

1    understanding wrong, certainly they can correct me on that.  For

2    or five points we would like to make.

3          First, on behalf of Mr. Calli's client, Mr.

4    Giordanella, we are asking that the Court order the Government

5    to make available to specifically Mr. Giordanella the affidavit

6    that was used in the search of his employer.  I don't think the

7    Government has an objection to that, but we would additionally

8    ask on behalf of all the Defendants that the Government be

9    ordered to make available to all defendants the search

10   affidavits regarding all of the Defendants since the

11   Government's theory is we are all co-conspirators.

12         I don't think the Government will object if the  Court

13   orders that, but the Government's position is absent a Court

14   Order, they only want to show the affidavits related to that

15   specific Defendant.  That's point number one, your Honor.

16         Point number two is we ask the Court to enter an order

17   requiring the Government to make available Mr. Bistrong's

18   handwritten notes concerning his conversations with Mr.

19   Giordanella.  My understanding from the Government is they

20   believe they have done that so to the extent the Government

21   hasn't done that, we would ask that they be ordered to.

22         And as I understand it from the Government, they will

23   assist if Mr. Calli cannot locate those.  He is assuming he has

24   already received them.

25         Then similarly that to the extent the Government has

1    not already provided them, that they provide Mr. Bistrong's

2    handwritten notes regarding his conversations with all

3    Defendants.  I don't think they would object to that.

4            Third point, your Honor, is my recollection is the

5    Court has a passing familiarity with the investigation and

6    prosecution of tax cases so it seems in light of the Court's

7    earlier comments that it be appropriate that the Court order the

8    Government to file a Motion under ex parte under seal 26 USC

9    6103 to get from the IRS Mr. Bistrong's original tax returns.  I

10   don't think the Government will object to that.

11           Certainly I would rather have them from the IRS than

12   from Mr. Bistrong because we have a greater indicia of

13   reliability that those were actually the ones filed.  That was

14   the third point, your Honor.

15           THE COURT:  They might be willing to do that on their

16   own initiative.

17           MR. BARGER:  I think they will, but again I don't want

18   to be presumptuous.

19           THE COURT:  It is always preferable than to be ordered

20   to do it.  Go ahead.

21           MR. BARGER:  Fourth point, your Honor, and this is -- I

22   don't want to hold Mr. Calli responsible for these arguments,

23   these are more my ideas than his -- the fourth point is we would

24   ask that the Court to the extent the Government hasn't provided

25   it, any information they have about any and all promises,

1    inducements, things of value to Mr. Bistrong related to the

2    decision in any jurisdiction not to prosecute him for his

3    conduct.  So if the Government went to bat for him, as is often

4    the case in Plea Agreements, in other jurisdictions, we would

5    like the Government to tell us that.

6        For example, Mr. Bistrong faced serious exposure in

7    England.  To the extent he -- and he hasn't been prosecuted

8    there.  So if the Government has gone to bat for him, we would

9    ask that the Court order that they provide that information to

10   the extent it has not been provided.

11       Fifth point is with regard to Mr. Bistrong, one of my

12   client's theories of the case is trying to understand why it is

13   that Bistrong targeted some Defendants and not others and

14   specifically -- and I haven't looked at the amended tax returns

15   yet -- but it appears to me Mr. Bistrong was continuing to do

16   business while he was still working for the Government.

17       So if he was doing business with other persons who are

18   not Defendants in this case or not targeted potential

19   conspirators and the Government has information about that, I

20   would like to know that because part of our theory in the case

21   is why did he pick them and not pick others.  Did he choose

22   other people with whom to do business and not try to set them

23   up -- I know that's my statement, not the Government's -- in

24   order to maybe develop a line of business for himself or to make

25   money for himself or did he try to get certain competitors out

1    of the way?

2         So I think it is relevant to the defenses here if the

3    Government has information about other persons with whom he did

4    business who are not identified as potential Defendants,  we can

5    have a Protective Order if the Government is worried about

6    revealing information related to sensitive matters or ongoing

7    investigations, but I do submit that that's relevant to our

8    defense.

9         Last point, your Honor, not in the nature of a specific

10   request, but as the Court observed, Mr. -- the Defendants cannot

11   conspire with the FBI agents, the undercover agents, but given

12   Mr. Bistrong's relationship, the extent of the control by the

13   Government, the length of control by the Government, once he

14   walks in the door in 2007, I submit he is a de facto Government

15   agent; and I would submit our clients cannot conspire with him

16   either.

17        So there is essentially no one at the hub.  So it

18   becomes important circling back to these some of these discovery

19   requests to know what it is the Government alleges to be the

20   interaction and conduct between the various Defendants.

21        THE COURT:  Is that a theory of yours or is that

22   something the Fourth Circuit has said or is that something the

23   Ninth Circuit has said?  Where did that come from?

24        MR. BARGER:  I tend to stay away from the Ninth Circuit

25   and the honest answer is I haven't looked at this issue yet,

1     but --

2              THE COURT:  The de facto agent theory, I am not

3     familiar with that one.

4              MR. BARGER:  I could say it is Barger on law.  But the

5     honest answer is I haven't looked yet and I will.

6              THE COURT:  That would be interesting.  De facto agent

7     theory.

8              MR. BARGER:  And that leads me to my last point, and

9     that is earlier in the Government's response, they indicated as

10    part of -- I don't remember if it was Bill of Particulars

11    discovery -- we don't really want to tell you who our unindicted

12    co-conspirators are yet because our investigation is -- I don't

13    know if they said progressing or in progress.  That troubles me

14    a little bit that the Government has some flexibility to decide

15    who is going to become a co-conspirator and who is not.

16             If they have information now about the unindicted

17    co-conspirators or the persons they believe, tell us.  If you

18    add to those people, you add to them later on.  If it turns out

19    you develop evidence that suggests, you know, we thought this

20    person was but in light of this evidence, we now take him off

21    the list.  Fine.  We all act in good faith, but I don't see the

22    necessity or the logic to delay that disclosure.  That's my last

23    point.  Thank you, your Honor.

24             THE COURT:  Thank you, Mr. Barger.  Mr. Madigan.

25             MR. MADIGAN:  Everybody is running for the hills, your

1    Honor. Good afternoon, your Honor. There is always a challenge

2    batting at the end of the lineup, but --

3            THE COURT: Still two more to go.

4            MR. MADIGAN: I just wanted to make a couple points.

5    First, with regard to Armor Holdings, I think the record in this

6    case should be clear that Armor Holdings is no innocent

7    bystander in this proceeding. This case might well be referred

8    to as the case of the shark and the minnows and the Government

9    for whatever strange reason has decided to make a deal with the

10   shark and send him loose for a couple of years, two-and-a-half

11   years, whereupon he uncovers a number of minnows, including my

12   client who has a small LLC and doesn't even have a company

13   business.

14           But Armor Holdings Mr. Bistrong was no, you know,

15   random small employee there. He was their Vice President of

16   International Sales. He was involved in an over $200,000 bribe

17   to a UN procurement official, and the information in that case

18   talks about a $4.1 million of jiggling the books of Armor so the

19   notion that they somehow didn't waive their privilege by coming

20   in there, I think your Honor could get rid of that with pretty

21   short shrift.

22           I also wanted to talk a bit about Brady. We have had

23   in this courthouse a number of problems with regard to Brady.

24   We have seen it across the country -- Montana, Florida,

25   California, over and over again driven apparently the best that

1    I can tell by a zeal to win at any cost.  This Attorney General

2    has made it clear that that should not be the standard and

3    indeed with regard to the January guidance that was issued by

4    the Department and the U.S. Attorney Manual itself particularly

5    with regard to impeachment and exculpatory evidence that the

6    Government's obligation that the Attorney General readily

7    embraces and has ordered training across the country to make it

8    clear to prosecutors that that is -- that they have to go beyond

9    Brady and Giglio with respect to disclosure.

10        The point that I wanted to make with regard to that

11   after listening to this kabuki dance with regard to the tax

12   returns that went on between the Government and Bistrong, the

13   Government has produced in this case and they have represented

14   to your Honor, Mr. Lipton did today, that they had carefully

15   looked for Brady information and there was none there.

16        However, the documentation around the shark in this

17   case was overwhelming in its volume.  615 audio and video

18   recordings of over 230 meetings, 24,000 telephone conversations,

19   5,287 telephone recordings between the Defendants and Individual

20   One, Mr. Bistrong.  6,600 documents, documents related to

21   Bistrong, 5,000 text messages, 242,000 pages of documents

22   obtained pursuant to the search warrant.

23        In our conversations with the Department, they have

24   advised that they have not reviewed those materials for Brady

25   materials, that they instead have just dumped this volume on the

1    Defendants many of whom are little minnows like the young man

2    that I represent, and that somehow we are supposed to go through

3    that giant volume.  They found what they want in the recordings

4    that they are going to use, and they have chosen not to even

5    look through this material.

6         So I think the short way around this problem, I would

7    urge the Court to give this some consideration, to issue an

8    order to the Government that they have to review that material

9    and someone over there, they can maybe draw straws as to who

10   would sign the certification turning over to us the Brady

11   material and representing to this Court that that material has

12   been reviewed and the remainder of it has no Brady information.

13   Thank you, your Honor.

14        THE COURT:  Thank you, Mr. Madigan.  Mr. McCool.

15        MR. McCOOL:  Thank you, your Honor.  I have three quick

16   points that I would like to raise with the Court.  The first

17   involves other crimes evidence, your Honor. You have heard other

18   counsel touch upon this.  As you know, there was a superseding

19   information involving Daniel Alvirez; and in that information an

20   additional FCPA count was added.  In that count there is a

21   reference to a co-conspirator number one.

22        I have asked repeatedly of the Government to tell me

23   whether or not that is Mr. Morales.  The response I get is,

24   well, you know, a time will come for 404(b) notice.  In its

25   response to our Motion To Compel, the Government recognizes as

1      it should that Mr. Morales is entitled to reasonable notice.

2      Then they go on, however, to cite three cases that range from

3      48 hours to several weeks.

4             Now, we disagree that anything approaching that would

5      be reasonable.  We would ask the Court to look or consider the

6      factors that are set forth in a Sixth Circuit case, US versus P

7      E R E Z, Ms. Gels, T O S T A at 36 F.3d 1552.  And in that case,

8      the Sixth Circuit looked at the following factors, three

9      factors.  One, when did the Government learn of these so-called

10     other crimes evidence.  Two, and this I submit is the most

11     important factor with respect to Mr. Morales, what prejudice if

12     any to Mr. Morales would lie for a lack of time to prepare, if

13     you will?  And then three, what's the significance of the

14     evidence to the Government?

15            Dealing with the first factor, your Honor, if

16     co-conspirator one and Mr. Alvirez's superseding information is

17     alleged to be Mr. Morales, then the Government knows it now and

18     there is no good reason why they shouldn't put us on notice.

19            The second, your Honor, deals with prejudice.  The

20     added FCPA count that I referred to relates to conduct that

21     occurred in the Republic of Georgia, conduct that occurred back

22     in March 2008.  If we wait until even 2, 3 months, 4 months

23     before trial to get this information, evidence is going to be

24     stale at best.  There is going to be little time to identify the

25     evidence, to identify and locate witnesses, to appeal to this

1   Court if necessary for Rule 14 depositions.

2           Your Honor, we submit that the evidence in this case,

3   the evidence that supports the current indictment is thin.  So

4   we expect and it has been suggested here that you may see other

5   crimes evidence because the Government is going to need it.

6   Otherwise, they have a pretty thin case.  All these factors,

7   your Honor, weigh in favor of disclosure at least at a date

8   certain that would give Mr. Morales a fair opportunity to

9   investigate these allegations and prepare to meet those

10  allegations at trial.

11          Your Honor, the second issue that I would like to

12  discuss deals with alcohol consumption on behalf of Mr. Morales.

13  In the indictment, the Government speaks of essentially three

14  meetings.  There is a meeting in May I guess of 2009.  Then they

15  refer to this so-called cocktail reception where the Government

16  alleges that the Defendants, including Mr. Morales, thanked the

17  minister of defense of Gabon for these commissions.

18          Now, of course, the Government is going to argue the

19  commission means bribe, but bribe is never said on these tapes.

20  What is apparent on these tapes is that my client has a bottle

21  of beer in his hand and is staggering around. Now, I understand

22  generally from the government that this was a reception set up

23  by the government, paid for by the government and my question to

24  them is:  Who paid for the booze? How much booze did you give to

25  my client? Who authorized these agents to liquor up my client

1    and then elicit what they believe to be inculpatory statements?

2         I asked the Government about this and I didn't really

3    get a clear answer, and I think it went something along the

4    lines, well, if we have it, you have it.  I think it gets to the

5    point that other counsel raised, and I asked, that is, what is

6    the scope of the Government's Brady obligations?  And I asked

7    them point blank:  Do you agree with Judge Friedman's statement

8    that the Government cannot meet its Brady obligations by as

9    quote, "in the Shaw case providing Miss Shaw with access to

10   6,000 documents and then claiming that she should have been able

11   to find the exculpatory information in the haystack"?

12        The apparent answer that I got from them, yes, we don't

13   agree with that.  We gave it to you, dive in, go look for it.

14   Well, your Honor, it is clear and -- well, I submit it can't be

15   credibly argued that the information about Government agents

16   providing alcohol to my client is not exculpatory, is not

17   material to his defense.  Indeed, the Government doesn't even

18   address it in their opposition to our Motion To Compel.

19        One final point, your Honor, and that deals with Plea

20   Agreements.  We had asked for -- I believe we have some

21   information, we have Mr. Alvirez's information, but we don't

22   have his Plea Agreement and according to Pacer, unless I am

23   missing something if it occurred under seal, it doesn't appear

24   that he has entered a plea before your Honor or any other Judge

25   before the bench.  But we had asked for this information and in

1    the Government's response, it says, well, this is Jencks

2    material.  It is not governed by Rule 16.  It is governed by

3    Jencks and the Jencks says this and we all know it.  You know,

4    they are not entitled to provide it until after Direct

5    Examination, but the Government says, hey, we will provide it

6    earlier and that's the end of it.

7          Well, your Honor, the Government is mistaken.  It is

8    not covered by Jencks.  It is covered by Brady, and it is

9    covered by Giglio.  This impeachment must be provided to

10   Mr. Morales quote "in time for its effective use at trial" end

11   quote and that U.S. versus Smith Grading and Paving at 760 F.2nd

12   527 but you put that quote into Westlaw and you are going to pop

13   up a hundred cases.

14         Now, why is it that Mr. Morales needs, for example,

15   Mr. Alvirez's Plea Agreement now? Your Honor, I won't repeat the

16   numbers, but you have a sense of the volume of audiotapes and

17   videotapes that are involved here.  It is important for

18   Mr. Morales, a man of limited resources, to have Mr. Alvirez's

19   Plea Agreement now so that he understands the scope of what he

20   pled to.

21         I think Mr. Krakoff pointed out that Mr. Bistrong was

22   involved in an embezzlement, one of the codefendants and I

23   believe he was referring to Mr. Alvirez.  Well, what would be

24   important to know is that included in his Plea Agreement now so

25   that when we are going through these tapes, we can understand

1    the case better, we can adequately prepare for trial and we can

2    meet the Government's allegations forcibly when this case does

3    go to trial.

4            Now, my experience, your Honor, in this courthouse has

5    been that these materials are produced very early on in

6    discovery and, in fact, just in the Blackwater case, Judge

7    Urbina ordered the cooperators' Plea Agreement unsealed several

8    months before trial.  I think we were at an arraignment, asked

9    for it in January of 2009.  We weren't supposed to go to trial

10   until January of 2010 and that was the disclosed to the

11   Defendants in April.  I don't see a good reason why that

12   shouldn't be done here.  Thank you, your Honor.  That's all I

13   have.

14           THE COURT:  Andalman.

15           MR. ANDALMAN:  Thank you, your Honor.  A couple points.

16   With regard to these internal memos, we had a conversation with

17   the Government on these and this audit that was referred to, the

18   on-site review, says that the FBI is directed to keep track of

19   the daily communications they are having with Mr. Bistrong; and

20   the Government's response to us was:  Well, yes, but you don't

21   know our response to that audit, there is a reason why there

22   aren't any documents that showed that daily contact with

23   Bistrong.

24           And we took the position with them and we told them we

25   felt like this put us at issue here that if the Government made

1    a conscious decision, we haven't seen the response of the

2    on-site review, they didn't provide that, but if the Government

3    made a conscious decision not to keep a record of its

4    communications with Bistrong, even though the on-site review

5    told it to, then they can't turn around and say, well, to the

6    extent that was in closed communications or that management

7    would  incorporate it in internal memos, you don't get those.

8         They can't choose to keep the record of the management

9    in a format where they then argue they don't have to produce it.

10        Second, Mr. Lipton I think made the point that there is

11   plenty of evidence of predication here or predisposition of

12   these Defendants.  There isn't any documentation that's been

13   produced concerning Mr. Goncalves, my client, suggesting any

14   predication or predisposition to commit any crime; and we think

15   it is imperative that we get the approval documentation and the

16   renewal documentations for the undercover operation because even

17   if they say nothing about predication for our client, we believe

18   that's exculpatory.  They didn't have any reason to believe that

19   our client was predisposed to violate the law.

20        With regard to Mr. Alvirez, I think Mr. Solomon made a

21   reference during his argument to a proffer to the Court that it

22   had in terms of understanding what the facts of this case are.

23   We are not aware of any such proffer so if there was a

24   proceeding under seal before the Court, if they do have

25   statements by Mr. Alvirez or if there is a record of that, we

1    think that we would be entitled to that.  They have said they

2    have produced all documents and that would certainly be a

3    statement anything they have from Mr. Alvirez.

4         If I could just make a couple points on the Bill of

5    Particulars, your Honor. The Government said, well, the

6    Defendants want the Court to compel the Government to commit to

7    even whether this is a single conspiracy or a multiple

8    conspiracy.  That's an issue later for the jury in a trial, but

9    we can't prepare a defense for trial without knowing if it is

10   even a multiple or a single conspiracy.

11        That has a fundamental impact on what the legal issues

12   are going to be and what the factual issues are going to be to

13   prepare a defense in this case.  We are not asking for evidence

14   of how -- you know, what their evidence is, how they are going

15   to prove their conspiracy, but what we want to know is what it

16   is that they are going to seek to prove.  When they stand in

17   front of a box and talk to the jury, it is going to be the

18   jury's decision whether or not they have satisfied their burden

19   of proof, but they are going to tell the jury here is what we

20   have proven and then they are going to go through their

21   evidence.

22        So the jury is not going to decide what they are going

23   to prove.  The jury is just going to decide whether.  What we

24   want to know is what are they going to prove and what we really

25   want is with regard to agreement, the same particulars they have

1    given with regard to overt acts.  Who was present when there was

2    an agreement?  On what dates did the supposed agreement occur?

3    Just the basic facts, the particulars of the dates of the

4    agreement of when the agreement formed.

5         That will tell us the theory of the conspiracy, the

6    contours of the conspiracy.  Is it a hub and spoke or is it a

7    chain or some hybrid?  If we just know the facts that have been

8    requested in the Motion for a Bill of Particulars, we will have

9    that answer and we need to have that answer to present you

10    before trial with what the legal issues are and with what the

11    factual issues are.  We can't really go to trial without knowing

12    that, and there is no reason not to get it out.

13         The last point I wanted to make has to do with their

14    reliance on discovery in lieu of a Bill of Particulars.  There

15    has been a lot said about the volume of discovery, tens of

16    thousands of recordings; and for our client, for Mr. Goncalves,

17    there are nine recordings that deals with Gabon.  Every single

18    one of them is with Mr. Bistrong.  There are two meetings of the

19    230 that keep getting referred to that relate to Gabon involving

20    our client and they are with Mr. Bistrong and with the other

21    Government agents.

22         They say there is 30,000 e-mails and there is tens of

23    thousands of other documents.  There is 56 that they have given

24    us and identified as relating to Mr. Goncalves.  To the extent

25    they are e-mails, they are all with Mr. Bistrong.  So the

1    discovery doesn't tell us anything except that our client had

2    communications with Mr. Bistrong and so, if their theory is that

3    this is a hub and spoke conspiracy and that's what it is, that

4    the agreement took place during these 50 or 60 communications

5    written and oral over time, we just need to know that.

6          The fact is that the discovery shows that this was

7    intentionally kept compartmentalized.  One of the meetings that

8    they gave us discovery with, October 6, 2009 meeting with our

9    client and Mr. Bistrong, they go out for dinner afterwards, they

10   have a social dinner with Mr. Bigelow, one of the other

11   Defendants, and nothing is said about Gabon and then our client

12   leaves.  And as soon as he leaves, Mr. Bistrong turns to

13   Mr. Bigelow and says:  The reason I didn't say anything about

14   Gabon is it is very important that we keep things

15   compartmentalized.

16         Well, that doesn't sound like a conspiracy to me.  That

17   sounds like he is intentionally keeping it separate and there is

18   other evidence with regard to the meetings with other Defendants

19   that we have seen where every communication -- the Clyde's

20   meeting that's referred to -- our client wasn't there.  Mr.

21   Bistrong took each one of the Defendants separately and talked

22   to them alone.

23         There is not only no evidence of communication, there

24   is evidence of a deliberate attempt, as Mr. Bistrong put it, to

25   compartmentalize the Defendants so they don't know about each

1    other.  In fact, our client had no idea Mr. Bigelow had anything

2    to do with this and had never met him until the day of their

3    arrests.  Those are the points that we would like to make. Thank

4    you, your Honor.

5              THE COURT:  Okay.

6              MR. CHESNOFF:  I think I only used three of my five.

7              THE COURT:  30 seconds.  It is getting late.

8              MR. CHESNOFF:  Your Honor, on the issue of the State

9    Department, I don't think it has come to the Court's attention

10   but should be part of the record that many of the Defendants

11   have now been denied permission to work in their businesses by

12   the State Department compared to the fact that Mr. Bistrong is

13   permitted to and the last time I checked the State Department

14   was part of the Executive Branch.

15             So I would again along the lines of not burying their

16   heads in the sand, I would recommend to the Government that they

17   find out whether Mr. Bistrong parlayed his cooperation into some

18   kind of special treatment by the State Department in light of

19   the manner in which the other Defendants were treated.

20             Your Honor, I think I polled some of the co-counsel.

21   The Court should know that our position is that we can't

22   conspire with Bistrong.  I know I come from the Ninth Circuit,

23   your Honor, but we all think that it is uniformly accepted that

24   that type of conspiracy cannot exist in the law.  It is not as

25   though Bistrong was a criminal at the time.  He was an agent at

1    the time.  Thank you.

2           THE COURT:   Government.

3           MR. LIPTON:  I will try to be as brief as possible,

4    your Honor. With regard to the arguments for Mr. Wier, I think

5    we have addressed them in our brief at page 43, and we will

6    leave it at that.  I don't think there is much more to be said.

7           The drug and alcohol records of Mr. Bistrong,

8    Individual One, we have provided -- the request has been for

9    psychological and psychiatric records related to Individual

10   One's drug and alcohol treatment --  (inaudible) -- a limitation

11   on the scope of their request or the time frame.

12          The Government has produced all the documents in its

13   position relating to his drug and alcohol treatment and it may

14   very well be the subject of a letter at the appropriate time

15   about more information relating to that, but it is clear that

16   defense counsel know that Individual One had a drug and alcohol

17   problem.  That's the very reason that the Government while he

18   was cooperating with the FBI had him take drug tests, and the

19   Government provided all of the results of those drug tests to

20   defense counsel which they have.

21          In the brief, we cite at page 57 the 79 cases that say

22   the Government is not obligated to go and get psychiatric

23   records or psychological records from his treating physician.

24   In fact, there is a privilege that goes to the treatment of

25   individuals and Individual One defense counsel hasn't cited any

1    authority that he can undue that privilege, but they certainly

2    have the impeachment information as to his problems and that

3    will certainly come out at trial.

4           Requests were made by Mr. Bigelow for the CIA

5    documents, and I think there is not a lot to be said about that.

6    We don't think that we are required to provide the

7    information -- to go to the State Department and provide any

8    documents to Mr. Bigelow when he knows about the very request

9    that he says he made to the State Department.  We don't think

10   there is any obligation, and there is no case that the defense

11   counsel cited that sort of rebuts that.

12          However, we have gone to the CIA as we have indicated,

13   and we have tried to find those documents.  Once we get those

14   documents, if we get those documents, we will produce whatever

15   is discoverable but we have made those inquiries; and I think

16   defense counsel indicated as such.  Your Honor, I think that is

17   addressed in more detail at pages 55 and 56 of our brief.

18          With regard to the search warrant affidavits, the

19   Government has taken the position that we do not want to stop or

20   prevent anybody from challenging a search warrant whose

21   residence or business has been searched.  So we have made -- and

22   made the Motion to unseal any search warrants for individuals

23   asking to challenge the search warrants that were for their

24   residence or for their business.  So that's not been

25   Government's intention and we have done that for everybody who

1    has asked for it.

2         Apparently Mr. Giordanella had not asked.  The first

3    that we learned about that is in his Motion.  He has asked for

4    the search warrant as to his former employer, and we will

5    provide that to him.  That's not a problem.

6         The additional request is for all of the Defendants'

7    search warrants and the Government has taken the position that

8    unless there is a basis for the Defendants to articulate why

9    they are able to challenge a search warrant in another location

10   in which they don't have an expectation of privacy, a reasonable

11   expectation of privacy, then we haven't taken the step of

12   unsealing that.

13        Defense counsel, a number of defense counsel has made a

14   request for search warrants.  We have provided them, but

15   unsealing all of them I think defense counsel might have

16   misrepresented what we had talked about during the break; but we

17   would object, your Honor, to just providing wholesale all the

18   search warrants to defense counsel, but anybody who wants to

19   challenge it specifically for their residence or their business,

20   we will make that available.

21        With regard to Individual One's handwritten notes that

22   Mr. Giordanella had indicated in his Motion, the Government has

23   not provided.  We have provided all of Mr. Bistrong's notes.

24   Everything in the Government's possession the Defendants have.

25   They have everything we have.

1          I think there were four specific requests with regard

2     to Mr. Giordanella and handwritten notes and we have told

3     defense counsel, we continue to tell defense counsel if there is

4     specific issues that you think -- specific discovery items or

5     specific issues about documents, we will be more than willing to

6     help and walk them through the discovery.  In this case, I think

7     four different meetings that were recorded were referenced in

8     which defense counsel indicated that they saw Individual One

9     taking notes and they weren't able to find the notes.

10         Well, if they would have come in and asked us, a couple

11    of those recordings it is clear no notes are being taken.  At

12    least one is very clear no notes are being taken.  The other one

13    it doesn't appear notes are being taken, and then we provided

14    the notes in discovery for the other two occasions so we can

15    certainly make Mr. Giordanella's counsel aware of where those

16    are in the discovery.

17         With regard to the tax records, I think we have already

18    addressed that, your Honor.  I am not going to go through that

19    again.

20         There was a couple of requests that were made today

21    that I don't believe the Government had received by way of

22    Motion and I think there was a reference to all promises to

23    Individual One that -- not to prosecute him in other

24    jurisdictions and we have certainly provided all of that

25    information.  If there is anything else that we have, we will;

1    but I believe we provided anything along the lines of any

2    promises, inducements and the like to Individual One to the

3    Defendants.

4         I think there was a request regarding documents with

5    regard to other individuals who Individual One did business

6    with.  I don't believe that's been a formal request.  I don't

7    remember receiving anything in the Motions about that.  The

8    defense counsel have all the conversations, every conversation

9    in which Mr. Bistrong has had, conversations with individuals

10   who are Defendants, who are non Defendants; and I think the rest

11   of that argument has been addressed in the Government's response

12   to the Bill of Particulars.

13        As to the request for unnamed codefendants, there was

14   an argument with regard to that.  I think that's also been

15   addressed in the Bill of Particulars portion of the argument.

16        The reference to Brady and that the Government has not

17   looked through the materials that is provided to defense counsel

18   and not identified whether it is Brady, we have looked through

19   all of the material.  We have identified where we think that

20   there is information that may be considered Brady or impeachment

21   information and made that available to defense counsel.  If

22   there is anything that we find as we go through the case more

23   that's specific to a certain Defendant, we will certainly

24   provide that to them.

25        But we, except for the search warrant documents, have

1    looked through all of our documents and we will look through the

2    search warrant documents as soon as the filter team review is

3    done with that.

4            THE COURT:  So the documents you have produced to the

5    defense, all the documents you have produced to the defense, you

6    have reviewed?

7            MR. LIPTON:  Correct, your Honor.

8            THE COURT:  And when you reviewed them, you were

9    looking to see in your judgment whether or not the document

10   contained information that you would be required to disclose

11   under Brady and Giglio, right?

12           MR. LIPTON:  Correct.  As well as recordings, as well

13   as the e-mails.  So, yes, through the course of the case, that's

14   been gone through and --

15           THE COURT:  Okay.

16           MR. LIPTON:  Mr. Morales' attorney addressed other

17   crimes evidence and without belaboring the point, your Honor,

18   the Government's brief at page 45 we address the issue of other

19   acts evidence; and I don't think defense counsel indicated, but

20   we clearly state in our Motion that we understand our

21   obligations under 404(b) information.  Part of the 404(b)

22   information is the search warrant documents that we haven't even

23   been able to look at.

24           Defense counsel all have that, but we I believe have

25   been reasonable and come up with a date of one month before

1     trial that we would turn over any 404(b) evidence.  We did cite

2     cases trying to say that we were reasonable in which the Court

3     has said a lot shorter time is appropriate and not unreasonable.

4     We have said in accordance with customary practice in this

5     District that we would turn over 404(b) evidence a month before

6     trial.  I think that goes with regard to all of the 404(b)

7     information, including  co-conspirator one that was in the

8     Alvirez information.

9          The alcohol consumption issue, I don't know if that was

10    addressed except for maybe a passing line in Mr. Morales'

11    Motion.  Obviously everything from that reception is on tape.

12    They know about it.  They know that alcohol was served.

13    Obviously Mr. Morales was drinking it.  He knows about that.  We

14    have provided information about the government paying for that

15    event and the bills that go to that so I believe they have all

16    the information to be fully informed about, and we have provided

17    everything that we have.

18         With regard to Mr. Alvirez's Plea Agreement, I don't

19    know if we have to address that too much further, your Honor. We

20    are not going to get into potential Government witnesses at this

21    point and at the appropriate time if and when there is a Plea

22    Agreement and if and when that individual becomes a Government

23    witness, we will certainly turn that over as we are required to

24    do.

25         THE COURT:  Very good.

1          MR. LIPTON:  With regard to the internal memos and the

2    on-site review, I think we have addressed that.  We have gone

3    through that with your Honor, and there is nothing more to add.

4          Mr. Goncalves talked about a couple of items that I

5    don't think his client moved on, but one was with regard to

6    predication and making sure those documents were turned over

7    and, again, I think that's been addressed in our earlier

8    argument about documents that we have reviewed for Brady to our

9    satisfaction.

10         The same applies to Mr. Alvirez's statement that was

11   addressed Mr. Goncalves' counsel.  And then the statements with

12   regard to Bill of Particulars, I don't want to belabor the

13   point, your Honor, but I don't believe that defense counsel is

14   entitled to the information he is requesting.  We have amply

15   addressed that in our prior argument so I won't say anything

16   more on that.

17         Unless your Honor has further questions from the

18   Government or requires any additional briefing on any of the

19   issues that we have addressed today or that are in the brief, we

20   will do that.

21         THE COURT:  Let me know what you decide to do on the

22   tax returns.

23         MR. LIPTON:  Absolutely.

24         THE COURT:  Mr. Barger cited you the Section 26 U.S.

25   Code.  You decide how you want to proceed, counsel, and bear in

1    mind what I said earlier.  There is a hard way and an easy way

2    to deal with this.  I think sooner or later those are going to

3    be obtained.  The only question is how.  So I will let you make

4    your own judgment call.

5         MR. LIPTON:  We understand, your Honor.  Enough said.

6         THE COURT:  Very good.  Now, with regard to the Motions

7    pending, I am going to grant the Motion to extend the

8    limitation, the page limitation so the Government can file its

9    Motion and not worry about that.

10        With regard to the speedy trial, excluding time under

11   the Speedy Trial Act, the Court will grant that Motion as well

12   for cause shown pursuant to Title 18 U.S. Code Section

13   3161(h)(7)(A).  The Court having considered all the factors

14   among others set forth in 3161(h)(7)(B)(2) finds that the ends

15   of justice would be served by tolling the Speedy Trial clock and

16   that those interests outweigh the interests of the public and

17   the Defendants.

18        The Court will also note that since the filing of the

19   Government's original Motion, the Grand Jury has returned a

20   Superseding Indictment charging all 22 Defendants together in a

21   single conspiracy.  The defense have indicated that they intend

22   to file substantial Motions challenging the Superseding

23   Indictment.  The Government proposed a method of grouping the

24   Defendants for trial.  Defense counsel have indicated that they

25   intend to file Motions related to the already voluminous

1    discovery the Government has provided in this case and several

2    defense counsel have withdrawn their opposition to the

3    Government's Motion.

4          So, in short, the Court finds pursuant to Section

5    3161(h)(7)(A) the case is so unusual and so complex because of

6    the number of Defendants, voluminous discovery, the wide range

7    and nature of the alleged conspiracy, the nature of the expected

8    evidence at trial, and the existence of novel questions of the

9    facts  or  the law that it is unreasonable to expect adequate

10   preparation for pretrial proceedings or trial within the time

11   limits established by the Act.

12         The Court will grant that Motion, and with regard to

13   these Motions, the Court will take them under advisement but

14   would like to set some deadlines for the next round.  There

15   seems to be a need to file some additional Motions here relating

16   to the entrapment defense, at least that's the impression I have

17   got.  I don't know if any one of the defense  counsel has been

18   he designated to speak with regard to the intentions of the

19   defense, but I gather there is an inclination to file Motions To

20   Dismiss the case on the grounds of entrapment.

21         Do I have a misimpression? If so, how long is it going

22   to take?

23         MR. ANDALMAN:  Your Honor, I can speak for

24   Mr. Goncalves.  Your Honor,  I think our position with regard to

25   additional Motions would be that until we -- as you know from

1   the arguments you heard today, the documents we are seeking in

2   the Motions To Compel and some of the information we are seeking

3   in the Bill of Particulars would be the basis for additional

4   Motions.  So until we know what the Court's ruling is on those

5   Motions and get --

6           THE COURT:  Maybe there is another way to put it.

7   Prior to ruling on these Motions, are there any other Motions

8   that you could file now?

9           MR. ANDALMAN:  Your Honor, not on our behalf.  Can I

10  make one factual point in response to Mr. Lipton's statement?

11          THE COURT:  No.  We are not here for that purpose.  Do

12  you have any other Motions you can file prior ruling on these

13  two Motions?

14          MR. ANDALMAN:  We don't.

15          THE COURT:  Okay.  Does anyone else? Does any other

16  defense counsel have any other Motions they intend to file prior

17  to learning about the Court's rulings on these two Motions?

18  Seeing no hands, I take it that no one intends to do that.  All

19  right.  Very good.

20          I am taking these under advisement.  I don't know when

21  I am going to rule.  I have, to say the least, lots of other

22  cases to work on, including a three-week trial next month.  So I

23  will endeavor to rule on it by the end of July, but I can't say

24  for certain.

25          I will set a Status Hearing in early August, or late

1    July I should say, late July.  We will see where we stand at

2    that point.  There may be other issues that arise in the

3    interim.  So that a look at the 29th of July, counsel, 3 o'clock

4    for a Status Hearing in the case.

5         MR. LIPTON:  Your Honor, I think a  couple of us are

6    out that week and, if there is no objection and it will not

7    burden the Court, can we do it following week? I guess that

8    would be the first week of August.

9         THE COURT:  Well, the first week of August is going to

10   be a problem so you just have to send those who are around.

11        MR. LIPTON:  Very well, your Honor.

12        THE COURT:  It is too hard to coordinate all these

13   calendars.  It is just too hard,  and people can have others

14   stand in, especially with summer vacation schedules being what

15   they are, but we have so many counsel here, it is almost

16   impossible really to have 100 percent.

17        MR. LEEPER:  What time did you say on the 29th?

18        THE COURT:  3:00.

19        MR. LIPTON:  Your Honor, this is just a status

20   conference in case we do have to send somebody in our stead, not

21   for substantive argument or anything like that?

22        THE COURT:  No, not for Motions arguments because

23   there aren't any other Motions pending out there.

24        MR. LIPTON:  Any follow up on the pending Motions I was

25   referring to.

1      THE COURT:  No.  I don't envision it for being follow

2  up arguments of any kind really.  Again, the defense counsel

3  have indicated today they don't intend to file any other Motions

4  between now and then so there is nothing to set a schedule for

5  you to respond to.  So I gather from what I am hearing that

6  until I rule on these Motions, they don't plan on filing any

7  other Motions so I will wait and see.  If I can rule by then, I

8  will try to.  I am not committing to doing that especially with

9  this trial that's about to unfold.

10      So I may or may not have the time get it done by then,

11  but I think it is probably worthwhile to have a status, a

12  control date, to work towards.  There could be other issues.

13  For all I know, other issues could arise and certainly some of

14  the issues that you have already raised I think the Government

15  perhaps in reflection might decide they can resolve the problems

16  in some other way.  So I will leave that to the Government to

17  decide how they wish to proceed.

18      MR. LIPTON:  On that point, your Honor, if there are

19  certain categories of documents that the Government resolves

20  with defense counsel, we will let the Court know.

21      THE COURT:  Yes.  Just work it out with them and then

22  send me a little notice of some kind that's copied to the

23  defense.

24      MR. CHESNOFF:  Thank you, your Honor.

25      THE COURT: Do you have anything else?

1          MR. CHESNOFF:  Just saying goodnight.

2          THE COURT:  Adios.

3          (Whereupon, at 6:55 p.m., the proceedings were

4     concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATE OF REPORTER

2

3          I, Patty A. Gels, certify that the foregoing is a

4     correct transcript from the record of proceedings in the

5     above-entitled matter.

6

7

8

9                                   _____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25